# DEPOSITION OF WENDELL DEAN VAN METER

## December 8, 2006

## Pages 1 through 103

## CONDENSED TRANSCRIPT AND CONCORDANCE
## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**



Blumberg No. 5114

DEFENDANT'S
EXHIBIT

A



Page 1

```
1        IN THE UNITED STATES DISTRICT COURT
2          FOR THE MIDDLE DISTRICT OF ALABAMA
3                   EASTERN DIVISION
4
5    WENDELL DEAN VAN METER,
     NEVA JANE VAN METER,
6
        Plaintiffs,
7
     Vs.              CIVIL ACTION NO.
8                     3:06-CV-583-DRB
     THE CITY OF LANETT,
9    etc., et al.,
10      Defendants.
11
12           * * * * * * * * * * * *
13
14      DEPOSITION OF WENDELL DEAN VAN METER,
15   taken pursuant to stipulation and agreement before
16   Lisa J. Nix, Registered Professional Reporter and
17   Commissioner for the State of Alabama at Large, in
18   the Law Offices of James Ingram and William Harris,
19   2005 South Broad Avenue, Lanett, Alabama on Friday,
20   December 8, 2006, commencing at approximately
21   8:50 a.m. CST.
22
23           * * * * * * * * * * * *
```

Page 2

```
1              APPEARANCES
2
3    FOR THE PLAINTIFF:
4    Mr. James Ingram
     Mr. William Harris
5    Attorneys at Law
     2005 South Broad Avenue
6    Post Office Box 1175
     Lanett, AL 36863
7
8    FOR THE DEFENDANT:
9    Mr. T. Randall Lyons
     WEBSTER, HENRY, LYONS & WHITE
10   Attorneys at Law
     418 Scott Street
11   Montgomery, Alabama
12
13           * * * * * * * * * * * *
14
15
16
         EXAMINATION INDEX
17
18   WENDELL DEAN VAN METER
        BY MR. LYONS . . . . . . . . . . .   5
19      BY MR. INGRAM . . . . . . . . .    81
        BY MR. LYONS . . . . . . . . . .   92
20      BY MR. INGRAM . . . . . . . . .    99
        BY MR. LYONS . . . . . . . . . . . 101
21
22
23
```

Page 3

```
1              EXHIBIT INDEX
2                   MAR
     DEFENDANT'S EXHIBIT
3
     1   12/7/05 notice of appeal to Joel Holley    36
4        from Wendell Dean Van Meter
5    2   12/7/05 Decision Upon Disciplinary/Due     37
         Process Hearing
6
7    3   12/2/05 letter to Lt. Dean VanMeter from   43
         Joel Holley re: Disciplinary
8        Action/Police Chief R. Docimo's
         Recommendation
9    4   Minutes of council meeting held            50
         12/19/05; Minutes of council meeting
10       held 12/14/05
11
12
13
14
15           * * * * * * * * * * * *
16
17            STIPULATION
18      It is hereby stipulated and agreed by and
19   between counsel representing the parties that the
20   deposition of WENDELL DEAN VAN METER is taken
21   pursuant to the Federal Rules of Civil Procedure
22   and that said deposition may be taken before Lisa
23   J. Nix, Registered Professional Reporter and
```

Page 4

```
1    Commissioner for the State of Alabama at Large, that
2    without the formality of a commission, that
3    objections to questions other than objections as to
4    the form of the question need not be made at this
5    time but may be reserved for a ruling at such time
6    as the said deposition may be offered in evidence
7    or used for any other purpose by either party
8    provided for by the Statute.
9        It is further stipulated and agreed by and
10   between counsel representing the parties in this
11   case that the filing of said deposition is hereby
12   waived and may be introduced at the trial of this
13   case or used in any other manner by either party
14   hereto provided for by the Statute regardless of
15   the waiving of the filing of the same.
16       It is further stipulated and agreed by and
17   between the parties hereto and the witness that the
18   signature of the witness to this deposition is
19   hereby waived.
20
21           * * * * * * * * * * * *
22
23
```

Page 5

1      WENDELL DEAN VAN METER
2          The witness, after having first been duly
3    sworn to speak the truth, the whole truth and
4    nothing but the truth testified as follows:
5                    EXAMINATION
6    BY MR. LYONS:
7    Q.   Could I get you to state your full name for
8         the record, please, sir.
9    A.   Wendell Dean Van Meter.
10   Q.   My name is Randy Lyons, and I represent the
11        City of Lanett in a lawsuit that you and
12        your wife have filed.
13           I'm here to take your deposition.  I'm
14        going to ask you a series of questions.
15        And when I'm asking you these questions, if
16        I ask you anything you don't understand,
17        please stop me and tell me and I'll
18        rephrase it or re-ask it to where you and
19        I understand each other.  Okay?
20   A.   Yes, sir.
21   Q.   And if you answer my question, I'm going to
22        assume you understood it.
23   A.   Yes, sir.

Page 6

1    Q.   Have you given a deposition before today?
2    A.   Yes, sir.  Not on this case.
3    Q.   No.  I mean, in other matters.
4    A.   Yes, sir.
5    Q.   How many different depositions do you think
6         you've given?
7    A.   Lord, I don't -- I can't remember.  27
8         years, I don't ...
9    Q.   All of them having to do with being a law
10        enforcement officer?
11   A.   Yes, sir.
12   Q.   Okay.  Have you ever been sued in your
13        individual capacity or all as just a police
14        officer?
15   A.   As a police officer.
16   Q.   Okay.  So you, yourself, personally have
17        never been sued by anyone?
18   A.   No, sir.
19   Q.   Have you ever sued anyone else other than
20        this lawsuit that we're here about?
21   A.   Yes, sir.
22   Q.   What other kind of lawsuit have you had?
23   A.   Over a wrecked vehicle.

Page 7

1    Q.   Were you injured in an automobile accident
2         or --
3    A.   No, sir, just the vehicle and damages.
4    Q.   Any other case you've ever been a plaintiff
5         in other than that one and this one?
6    A.   No, sir.
7    Q.   So you just sued over property damage?
8    A.   Yes, sir.
9    Q.   I'm going to ask you a series of questions
10        I ask everybody, and I don't mean to offend
11        you if I ask -- by these questions.
12           One of them is, have you ever been
13        arrested for anything?
14   A.   No, sir.
15   Q.   I didn't think so.
16   A.   Well, I've been arrested, but not
17        convicted.
18   Q.   Okay.  What were you arrested for?
19   A.   Verbal harassment.
20   Q.   But you were not convicted of that?
21   A.   No, sir.
22   Q.   And you've never been convicted of any
23        crime?

Page 8

1    A.   No, sir.  A speeding ticket.
2    Q.   Well, I meant other -- I should have
3         clarified it that way, but other than a
4         speeding ticket.
5    A.   No, sir.
6    Q.   Have you ever filed for disability?
7    A.   No, sir.
8    Q.   Have you ever filed bankruptcy?
9    A.   No, sir.
10   Q.   Ever been injured on the job?
11   A.   Yes, sir.
12   Q.   How were you injured on the job?
13   A.   Let's see.  The first time I got my nose
14        broke in a fight with the City.  Well, I
15        wasn't fighting with the City.  I was
16        representing the City.
17   Q.   You were a police officer for the City?
18   A.   Right.  Correct.
19   Q.   All right.  Broken nose.  What else?  How
20        else have you been injured on the job?
21   A.   Cracked ribs.
22   Q.   Okay.
23   A.   Strained back.

Page 9

1  Q. All right.
2  A. I think that's about it.
3       MR. HARRIS: Did you get hurt when
4       you were in the wreck with the
5       cow?
6       THE WITNESS: No, sir.
7  Q. What's your present address, please, sir?
8  A. 1735 35th Avenue Southwest, Lanett, Alabama
9     36863.
10 Q. How long have you lived at that address?
11 A. 32 years.
12 Q. Who lives there with you, please, sir?
13 A. My wife and my granddaughter.
14 Q. And what's your wife's name?
15 A. Neva Jane Van Meter.
16 Q. And how long have y'all been married?
17 A. 32 years.
18 Q. What's your date of birth?
19 A. March 10th, 1956.
20 Q. Your social security number?
21 A. 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.
22 Q. Do you have an Alabama driver's license?
23 A. Yes, sir.

Page 10

1  Q. What's its number?
2  A. I haven't a clue.
3  Q. Do you have it with you?
4  A. Yes, sir.
5  Q. 3944129, and --
6  A. Commercial.
7  Q. You have a commercial license?
8  A. Yes, sir.
9  Q. I see it at the top. Okay.
10    What kind of commercial vehicles are
11    you licensed to drive?
12 A. Everything but double and triple trailers
13    and HAZMAT.
14 Q. How long have you had a CDL?
15 A. Ten or 12 years.
16 Q. And you have a restriction for corrective
17    lenses?
18 A. Yes, sir.
19 Q. Has your license ever been suspended or
20    revoked for anything?
21 A. No, sir.
22 Q. Have you ever driven over-the-road trucks?
23 A. On drug details, yes, sir. I mean, I

Page 11

1       borrow a truck for undercover details and
2       stuff like that.
3  Q. Okay. What's your educational background?
4  A. High school.
5  Q. What year did you graduate?
6  A. '73.
7  Q. Any military?
8  A. No, sir.
9  Q. No education after high school?
10 A. Not other than schools the City sent me to.
11 Q. Police school, police academy, things like
12    that?
13 A. Police academy, some things like that.
14 Q. And you told me earlier before we started
15    the deposition, but you worked for the City
16    of Lanett for 27 years?
17 A. I started in 1978. I left in '80. Went to
18    work with the sheriff's department until
19    '82. Come back to the City.
20    '85, I went to Diversified Products in
21    Opelika. '88, I come back to the City.
22    Been there ever since.
23 Q. Let me make sure I got it right. 1978, you

Page 12

1       started with the City of Lanett with the
2       police department?
3  A. Yes, sir.
4  Q. And were you just --
5  A. Patrolman.
6  Q. Patrolman. Okay. And then you were there
7       until 1980?
8  A. Yes, sir.
9  Q. And in '80 to '82, you left and went to the
10      sheriff's department to be a deputy?
11 A. Chambers County. (Nods head up and down.)
12 Q. Okay. And then you left there in 1982, and
13      you worked until '85 at Diversified
14      Products?
15 A. No, sir.
16 Q. Oh, I'm sorry.
17 A. I come back to Lanett.
18 Q. Came back to Lanett?
19 A. Yes, sir.
20 Q. I knew I would get that wrong. All
21      right. To be a patrolman again?
22 A. Well, I handled a K-9 unit and I worked
23      investigation.

Deposition of Wendell Dean Van Meter                              December 8, 2006

Page 13

1    Q.  And you were there from '82 to '85, and
2         then you went to DP?
3    A.  Correct.
4    Q.  How long were you at Diversified Products?
5    A.  About three years, two and a half, three
6         years.  I come back to the City in '88.
7    Q.  And from 1988 until your termination, you
8         were with the City of Lanett?
9    A.  Correct.
10   Q.  And your position when you left the City
11        was lieutenant?
12   A.  Yes, sir.
13   Q.  Is that the highest rank you had ever
14        achieved with the City?
15   A.  Yes, sir.
16   Q.  While you were employed with the City of
17        Lanett, were you ever -- did you ever
18        receive any disciplinary action?
19   A.  Yes, sir.
20   Q.  Can you remember what those were for?
21   A.  Let's see.  Under Jones, when Jones was
22        chief, I let Mr. Lanier's daughter out of
23        jail.  She was 18 years old, charged with a

Page 14

1         DUI.  I let them bond her out instead of
2         making her stay the mandatory hours.
3    Q.  Okay.  And what was the discipline for
4         that?
5    A.  Eight days without pay.
6    Q.  Okay.  What else?
7    A.  Let's see.  Jimmy Smith was chief.  I
8         wrecked the patrol car.
9    Q.  What was the discipline for that?
10   A.  Two days without pay and walk a foot beat
11        for 30 days.
12   Q.  Okay.
13   A.  That's when I got a DUI on a foot beat.
14   Q.  You arrested somebody for DUI on a foot
15        beat?
16   A.  (Witness nods head up and down.)
17   Q.  All right.  What else?  What other
18        disciplinary action have you had?
19   A.  That's about all I can think of offhand.
20        I'm sure there's some more in there,
21        but ...
22   Q.  Okay.  Jimmy Smith, when was he chief?  Do
23        you remember?

Page 15

1    A.  Dorman retired in '80.  Jimmy Smith come in
2         in '84.
3    Q.  Okay.  And I remember Jimmy Jones, but I
4         just didn't ...
5    A.  Let's see.  I've been through seven chiefs
6         and eight mayors.
7    Q.  Well, what we are here about today is your
8         lawsuit about your termination from the
9         City of Lanett, and I understand that stems
10        from you having possession of some
11        personnel files; is that correct?
12   A.  Yes, sir.
13   Q.  Okay.  Tell me how it was that you came to
14        be in possession of these personnel files.
15   A.  I was on duty.  I rode through the parking
16        lot of the city hall complex.  Fire
17        department personnel were throwing files --
18        pulling files from -- I call it a Banker
19        Box and throwing them in 55-gallon drums.
20        They were looking at them, going
21        through them, and I asked them what they
22        was doing.  They told me they was throwing
23        away old files.  They was cleaning out an

Page 16

1         office for somebody that got promoted, city
2         hall.
3         So I said, well, I wonder if my old
4         file is in there.  They said they didn't
5         know.  I climbed up there and started
6         looking through them.  And then one of the
7         firemen come up -- fire personnel come up
8         and said, Dean, I think we done throwed
9         your old one away.
10        See, I was looking for my old one from
11        '78 where Pete McCoy swore me in, the
12        original -- where he swore me in
13        originally.
14        Well, then I saw some old friends'
15        files and I said, well, I wonder if they
16        would like to have some keepsake.  They're
17        throwing them away.  I'll get them.  So I
18        got several files, put them in my truck.
19        The firemen was looking at them.
20        The little Mitchum girl ...
21             MR. INGRAM:  Tessa
22   A.  Tessa.  There was an elderly gentleman that
23        had been missing for several years.  She

Deposition of Wendell Dean Van Meter                                    December 8, 2006

Page 17

1    saw his file, O. D. Gore. I never knew
2    O. D. Gore worked for the City of Lanett.
3    She said he worked for the street
4    department.
5         Anyway, I got several of the old
6    friends' files and I put them in my truck.
7    Q.  Okay. Were they burning the files while
8    you were out there?
9    A.  They was throwing them in a barrel. That's
10   all I know. And they made the comment they
11   was going to carry the rest of them what
12   they couldn't get in the barrels to an old
13   abandoned house that they was going to burn
14   that night, and they was going to scatter
15   them around on the floor.
16   Q.  You just saw them putting them in barrels?
17   You didn't see them burn anything?
18   A.  I didn't see a fire.
19   Q.  Okay.
20   A.  And according to the fire personnel, they
21   was just throwing them away.
22   Q.  Whose files did you get?
23   A.  Let's see. Peggy Hester's. Greg Ray's.

Page 18

1    Bryan Poe's. Who else? Ricky Price's.
2    Joel. I got Joel's.
3    Q.  Joel Holley?
4    A.  Yes, sir.
5         I can't remember who all. I know
6    those.
7    Q.  There were others, though, too?
8    A.  I think so, yes, sir.
9    Q.  What did you do -- Okay. So you talked to
10   the fire personnel, and they said they were
11   throwing them away or that they were going
12   to put them in these barrels or take them
13   to this house to have a burn?
14   A.  Uh-huh. (Positive response.)
15   Q.  You understood at least they were going to
16   burn the ones they were taking out to the
17   house?
18   A.  That's what they told me.
19   Q.  That's what they told you. Okay.
20   A.  Whether they did or not, I don't know.
21   Q.  That's just what you understood they said?
22   A.  Correct.
23   Q.  Okay. Did anybody with the fire department

Page 19

1    say anything to you about taking the files?
2    A.  No, sir.
3    Q.  But you did not find your own personal
4    file?
5    A.  No, sir.
6    Q.  What did you do with the files that you did
7    take?
8    A.  Well, a couple of days later, I ran into
9    Bryan Poe. He works for the City of
10   Valley, the police department, and I give
11   him his.
12        And then about a week later -- Well, I
13   called Ricky Price. He said that when he
14   was in the area -- he was up toward
15   Birmingham. But he said when he was in the
16   area, he'd swing by and pick it up. He
17   said he'd like to have his old file. I
18   said all right.
19        I tried to get ahold of Greg Ray. He's
20   in -- was up toward Huntsville the last
21   time I knew.
22        Peggy Hester, she had got a divorce,
23   moved to Florida and remarried, so I

Page 20

1    couldn't find her.
2         And Joel, it was October or November.
3    Anyway, they was going through budgets, and
4    I didn't see him. So I said, well, when I
5    see him, I'll give him his old file.
6         Well, after I give Bryan his, about a
7    week or so later, Bryan calls me on the
8    phone. And he says, they were supposed to
9    have taken some stuff out of my file. I
10   says, I don't know what you're talking
11   about. Don't have a clue. I didn't open
12   them up. I just saw the names on them.
13   Q.  You never looked through any of these
14   files?
15   A.  No, I never did go through any of them.
16   Q.  Okay.
17   A.  And he was fussing about there was supposed
18   to have been some stuff taken out and he
19   was going to contact his attorney and
20   nah-nah, nah-nah. And next thing you know,
21   they're calling me and asking me about it.
22   Q.  During the time that you obtained -- other
23   than talking to the firemen or the fire

Page 21

1      personnel about what they were doing and
2      obtaining the file, you never talked with
3      anybody else with the City about taking any
4      of the files?
5  A.  Huh-uh. (Negative response.)  They rode in
6      my truck back and forth to work every day,
7      but I didn't say anything to anybody.
8  Q.  And you didn't say anything to them about
9      anybody -- about getting them originally?
10      You didn't ask anybody if it was okay?
11  A.  There wasn't nobody out there but the
12      firemen, and they said they was throwing
13      them away, so ...
14  Q.  My question is, you didn't ask anybody if
15      you could take them?
16  A.  No, I didn't go to city hall and ask
17      anybody.  I mean, the firemen were out
18      there throwing them away.
19      That's like when they torn down the old
20      police department complex and all that, I
21      got some brick from it.  I mean, I didn't
22      go and ask anybody.  I got the brick, dated
23      them, put them in my barn.

Page 22

1  Q.  Okay.
2  A.  I mean, keepsakes.
3  Q.  Well, but you'd agree that brick is a
4      little bit different than personnel files?
5  A.  Well, it's according to how the City
6      would -- if they was throwing them away, I
7      was getting them.
8  Q.  If it's got information in a file that you
9      wouldn't have been privy to otherwise, then
10      that's different than getting a piece of
11      brick that --
12  A.  I don't know what was in them.  I didn't
13      open them up.
14  Q.  Okay.  We'll just move on.  So Bryan Poe
15      called you, and he was ticked off?
16  A.  Yes, sir.
17  Q.  And you didn't know what he was talking
18      about?
19  A.  I didn't have a clue.
20  Q.  And Mr. Poe had had litigation against the
21      City years ago?
22  A.  Years ago, yes, sir.
23  Q.  I had the pleasure of being involved in

Page 23

1      that one, too.
2      And so he called you and said they were
3      supposed to have taken stuff out of his
4      file that was still in there or whatever?
5  A.  That's what he was telling me.  I don't
6      know.
7  Q.  So then the next thing you know, you're
8      called in to where?
9  A.  Well, I wasn't called in.
10  Q.  Okay.
11  A.  I get a phone call at home that I'm being
12      investigated for taking personnel files.
13  Q.  Who called you?
14  A.  Eddie Chandler.
15  Q.  And who is he?
16      MR. INGRAM:  Former councilman.
17  A.  Yeah, former councilman.
18      MR. HARRIS:  He's a local TV
19      personality.
20  Q.  Is he the one that runs that -- the TV show
21      that's always talking about everything
22      going on around --
23  A.  (Witness nods head up and down.)

Page 24

1  Q.  I can't think of the name of it right now.
2  A.  Rumor Has It.
3  Q.  Rumor Has It.  That's it.
4      Mr. Chandler called you at home and
5      told you what, now?
6  A.  I was being investigated for taking
7      personnel files.
8  Q.  Did he tell you how he knew that?
9  A.  No, sir.  He told me who was investigating
10      it.  Teddy Morris.
11  Q.  He told you that Teddy Morris was
12      investigating it?
13  A.  Correct.
14  Q.  Anything else he told you?
15  A.  No, sir.
16  Q.  What's the next thing that you heard or --
17  A.  The next thing I done when I hung up the
18      phone, I called Docimo -- Chief Docimo at
19      home.  It was on a Sunday afternoon.
20  Q.  And what occurred in that conversation?
21  A.  I asked him about it.
22  Q.  What did he say?
23  A.  He couldn't talk about it.

Page 29

1   gave? You're talking about the statement
2   you gave to --
3   A. I've got them at the house. I don't have
4      them with me.
5   Q. I'm not asking for it right now. But
6      you've got a copy of the statement you gave
7      to Teddy Morris?
8   A. Yes, sir.
9   Q. Have you got any other notes that you've
10     kept as to what happened and how it
11     occurred and all that?
12  A. Yes, sir.
13  Q. If you can make those available to your
14     lawyer so that we could get a copy of
15     those, that would be great.
16  A. (Witness nods head up and down.)
17  Q. I know that you were -- that the hearings
18     took place around the first part to the
19     middle part of December of 2005.
20  A. Yes, sir.
21  Q. So I guess my question is, is when you came
22     in to turn in the files, was it already
23     December or was it November or --

Page 30

1   A. I'm thinking it was the latter part of
2      November.
3   Q. That's what I figured.
4   A. That's what I'm thinking. Because
5      immediately, they put me on administrative
6      leave.
7   Q. Okay. Let's go back to you meeting Joel
8      Holley at his office at city hall. You
9      gave him the files, and then what happens?
10  A. He said, you know this is City property? I
11     said, they was throwing them away. He
12     said, it's City property. I said, Joel,
13     they was throwing them away. How many
14     search warrants have I gotten from you over
15     the years by going through a trash can and
16     getting probable cause to get in a house?
17     You've given me search warrants on that
18     before.
19  Q. Okay. And what else did --
20  A. He said that the mayor and the council were
21     upset about it.
22  Q. Okay.
23  A. And then later, I'm told by several

Page 31

1   officers -- Tracy Bandy and Tifton Dobbs --
2   that the mayor wasn't going to help me
3   because I didn't help him in the election.
4   I didn't support him in the election.
5   Q. Let's go back, though, to when you were
6      talking to Joel Holley. Is there anything
7      else that occurred in that meeting other
8      than what you've told me about?
9   A. Not that I remember.
10  Q. You told me that at some point, you were
11     put on administrative leave. When was that
12     in relation to your meeting with
13     Mr. Holley?
14  A. Let's see. It was on a Monday. I'm not
15     sure when my next scheduled workday was.
16     We worked four on and four off. But when I
17     come back in --
18        It was November the 8th.
19  Q. November the 8th?
20  A. Yes, sir, that's what I was put on
21     administrative leave.
22        THE WITNESS: Have we got another
23     copy of that?

Page 32

1         MR. HARRIS: He's got a copy of
2      that.
3   Q. When you were put on administrative leave,
4      was that before or after you had given the
5      files to Joel Holley, this letter?
6   A. I had done give the files to Joel.
7   Q. Okay. So it would have been -- so November
8      8th would have been after you met with Joel
9      Holley that Monday morning?
10  A. Yes, sir.
11  Q. Okay. I just want to make sure. All
12     right.
13        After you talked with Joel Holley and
14     then you were placed on administrative
15     leave, did you -- well, between talking to
16     Joel Holley and being placed on
17     administrative leave, do you remember
18     speaking to anyone else at the City about
19     this situation?
20  A. I think it was about a week later when
21     Teddy called and wanted me to come in and
22     give a statement.
23  Q. Okay. And you went and did that?

Page 33

1  A.  Yes, sir.
2  Q.  All right.  What's the next thing that you
3     did as far as ..
4  A.  Waited on Docimo to call me in and tell me
5     the outcome of the investigation.
6  Q.  Do you remember when that was?
7  A.  I'm not sure of the date.
8  Q.  Do you remember how long you were on
9     administrative leave before that?
10  A.  About two weeks, about two or so weeks,
11     something like that.
12  Q.  Tell me what happened in that meeting
13     between you and Chief Docimo.
14  A.  He called me in and told me that his
15     recommendation was termination and I could
16     file an appeal to the city manager.  I told
17     him I wanted to go ahead and file the
18     appeal.  I shook his hand and walked out.
19  Q.  Okay.  And so, then, you could appeal.  And
20     who did you appeal to first?  The city
21     manager?
22  A.  City manager, yes, sir.
23  Q.  And did you have -- Did you have a

Page 34

1     hearing -- a meeting with Joel Holley or a
2     hearing, or how did that occur?
3  A.  We had a hearing with Joel.
4  Q.  Okay.  And who was present at that hearing?
5  A.  Both my attorneys and Joel and Jennie
6     Gunnells.
7        (Brief interruption.)
8  Q.  And what occurred in that hearing?
9  A.  Told the facts of what I've done told you.
10     He said that he would make a decision -- he
11     had, what?  Three days to make it, but he
12     said he'd have me an answer that day.
13  Q.  And according to the document I have, it
14     shows that this meeting occurred -- or
15     hearing occurred on Wednesday, December 7th
16     of 2005.  Does that sound about right to
17     you?
18  A.  Sounds about right, yes, sir.
19  Q.  And Mr. Holley told you and your attorneys
20     that he would try to give you a decision
21     within a 24-hour period --
22  A.  Correct.
23  Q.  -- although he had three days, and then you

Page 35

1     had five working days to appeal, correct?
2  A.  Correct.
3  Q.  Prior to that hearing on December 7th, had
4     you spoken with any city council member
5     about this incident?
6  A.  I'm not sure if I had or not.
7  Q.  The only reason I asked is in this
8     document, it says that you told them that
9     you had spoken with Mike Yarbrough.
10  A.  I think I did mention it to him, and he --
11     he wouldn't comment on it.
12  Q.  Okay.  And you also stated that Lucille
13     McCullars had called you after your
14     December meeting and asked if you got fired
15     at the meeting.  That was something you
16     said in the hearing.
17        Is the December 2nd meeting the one you
18     had with Chief Docimo?
19  A.  I'm not sure.
20        MR. INGRAM:  Randy, what document
21        are you reading from?
22        MR. LYONS:  I am reading some
23        notes from the City of Lanett

Page 36

1        Dean Van Meter hearing,
2        Wednesday, December 7, 2005.
3        (Defendant's Exhibit 1 was marked
4        for identification.)
5  Q.  Let me show you what we've marked as
6     Defendant's Exhibit Number 1.
7        MR. HARRIS:  Okay.  We've got
8        that.
9  Q.  This is a document that's dated December
10     the 7th and signed by you, correct?
11  A.  Correct.
12  Q.  And this is a notice of appeal, and it's
13     addressed to Joel Holley, correct?
14  A.  Correct.
15  Q.  And is this a notice of appeal from his
16     decision or --
17  A.  It's a notice of appeal from his decision,
18     but I let him know so he could notify the
19     mayor and council that I wished to appeal
20     it to them.
21  Q.  All right.
22  A.  Which, I mean, his decision, he said I was
23     terminated effective immediately.

Deposition of Wendell Dean Van Meter                                    December 8, 2006

Page 37

1  Q.  Okay. And that's what I was about to ask
2      you. There's another document ...
3          (Defendant's Exhibit 2 was marked
4          for identification.)
5  Q.  These documents have highlighting on them
6      and some of them are underlined, but that
7      doesn't have any significance to anything.
8          I'll just show you Defendant's Exhibit
9      Number 2. I'm sorry. I'll just show it to
10     your lawyer.
11         MR. HARRIS:  I think that's what
12             you're looking at in front of
13             you, Dean.
14 Q.  It's the same thing. It's just showing
15     Joel Holley's decision.
16 A.  Yes, sir.
17 Q.  And that was to uphold the chief's
18     recommendation to terminate you effective
19     immediately, correct, and that's dated
20     December 7th of '05?
21 A.  Right.
22 Q.  As far as this notice, there's a
23     certificate of service that you and your

Page 38

1      attorneys got that. You would admit you
2      got this decision, correct?
3  A.  Correct. Don't agree with it, but I got
4      it.
5  Q.  If you agree with it, we wouldn't be here,
6      would we?
7  A.  Well, I mean, he terminated me without my
8      due process with the mayor and council.
9  Q.  Well –
10 A.  Do you see what I'm saying?
11 Q.  I guess what you're saying -- and you
12     correct me if I'm wrong. You're saying
13     because he said you were terminated
14     effective immediately, that that was a
15     decision that, then, the mayor and council
16     couldn't overturn?
17 A.  They could overturn it, but he's supposed
18     to make recommendations. And then I've got
19     an appeal process that -- and if I don't
20     use my appeals, then that would come into
21     effect. But until I use -- when I use my
22     appeal process, then he's done made the
23     decision and influenced the mayor and

Page 39

1      council.
2  Q.  Well, what's the difference in him saying
3      this is what it is or this is what my
4      recommendation is? I mean, that's --
5  A.  Because that's not a recommendation. That
6      says I was terminated, period.
7  Q.  Well, he as the city manager has said that
8      you're terminated, correct?
9  A.  Yes, sir.
10 Q.  And you're saying that what he should have
11     done is said my recommendation is that the
12     chief's recommendation should be accepted
13     by the council --
14 A.  Correct. Recommendation, not --
15 Q.  -- and that he recommends you to be
16     terminated effective immediately?
17 A.  He didn't recommend.
18 Q.  No. I'm saying, that's what you're
19     saying -- you're saying that's what he
20     should have done?
21 A.  That's what they've always done in the
22     past, made recommendations.
23 Q.  And that he should have made a

Page 40

1      recommendation --
2  A.  And then if the individual doesn't file an
3      appeal to the mayor and council, then the
4      city manager's recommendation would go into
5      effect as termination.
6  Q.  Okay. And so --
7  A.  I was denied due process right there.
8  Q.  Well, you had a hearing with the mayor --
9  A.  I was already terminated.
10 Q.  Well, you agreed -- I mean, you agreed with
11     me a moment ago, though, that the mayor and
12     council could have overturned the city
13     manager's decision, correct?
14 A.  But I was already terminated.
15 Q.  Well, if it's an appeal, then that means
16     that you can appeal that decision, correct?
17 A.  But it should have been a recommendation,
18     not terminated effective immediately.
19 Q.  I understand what you're saying.
20 A.  I mean, I'm told I'm terminated. Now,
21     you've got five days --
22 Q.  To appeal.
23 A.  -- to appeal.

Deposition of Wendell Dean Van Meter                          December 8, 2006

Page 45

1  A. Correct.
2  Q. Okay. And then you had a hearing then
3     after December 7th, it appears, on December
4     the 14th with the city council -- a
5     special-called city council meeting; is
6     that correct?
7  A. Correct.
8  Q. And prior to December 14th and after
9     December 7th, did you have any other
10    meetings, contact or any involvement with
11    the City of Lanett or anybody with the City
12    of Lanett regarding this incident?
13 A. No, sir.
14 Q. Tell me what occurred in the city council
15    meeting for December the 14th of 2005.
16 A. I think it was six o'clock in the evening
17    when we met.
18 Q. 5:30. Okay. Whatever.
19 A. 5:30?
20 Q. Yes, sir.
21 A. I'm sorry.
22 Q. That's okay.
23 A. Met in the council chamber. I think Judge

Page 46

1     Calvin Milford was the mediator.
2  Q. Okay.
3  A. Just told them what happened, what I've
4     told you.
5  Q. Didn't tell any different than what you've
6     told me today?
7  A. No, sir.
8  Q. And the whole council was present?
9  A. Yes, sir.
10 Q. Did they take a vote with you present?
11 A. Not at that time, no, sir.
12 Q. What else occurred other than you telling
13    your story as far as what happened? Did
14    the City put on any testimony?
15 A. My attorneys called Jennie Gunnells.
16 Q. Okay. Jennie Gunnells was called.
17 A. Personnel.
18 Q. Okay. What was she asked to talk about?
19 A. What policy the City had on destroying
20    personnel files.
21 Q. Okay.
22 A. She said they didn't have one. William
23    Harris asked Ms. Gunnells if she had ever

Page 47

1     seen the State regulations on destroying
2     personnel files. She said she hadn't.
3  Q. Okay.
4  A. Joel at one point made a comment to the
5     mayor and council to either back him and
6     the department head or they didn't need
7     them.
8        Without looking over it, I --
9        THE WITNESS: We haven't got ours
10          typed up yet, have we?
11       MR. INGRAM: Randy, I've got a
12          transcript of that.
13       MR. LYONS: Do you?
14       MR. INGRAM: I'll make it
15          available to you.
16 Q. I don't have one either. That's why I'm
17    asking what you remember.
18 A. Well, I'm trying to remember everything.
19       MR. INGRAM: We had a court
20          reporter present.
21 Q. Okay. How long did that hearing last?
22 A. About two hours, an hour or two.
23 Q. One to two hours?

Page 48

1  A. Yes, sir.
2  Q. And what was -- When you left that hearing
3     at 6:30, 7:30, whatever time it was, what
4     was -- did you have an outcome at that
5     point?
6  A. No, sir.
7  Q. Okay.
8        THE WITNESS: Did we?
9        MR. INGRAM: You had the vote.
10       THE WITNESS: Well, I thought they
11          come back later --
12       MR. HARRIS: I thought everybody
13          came back.
14       MR. INGRAM: That's right. A day
15          later.
16       MR. HARRIS: They announced it, I
17          think, at the next regularly-
18          scheduled council meeting.
19       MR. LYONS: Because of the
20          sunshine law?
21       MR. HARRIS: Right.
22 Q. And the next council meeting was, what?
23    The next day?

Deposition of Wendell Dean Van Meter                                December 8, 2006

Page 49

1    A.   I'm not sure.  Somewhere along in there,
2         yes, sir.  It couldn't have been the next
3         day because it was on Monday.  Normal
4         council meeting is on Mondays.  It was
5         close to a week.
6              MR. INGRAM:  Yeah, close to a
7         week.
8    Q.   Were you present at the regularly-scheduled
9         council meeting?
10   A.   Yes, sir.
11   Q.   What occurred at that meeting?
12   A.   They voted.
13   Q.   Anything else other than a vote occur?
14   A.   I don't know.  I got up and left.
15   Q.   No.  I mean, prior to your vote -- prior to
16        the vote, did anything else occur about the
17        incident with you?
18   A.   Not that I know of.
19             MR. HARRIS:  (Shakes head from
20        side to side.)
21   Q.   It appears that that was a council
22        meeting ...
23             MR. LYONS:  Let's mark this as

Page 50

1              Defendant's 4.
2              (Defendant's Exhibit 4 was marked
3         for identification.)
4    Q.   The council meeting was December the 19th.
5         Have you seen these minutes?  And it's
6         about -- The part about you is down here.
7    A.   No, sir, I haven't seen this.
8    Q.   It just says something to the -- that they
9         brought up the matter of what was discussed
10        at the December 14th special session that
11        was taken under advisement and that they --
12        about Lt. Dean Van Meter, that they were
13        going to take a vote.  And it appears that
14        the vote was -- there were two nays and the
15        rest yeas.
16   A.   Yeah, four to two.
17   Q.   Now that you've reviewed Defendant's
18        Exhibit Number 4 as far as --
19             MR. LYONS:  Have y'all seen it?
20             MR. HARRIS:  No.
21   Q.   -- about what occurred at the city council
22        meeting, is that what you remember
23        occurring?

Page 51

1    A.   Yes, sir.
2    Q.   Have you had any other contact with anyone
3         with the City of Lanett regarding this
4         matter?
5    A.   No, sir.
6    Q.   You mentioned earlier that two police
7         officers told you that the mayor said he
8         wasn't going to help you because you didn't
9         help him in the election.
10   A.   Correct.
11   Q.   And that was Tracy Bandy and who?
12   A.   Tifton Dobbs.
13   Q.   Has the mayor ever said anything to you
14        about --
15   A.   Directly?
16   Q.   Yeah.  Has he ever said anything to you
17        directly?
18   A.   No, sir.
19   Q.   Has he ever done anything -- Has he ever
20        inferred anything to you that would make
21        you think that he was trying to get you for
22        some political activity you took?
23   A.   No, sir, I don't ...

Page 52

1    Q.   He hasn't said anything --
2    A.   He hasn't said anything to me directly, no,
3         sir.
4    Q.   Have you overheard him say anything to
5         anyone else?
6    A.   No, sir.
7    Q.   Has any member of the city council told you
8         that the mayor was after you because you
9         didn't support him?
10   A.   No, sir.
11   Q.   How did the two officers that told you
12        that, where did they learn this
13        information, if you know?
14   A.   They go by his house, the mayor's house.
15   Q.   Just --
16   A.   They're friends with the mayor.
17   Q.   Just because they're friends with the
18        mayor?
19   A.   Yes, sir.
20   Q.   Correct me if I'm wrong, but from what I
21        understand you were telling me earlier,
22        your main complaint regarding your due
23        process --

Deposition of Wendell Dean Van Meter                                    December 8, 2006

Page 53

1   A.  I'm terminated.  That's my main complaint.
2   Q.  Okay.  I understand your main complaint is
3       that you're terminated.
4   A.  Sir, I've lost a 27-year career, and I'm
5       accused of being a thief.  And getting
6       another job is impossible at 50 years old.
7   Q.  Let me ask you one question about this and
8       then I'm going to go through your complaint
9       with you.
10  A.  Okay.
11  Q.  You've made a due process claim.  You're
12      saying that you were denied due process,
13      correct?
14  A.  Uh-huh.  (Positive response.)
15  Q.  Yes?
16  A.  Yes, sir.
17  Q.  Is the basis of the denial of your due
18      process what you've told me about
19      Defendant's Exhibit Number 2, that --
20      Mr. Holley putting in there that you were
21      terminated effective immediately, is that
22      what you're saying was the denial of your
23      due process?

Page 54

1   A.  Yes, sir.
2   Q.  Was there anything else that you're relying
3       on for your denial of due process?  And
4       you're looking at your lawyers, but --
5   A.  Well, that's what I hired them for.
6   Q.  But if you know of anything else, this is
7       my only time to --
8   A.  Well, I'm trying to think exactly ...
9   Q.  I mean, that's one of your claims, and
10      this is my only time to get to ask you.
11      (Attorney-client discussion.)
12      THE WITNESS:  Yeah, I forgot about
13      that.
14  A.  Oscar -- We asked Oscar Crawley to recuse
15      himself in the hearing, and he wouldn't do
16      it.
17  Q.  Okay.  And is that a part of what you're
18      claiming is a denial of your due process?
19  A.  Yes, sir.
20  Q.  Why did you ask Mayor Crawley to recuse
21      himself?
22  A.  Because of me being for another candidate
23      for mayor and him having ill feelings

Page 55

1   towards me according to the officers.
2   Q.  All right.  The vote that was taken
3       regarding your termination, did Mayor
4       Crawley vote in that?
5   A.  Yes, sir.  I mean, it's in this right here,
6       yes, sir.
7   Q.  It says there was a roll call vote.
8       Councilman Malone -- Tony Malone said nay.
9       Councilmember Duskin, yea.  Councilmember
10      Heard, nay.  Councilmember Yarbrough, yea.
11      Councilmember McCoy, yea.  And Mayor
12      Crawley, yea.
13  A.  Correct.
14  Q.  Well, it would have still been three to two
15      even if the mayor had withheld his vote,
16      correct?
17  A.  Possibly.
18  Q.  Well, he was the last one --
19  A.  Unless somebody else changed their vote
20      because of him.
21  Q.  Well, he was the last one called according
22      to the records.
23  A.  But if he had recused himself, then

Page 56

1   somebody else might have voted different,
2   correct?
3   Q.  I don't have any idea.
4   A.  I don't either.  We'll never know because
5       he wouldn't accuse himself.
6       MR. HARRIS:  Recuse.
7   Q.  Recuse himself.
8   A.  I'm sorry.
9   Q.  Well, but as it stands, Mayor Crawley
10      appears to be the last one that voted, and
11      he was a yea vote, but it would have still
12      been a three to two vote if you would have
13      just removed him from the situation?
14  A.  If you removed him from that right there,
15      yes, sir.  But in reality, I don't know.
16  Q.  Well, we can speculate as to what could
17      have occurred all day long.
18      Anything else you base your claim of
19      violation of due process other than this
20      statement in Defendant's Exhibit Number 2
21      and that Mayor Crawley wouldn't recuse
22      himself?
23  A.  No, sir.

Page 57

1    Q.   And other than you were of the opinion that
2         Mayor Crawley had ill feelings towards you
3         because you supported his opposition, was
4         there any other reason that you felt that
5         he should recuse himself?
6    A.   Years ago, I done an investigation, and he
7         was sitting on the board of the housing
8         authority, yes, sir.
9    Q.   Investigated the housing board, the housing
10        authority board?
11   A.   Members, and he was a member.
12   Q.   And he was investigated himself?
13   A.   Yes, sir.
14   Q.   Anything come of that?
15   A.   I was pulled out of the investigation.
16   Q.   You were pulled out?
17   A.   Yes, sir, put on patrol. That's when Gene
18        Jones was chief.
19   Q.   As far as anything with Mayor Crawley at
20        that time, was he -- did any investigation
21        find anything against him?
22   A.   There was one individual that went to
23        prison.

Page 58

1    Q.   But it wasn't him?
2    A.   No, it wasn't him.
3    Q.   Okay. But other than what these officers
4         have told you, you have no other evidence
5         that Mayor Crawley has any ill feelings
6         towards you, do you?
7    A.   Like I said, I done an investigation. And
8         before it was complete -- completed, he
9         had -- using maintenance personnel at his
10        residence from the housing authority.
11   Q.   We're talking about two different things.
12   A.   I know it. You're talking about --
13   Q.   How long ago was this investigation?
14   A.   That's when Gene Jones was chief.
15   Q.   So it's been quite some time?
16   A.   Correct. And I don't know if he had any
17        animosity toward me from that or not. I
18        don't know.
19   Q.   That would have been probably the early
20        nineties?
21   A.   Correct.
22   Q.   Well, I mean, as far as --
23   A.   I mean, I don't know.

Page 59

1    Q.   I understand. Let me ask you this, then.
2         Other than what Officer Bandy and the other
3         officer told you, have you any other
4         evidence that Mayor Crawley has any ill
5         will or --
6    A.   No, sir.
7    Q.   -- feelings towards you?
8    A.   No, sir.
9    Q.   And you mentioned something, and I meant to
10        ask you earlier, but -- are you employed
11        anywhere at the present time?
12   A.   Marvin's.
13   Q.   Marvin's?
14   A.   Yes, sir.
15   Q.   And what do you do there?
16   A.   I work on the lumberyard.
17   Q.   And how long have you worked there?
18   A.   About four months, five months.
19   Q.   Have you worked anywhere else other than
20        Marvin's since the City of Lanett?
21   A.   Locksmithing.
22   Q.   Just working on your own?
23   A.   No, sir. Roquemore's Key & Safe.

Page 60

1    Q.   And why did you leave Roquemore's to go to
2         Marvin's?
3    A.   Steadier.
4    Q.   What's your pay at Marvin's?
5    A.   8.50 an hour.
6    Q.   And how many hours a week?
7    A.   No more than 40.
8    Q.   And when you left the City, what was your
9         rate of pay at that time?
10   A.   17 something. 16, $17 an hour.
11   Q.   Were you on salary or were you still
12        hourly?
13   A.   Hourly.
14   Q.   How many hours did you normally work a
15        whole week?
16   A.   We work 36 hours one week, 48 the next
17        week. Four on, four off.
18   Q.   Do you remember where you were as far as
19        the step for lieutenant?
20   A.   I'd topped out. I'd been topped out
21        about -- since Terrell Whaley was mayor. I
22        can remember the mayors, but as far as the
23        years ...

## PART III: EMPLOYER CERTIFICATION

is is a state agency reporting unit, do not submit this form to the *Retirement Systems* until all warrant cancellations for this individual ve been processed by the state comptroller.

Name of Employing Agency: _City of Lanett_

Last retirement contribution was included in the _December 2005_ report:

(Month or if state employee last payroll check issue date)

Last day for which employee is paid: _12_ _19_ _05_

　　　　　　　　　　　　　　　　　　　　Month　Day　Year

I hereby certify the final salary payment has been made to the above named member and that this person has no further contract, written or oral, to return to employment at said agency.

Signature of Payroll Official: _Qenell Lee_　　　　　　　　　Date: _12/21/05_

Note: Send this form with the payroll report which includes the member's final deposit.

### INSTRUCTIONS FOR REFUND REQUEST

- Type or print in black ink.
- Complete Part I and Part II and have your signature notarized.
- Part III should be completed by the employing agency. The refund will <u>not</u> be mailed until the Retirement Systems of Alabama (RSA) receives the member's final deposit and this form.
- Any person who makes a false statement or falsifies a record in an attempt to defraud the RSA shall be guilty of a misdemeanor, and upon conviction, be punished by a fine up to $500.00 and/or imprisonment not to exceed one year.
- After this form has been completed, any address change must be submitted to RSA in writing and be signed by the applicant. Include your Social Security number on any correspondence.

### Employment Termination Statement

ereby certify that I have permanently terminated my employment in any agency covered by the Retirement Systems indicated and request that the contributions and applicable interest be distributed as shown. I further certify I do not have a contract nor am I negotiating for employment with any agency covered by the System indicated. I understand that I am *not entitled to the total interest* credited to my account, but a proportion of the total interest determined by the number of years I have contributed. The refundable funds in my account are due to me and unpaid, and I understand that payment in accordance with this form will release the RSA from any claim for other benefits.

### No portion of the refund is subject to state of Alabama income tax.

If you have any questions regarding the taxability of your refund, contact the IRS or a tax advisor.



DEFENDANT'S
EXHIBIT

B