# EXHIBIT D

```
 1                CITY OF LANETT, ALABAMA

 2                 CITY COUNCIL MEETING

 3                 DECEMBER 14, 2005

 4                  5:30 P.M. (EST)

 5       APPEAL FOR DISCIPLINARY ACTION TAKEN

 6         AGAINST LIEUTENANT DEAN VAN METER

 7    PRESENT:

 8        MAYOR:              Oscar Crawley

 9        CITY MANAGER:       Joel Holley

10        CITY ATTORNEY:      Larry Nix, Esq.

11    COUNCIL MEMBERS PRESENT:

12        District 1 - Tony Malone

13        District 2 - Jamie Heard

14        District 3 - Kyle McCoy

15        District 4 - John Duskin

16        District 5 - Mike Yarbrough

17

18    ALSO PRESENT:

19        Dean Van Meter

20    FOR DEAN VAN METER:

21        Jim Ingram, Esq.

22        Bill Harris, Esq.

23

24        MELANIE H. GARNER, CSR, RPR

25            COURT REPORTER
```

PROCEEDINGS

(DECEMBER 14, 2005)

MAYOR CRAWLEY:  I would like to call the meeting to order, and we are here tonight to hear an appeal for disciplinary action taken against Lieutenant Dean Van Meter.  And so at this time I entertain a motion that we go into executive session.

MR. NIX:  Mr. Mayor, I've given you the reasons under the New Open Meetings Law that this can be taken into executive session.  So it involves the good name and character of an individual and the discipline and/or dismissal of a public employee.  Those are the reasons that we're citing for going into it.

Also, I would note that after one of the council members makes a motion, it must be a roll-call vote.  And, at the conclusion of the vote, assuming that the council moves to go into executive session, Your Honor needs to tell the people, the public here, that we will reconvene at the end of the executive session, of what your estimate of the time is before we reconvene.

MR. INGRAM:  If it please the council, on

behalf of Lieutenant Van Meter, we would respectfully waive any closed part of this hearing, if you want to take that into consideration.

MR. NIX:  Mr. Mayor, they had said that. The only problem that I have, as the city's counsel, is that there may be testimony that's brought up that I don't know about that might endanger the City.  So I would advise the council to go into executive session.

MAYOR CRAWLEY:  I entertain a motion.

COUNCILMAN DUSKIN:  Mr. Mayor, I'd like to move that we go into executive session and discuss the general reputation and character of an individual and consider the discipline and dismissal of a public employee.

MAYOR CRAWLEY:  Second?

COUNCILMAN MCCOY:  Second.

MAYOR CRAWLEY:  Roll call, please.

CITY CLERK:  Council Member Malone?

COUNCILMAN MALONE:  No.

CITY CLERK:  Council Member Duskin?

COUNCILMAN DUSKIN:  Yes.

CITY CLERK:  Council Member Heard?

COUNCILMMAN HEARD:  Yes.

1   CITY CLERK:  Council Member Yarbrough?

2   COUNCILMAN YARBROUGH:  Yes.

3   CITY CLERK:  Council Member McCoy?

4   COUNCILMAN MCCOY:  Yes.

5   CITY CLERK:  Mayor Crawley?

6   MAYOR CRAWLEY:  Yes.

7   MR. NIX:  And then, Mr. Mayor, again,

8   according to the New Open Meetings Law, you

9   should announce that you will reconvene at the

10  end of the executive session and your estimate

11  of how long you think that will be.  I really

12  can't help you there.  Maybe two hours.

13  MAYOR CRAWLEY:  We will reconvene in

14  approximately two hours out of executive

15  session.  So we'll ask everybody to leave the

16  area.

17              (EXECUTIVE SESSION)

18  MR. NIX:  We've asked, with the consent of

19  Mr. Van Meter, while we're sitting here

20  somewhat of in a courtroom scenario, we hope

21  that this will be more of an informal

22  process -- I will finish when the room is

23  vacated.

24              (BRIEF INTERRUPTION)

25  MR. NIX:  Mr. Mayor, what I started to say

1    before Judge Holley finished securing the room,

2    in order to expedite the proceedings and ensure

3    an orderly process, we've asked, with the

4    consent of Mr. Ingram and Lieutenant Van Meter

5    and Mr. Bill Harris, that Judge Calvin Milford

6    simply act as a hearing officer to keep these

7    proceedings moving ahead in a steady and

8    orderly fashion.  Again, our personnel policy

9    provides for this.  We want and the intent of

10   this is to give Lieutenant Van Meter all

11   elements of due process to which he's entitled,

12   the ability to call his witnesses, the ability

13   to cross-examine our witnesses, the ability to

14   refute the charges, to have the charges against

15   him read.

16        I'm going to ask Judge Milford if he would

17   to read those two -- I hate to say charges --

18   but disciplinary actions which brings about

19   this appeal.  After that, I'm also going to ask

20   Judge Milford to make a roll call of each of

21   the council members, because you will be the

22   body that will ultimately vote on this to

23   ensure that Lieutenant Van Meter is getting a

24   fair and impartial hearing.

25        Judge Milford, would you read the

1    disciplinary charges that Lieutenant Van Meter

2    has appealed?

3         JUDGE MILFORD:  Sure.  There are two or

4    appear to be two disciplinary actions in

5    consideration at this point in time.  The first

6    reads as follows:  On or about October 3rd,

7    2005, Lieutenant Van Meter removed certain

8    personnel files from boxes of City-owned files

9    that were to be destroyed by burning them.

10   After removing the files from the boxes without

11   permission, they were subsequently taken to his

12   residence.  Files belonging to Brian Poe and

13   Stan Ross were subsequently turned over to

14   them.  The taking of city property and the

15   possession of stolen personnel files and the

16   subsequent distribution of stolen personnel

17   files is a violation of Rules and Regulations

18   1.230, conduct unbecoming an officer.  Action

19   taken was termination of employment with the

20   City of Lanett Police Department for violation

21   of City of Lanett Police Department Rules and

22   Regulations 1.230, conduct unbecoming of an

23   officer.  That action was taken by Chief Ron W.

24   Docimo.

25        The other charges that on or about October

1    the 3rd, 2005, Lieutenant Van Meter removed

2    several personnel files from boxes of

3    City-owned files that were to be destroyed by

4    burning them.  After removing the files from

5    the boxes without permission, they were

6    subsequently taken to his residence.  The

7    taking of city property constitutes theft of

8    city property.  The action taken was

9    termination of employment with the City of

10   Lanett Police Department for violation of City

11   of Lanett Employee Personnel Handbook Group II

12   offense, Section A, Subsection 10 otherwise

13   known as theft of city property, specifically

14   referring to personnel files.  That action was

15   taken by Chief Ronald W. Docimo.

16        Now, again, let me say at the start that my

17   understanding of a personnel hearing such as

18   this is that they're to be conducted

19   informally, and that I certainly don't intend

20   by my being here to give this appearance of a

21   trial or anything of that nature.  I'm here for

22   the convenience of all parties, and I'm happy

23   to do so.

24        At any point in time if anyone feels like

25   the proceeding is not going in the right

1  direction, if you'll let me know I'll try to

2  see if I can mediate and moderate and get

3  everybody back focused on what you want to get

4  focused on.

5      Both sides have asked me to ask each of you

6  the following question, and the question is as

7  follows.  And I'll each of you individually

8  once I read the question.  Do you know of any

9  reason why you cannot render a fair, impartial,

10  and unbiased decision with regards to the

11  disciplinary appeal before you?

12      Council Member Malone?

13      COUNCILMAN MALONE:  No.

14      JUDGE MILFORD:  Council Member Duskin?

15      COUNCILMAN DUSKIN:  No.

16      JUDGE MILFORD:  Council Member Heard?

17      COUNCILMAN HEARD:  No.

18      JUDGE MILFORD: Council Member Yarbrough?

19      COUNCILMAN YARBROUGH:  No.

20      JUDGE MILFORD:  Council Member McCoy?

21      COUNCILMAN MCCOY:  No.

22      JUDGE MILFORD:  And Mayor Crawley?

23      MAYOR CRAWLEY:  No.

24      JUDGE MILFORD:  Okay.  Having said that, I

25  believe, Mr. Nix, we have agreed before the

1    meeting that the City would present evidence
2    first.
3        MR. NIX:  We will.  I understand that
4    Mr. Ingram had stated a request which he was
5    kind enough to state before we convened.  Now I
6    will give him the opportunity to make that
7    request.
8        MR. INGRAM:  Mayor and council, thank you.
9    At this time I would respectfully ask that the
10   mayor recuse himself from these proceedings.
11   There has been indications on our behalf that
12   he may have some sort of bias or preconceived
13   notion about the disciplinary action of
14   Lieutenant Van Meter.  So on that, I would ask
15   that you would recuse yourself from voting in
16   this process.
17       MR. NIX:  And, Mr. Mayor, before you
18   respond, on behalf of the City, our response to
19   that would be that this hearing itself gives
20   Lieutenant Van Meter and his counsel every
21   attempt to sway, influence, convince this
22   council as to the recommendations of the city
23   manager and the police chief are not to be
24   upheld.  That's what they have the right to
25   do.

1    Also, each of you has just read into the
2    Record of this proceeding that there is no
3    reason why each of you cannot render a fair,
4    unbiased, and impartial opinion.
5    Mr. Mayor, I would hope that you would not
6    recuse yourself.
7    MAYOR CRAWLEY:  I am the mayor, chief
8    executive officer of this city in charge of
9    administration of personnel policy.  And I have
10   one vote in the outcome of Dean Van Meter of
11   this hearing.  And I'm not going to excuse
12   myself because I am the mayor.  And I'm the one
13   that would have to call the meeting to order
14   after the hearing is over.  I guess, do you
15   want me to leave and not be here for the
16   voting?
17   MR. INGRAM:  No, sir.  My request was that
18   you refrain from voting on the matter.
19   MAYOR CRAWLEY:  No, I'm not going to do
20   that, Jim.  I'm the mayor of the City, and it
21   is my job to make sure that the personnel files
22   are taken care of in this city.  I'm not going
23   to refuse to vote, because I can vote and be
24   fair to Lieutenant Van Meter and to you and to
25   others that are represented here.

1    JUDGE MILFORD: Mr. Mayor, also, for the
2    Record, I would like -- and if these statements
3    are incorrect -- and I don't think they are --
4    but Mr. Ingram and Mr. Harris can correct me.
5    I would like to confirm that Lieutenant Van
6    Meter has received a copy of the charges in
7    writing; is that correct?
8         MR. INGRAM: Correct.
9         MR. NIX: That he has received an entire
10   copy of all of our investigation file and that
11   there under our personnel policy, Mr. Mayor --
12   again, this is just sort of housekeeping
13   details -- Lieutenant Van Meter has an
14   opportunity to appear. He has three steps in
15   his grievance process. One is to appear before
16   the city manager. Two is to have an appearance
17   before the mayor and council. And the third
18   step is the step we're in now which is a full
19   due process hearing.
20        It is correct, Mr. Harris and Mr. Ingram,
21   that Lieutenant Van Meter has waived that
22   second appearance before. And I just wanted to
23   confirm that for the Record -- the second
24   appearance before the mayor and council and
25   agreed to proceed right to this hearing.

1    MR. INGRAM:  That's correct.

2    MR. NIX:  Okay.  Again, Judge and Mayor,

3    His Honors, we want to keep this fairly

4    informal.  I hate to say I call Judge Holley to

5    the stand.  I would like for Judge Holley to be

6    sworn in, because our personnel policy does say

7    that these proceedings will take place under

8    oath.  So I would like for him to be sworn in

9    and ask him some question and, of course, give

10   Lieutenant Van Meter and his representatives a

11   chance to ask questions as well.

12   JUDGE MILFORD:  How do you want to do

13   this?

14   MR. NIX:  Judge, would you mind swearing

15   them?

16                (WITNESS SWORN)

17             JOEL HOLLEY,

18   the witness, having first been sworn to

19   speak the truth, the whole truth, and nothing

20   but the truth, testified as follows:

21                EXAMINATION

22   BY MR. NIX:

23   Q.  Judge, first of all, would you just explain to

24       the judge and council what the process is about

25       destroying -- about the requirement the city

```
 1        has to destroy certain sensitive personnel
 2        files and other financial information?
 3   A.   Certainly under the state law, there is a
 4        record retention schedule and guidelines.
 5        Certain information that is generated by any
 6        government unit, whether it be municipality,
 7        county, or state certainly contains sensitive
 8        materials such as personnel files, payroll
 9        records, that sort of thing, there are
10        basically two ways to destroy personnel records
11        or old records.  The purpose being to keep
12        anyone from having access.  That is by
13        shredding or burning.
14   Q.   And in the latter part of September of this
15        year, were there not approximately nine -- I
16        call them banker boxes -- file boxes full of
17        such files which the personnel director
18        directed be destroyed?
19   A.   Yes.  When Ms. Gunnels moved to the back
20        office, actually she and Larry Ray swapped --
21        he swapped offices, put her in the back office
22        because she would be handling primarily human
23        resource functions of personnel and insurance
24        since the City became self-insured.  We found
25        that, apparently, there had been no records
```

1   removed or destroyed in a number of years,
2   probably 25 years.  So it was very crowded and
3   she didn't have room to put them all in her
4   office.  So she actually went to work to
5   determine what records were proper to be now
6   finally disposed of.  That we kept them so long
7   to make sure that, number one, we could legally
8   get rid of them.  One of the interesting things
9   we found out in that was that an employee
10  newsletter that we now generate in-house for
11  some reason has to be kept forever.  That's
12  strange.  But employee newsletters under that
13  guideline has to be kept forever.  And there
14  are different time frames for what things that
15  you have to keep or how long you have to keep
16  them.
17      So she determined that certain old records,
18  certainly for employees who no longer worked
19  here, have not worked here in awhile, had been
20  retained long enough so they could be properly
21  destroyed.  And, also, there were a number of
22  old payroll records that were very old and
23  things like that that no longer had to be
24  kept.
25      We had no really other secure place to keep

1    them, because we, as you all know, we are sort

2    of cramped in space here in this building.  So

3    she, after checking -- also, you have to keep a

4    list of things that you destroy.  So after

5    doing that, she set about trying to come up

6    with a way to properly destroy the records.

7  Q.   I'm going to jump forward a little bit.

8  A.   Yes, sir.

9  Q.   To a day when Lieutenant Van Meter actually

10       came to your office.  He admitted taking

11       personnel files, right?

12 A.   Yes, sir.

13 Q.   How long after the burning did your meeting

14       with Lieutenant Van Meter take place?

15 A.   The employee, the best we can -- or the police

16       department's internal investigation indicated

17       that the files were taken October the 3rd.  And

18       the reason that date is verifiable is because

19       that's the date the boxes were loaded on the

20       back of the city vehicle.  That was the day

21       that we had a council meeting and the

22       controlled burn of a dilapidated house occurred

23       after the council meeting.  That was October

24       the 3rd.  Mr. Van Meter contacted me at my home

25       by phone on late evening before dark but late

1    evening of the Sunday, October the 30th.

2    Monday morning then, October 31st, he met me as

3    I came to the city hall, came into my office

4    and then turned over several files to me.

5  Q.   Was your file one of them?

6  A.   Yes, sir.

7  Q.   Excuse me.  Let me rephrase that.  Was the

8    city's file that contained information about

9    you among the files?

10  A.   In fact, I remembered because there was a file

11    on top.  And I don't remember how many there

12    were, but the one on top had my name.  So that

13    got my attention.

14       I would say that prior to that date when I

15    was informed by the chief of police that there

16    was a problem, he had been told or found out

17    somehow that some files were taken, and that,

18    in fact, a local attorney was in possession of

19    one of the files.  Prior to all of this

20    happening, I actually went to that local

21    attorney's office and informed him that I was

22    aware that he was in possession of city

23    property, and that being an employee personnel

24    file from an employee that used to work at the

25    city.  And that certainly the employee would be

entitled to a copy of anything in there.  And
that he himself could copy it at his own risk.
That was between him and his client.  But the
file itself and contents were city property,
and I certainly desired that it be returned.
It was returned to the city hall within an hour
or hour and a half.

COUNCILMAN MCCOY:  Judge?

MR. HOLLEY:  Yes, sir.

COUNCILMAN MCCOY:  You said the controlled
burn was on the 3rd.

MR. HOLLEY:  The best I can recollect,
October the 3rd after council meeting.

COUNCILMAN MCCOY:  And then Lieutenant Van
Meter contacted you on the 30th?

MR. HOLLEY:  Yes, sir.  That was Mr. Nix's
question.  He contacted me at home on my city
cell on October the 30th.  He returned those
files to me Monday.  And I assume he was off
duty because he wasn't in uniform.  Monday,
October 31st?

COUNCILMAN MCCOY:  What day did the
internal investigation begin on the
disappearance of these files?

MR. HOLLEY:  I have no idea.  Somewhere,

the best I can recollect, around the 26th.

Because I think I actually went to local

Attorney Phillips -- Don Phillips' office on

October the 28th.

COUNCILMAN MCCOY:  Of October?

MR. HOLLEY:  Yes, sir.  Internal

investigation, in my opinion -- the chief would

have that -- somewhere around the 26th.

COUNCILMAN MCCOY:  When did we know that

files had been taken?

MR. HOLLEY:  I assume the 26th, as far as

him.  I knew the day he came to me, which was

around the 26th of October.

COUNCILMAN MCCOY:  Don Phillips?

MR. HOLLEY:  That Don Phillips had the file

belonging to a former employee, Brian Poe.

COUNCILMAN MCCOY:  Okay.

MR. HOLLEY:  So, to answer your question, I

guess, succinctly, the best we can recollect

the files were burned or the files were taken

from the back of a city vehicle October the 3rd

of 2005.  The files that were returned to me by

Employee Van Meter was October the 31st.  The

morning of October the 31st.

Q.  The whole point -- let's get to the chase.

1   A.   It happened about a month.

2   Q.   Several weeks passed between the time.  And the

3        investigation had already begun by the time you

4        got your file back?

5   A.   Yes, sir.

6   Q.   And you didn't even know he had your file?

7   A.   No, sir.  In fact, I didn't even know I had a

8        file.  I can explain that.  When I finished law

9        school in 1976, the present mayor and council

10       at that time -- the mayor, if I remember, was

11       Mr. Buddy Colley.  I was a new lawyer in town,

12       opened an office, and I was hired by the mayor

13       and council to act as the city magistrate or

14       city judge.

15           When Mr. Van Meter handed me those files

16       and I saw my name on top, I quickly opened the

17       file.  There were two pieces of paper in that

18       file, a copy of an oath of office and my W-2

19       form from 1977 which contained my name and my

20       social security number and other stuff.

21           COUNCILMAN MALONE:  Mr. Holley, I have a

22       question.  The city attorney asked you what the

23       process or what the requirements that the city

24       has in destroying sensitive files.  Do the City

25       have a policy in place?  Yes or no?

        MR. HOLLEY:  I don't know, Mr. Malone, if
there's been a written policy in place since
I've been here.  I haven't found one.  Like I
say, I don't know that any file has ever been
destroyed here before.  But those are one of
the things that certainly, as far as written
policy, in destroying files.  The most
important things is that since they contain
sensitive material that you have a duty to
destroy, not to abandon or throw away.  The two
methods of destroying are basically burning,
totally consuming, and/or shredding.  And, of
course, the only shredder we have is one that
fits in an office waste basket.
        COUNCILMAN MALONE:  I have a question.
What do we do if we have a witness that's not
here that we need to talk to?  Ms. Gunnels is
not here?
        MR. HOLLEY:  Yes, sir, she's available.
        COUNCILMAN MALONE:  Okay.
        MR. NIX:  But, to answer your question,
Council Member Malone, this is an informal
process.  It's not a court hearing, and we
don't have subpoena power to mandate.  In fact,
there are several witnesses, such as Mr. Brian

1    Poe, that we would very much like to have

2    here.  But he refused to cooperate.

3         MR. HOLLEY:  I will say this for our

4    Record.  Me and Mr. Harris met this morning.

5    Mr. Harris produced a list of witnesses,

6    employee witnesses, if you call it that.  And I

7    called Counsel Nix on the speaker phone, and we

8    all talked.  Neither the City nor the employee

9    has subpoena power.  That in an effort of

10   cooperation, I went to the department heads.

11   There was a police officer that he desired and

12   several fire people.  I went to those

13   department heads and said, Would you contact

14   your employees and see if they would be

15   available if they want to be called.  I can't

16   compel them to be here.  The City certainly is

17   not going to pay them overtime because they're

18   witnesses that Mr. Harris and Mr. Ingram

19   wanted.  And they certainly said they would

20   attempt to, but we can't compel anybody to be

21   here.  If they're here, they're here because

22   they want to be here or they were asked to be

23   here.

24        COUNCILMAN MALONE:  Yes, sir.  But we don't

25   have any policy for destroying sensitive

1  personal files in place right now?  He asked

2  you to explain to us --

3      MR. HOLLEY:  To answer your question,

4  Mr. Malone, I'm not aware of any written policy

5  that the City has at this point in time in the

6  personnel policy that exists that's been in

7  existence for a number of years as to

8  destroying files.

9      COUNCILMAN MCCOY:  Does the State have a

10  policy?

11      MR. HOLLEY:  I don't know that the State

12  has a, quote, policy.  They have certain

13  guidelines that you follow.

14      COUNCILMAN MCCOY:  Okay.  Okay.

15      COUNCILMAN MALONE:  And I might be wrong,

16  but correct me if I'm wrong.  It says in this

17  book here, a municipality council or a

18  committee authorized by the council may by

19  resolution issue subpoena pursuant to Section

20  11-43-11.3 of the *Code*.  What is that?

21      MR. NIX:  Our personnel policy doesn't

22  provide that.  I have to go by our personnel

23  policy first, Mr. Malone.

24      MR. HOLLEY:  What did you read from,

25  Mr. Malone?  I didn't hear you.

1      COUNCILMAN MALONE:  I'm reading from the --

2      MR. HOLLEY:  That's league municipality --

3      COUNCILMAN MALONE:  That's *Code* Section

4  11-43-11.3 of the *Code*.

5      MR. NIX:  Well, let me say this,

6  Mr. Malone.  We've got all the witnesses here

7  we want.  If Mr. Harris --

8      COUNCILMAN MALONE:  Well, I mean, you just

9  mentioned that we don't have the power to

10  subpoena.

11      MR. NIX:  No, we don't, not in our

12  personnel policy.

13      MR. HARRIS:  Mr. Nix, could I add something

14  to what you're saying?

15      MR. NIX:  Sure.

16      MR. HARRIS:  The City -- I met with Judge

17  Holley this morning.  We talked about this at

18  length.  They're at a disadvantage by not being

19  able to subpoena, as are we.  The City has gone

20  overboard, for the Record, to try to be

21  accommodating to us for anybody that we might

22  want here, trying to make them available.  But

23  they cannot just by virtue of the fact that

24  they're an employee make them be here.  And we

25  discussed this at length, and we had a

1    conference call with Mr. Nix.  And, you know,

2    the City has -- you know, Judge Holley

3    personally took me to the fire department, and

4    I talked to the chief and told him who we

5    thought that we might be questioning.  The

6    chief said he would make every one of them

7    available.  I think everybody we had but three

8    people would be working.  And I said, I'll get

9    in touch with them.

10        MR. HOLLEY:  Most of them were actually on

11    duty, anyway.

12        MR. HARRIS:  Right.  And I told him, you

13    know, don't go bother these people off duty.  I

14    don't think we'll need them.  We'll just give

15    you a list of everybody we can possibly think

16    of to try to give notice.  Did the same thing

17    with Chief Docimo.  Went over talked to him.

18    The same result.  So, you know, we're together

19    as far as the subpoena thing, but we understand

20    that and that's not something that the City

21    made that rule.  That's just because this is an

22    administrative hearing.  And they have gone

23    overboard to be accommodating to us, and we

24    appreciate that.

25        MR. HOLLEY:  Mr. Malone Section 11-43-30

```
 1          through 33 was special legislation passed by

 2          the Alabama Legislature to give police officers

 3          protection in disciplinary hearings.  We're not

 4          bound by that legislation, because 11-43-31 or

 5          32 says that this does not apply to

 6          municipalities who have due process procedures

 7          in place by the year of 2001.  So we didn't

 8          come under that.

 9    Q.    The long and short of it, Lieutenant Van Meter

10          admitted to you when he came to see you that he

11          took the files?

12    A.    Yes, sir.

13    Q.    He admitted that he gave them to people outside

14          the City?

15    A.    Yes, sir.

16    Q.    Now, reading from your statement -- and

17          Lieutenant Van Meter is here, so he can

18          certainly refute this -- and this is in part of

19          what has been provided to Mr. Harris and

20          Mr. Ingram from your statement.  "Then began

21          talking and the story was he saw some firemen

22          burning files in a 55 gallon drum near the fire

23          department.  He said, one of them said they

24          were being thrown away.  He got some of them.

25          I asked him, why.  He said he figured his
```

1    friends would want them.  At some point I told

2    him that I had retrieved the file with the name

3    Brian Poe from Attorney Don Phillips, that the

4    files are city property, that they're not being

5    discarded but being destroyed by burning.  I

6    asked him at some point which fireman or who

7    said they were being thrown away.  He said he

8    didn't remember who was standing out there."

9        And that's just a partial.  The point is,

10   he told you that he took the files?

11   A.   Yes, sir.

12       MR. NIX:  All right.  Again, Judge Milford

13   and Mayor Crawley and Mr. Ingram and Mr. Harris

14   and Mr. Van Meter, you know, I hate to say

15   "Your witness," but go ahead and ask Judge

16   Holley what you want to.

17                    EXAMINATION

18   BY MR. HARRIS:

19   Q.   Judge, Mr. Malone asked while ago about the

20   State guidelines for burning records and

21   everything.  Can I walk over there where you

22   are?

23   A.   Sure.

24   Q.   Are you familiar with the Local Government

25   Records Commission, which is a state agency

1       which actually controls the destruction of

2       records for local municipalities?

3   A.   No, sir, I'm not.

4   Q.   Well, there is such an organization, Chapter

5       41-13-22 *Code of Alabama* establishes them.  And

6       under 41-13-5 of the *Code of Alabama*, it

7       actually requires that the city has to get

8       permission from this state agency in order to

9       burn records.  This is --

10  A.   Hold on just a minute.

11  Q.   This is the booklet that the State puts out.

12      It's under the Department of Archives and

13      History.  And it states guidelines from

14      everything from airport authorities to parks

15      and recreation to anything else.  It tells you

16      how long you need to keep them, how you need to

17      destroy them.  Furthermore, they have this

18      procedural leaflet that they put out which is

19      Records Destruction Procedures for Local

20      Governments.  It tells you how to destroy them,

21      when to destroy them.  We've got this here if

22      y'all would like to look at it.  Got it here

23      for y'all's consideration.

24          As I understood what you said, I've only

25      got one question for you.  You know, you're

```
 1        talking about -- Mr. Nix talking about Officer
 2        Van Meter said he took the files.  It is
 3        undisputed, folks, that Dean took these files.
 4        You know, he has admitted he took the files.
 5        When he found out there was a problem, he
 6        brought them back.  Our contention is that this
 7        ain't a theft of property.  He thought and had
 8        every reason to think that this was garbage.
 9        And he was picking these files up and thought
10        these people might want them.  When he found
11        out there was a problem, he brought them back.
12        Okay?  So we're not disputing that.  I want to
13        clear that up right now.  This ain't a
14        "who-done-it."  It's about whether what was
15        done was one thing or the other.  And we
16        disagree with the City on what they think it
17        was.
18            As I understood what you said, the first
19        you heard about the files was when Mr. Phillips
20        called; is that correct?
21    A.   No, that's not correct.
22    Q.   Okay.  I misunderstood you.
23    A.   The first I heard is when the police chief of
24        the City of Lanett came to my office and closed
25        the door and says, we have a problem.
```

1    Basically he told me that we had at that point

2    an employee that had taken personnel files from

3    the back of the city vehicle.

4  Q.  I'm sorry.  I just wanted to get the time

5    right.

6         COUNCILMAN MCCOY:  Let me make sure I'm

7    understanding this.  Dean, you said you took

8    the files; is that correct?

9         MR. VAN METER:  Sir?

10         COUNCILMAN MCCOY:  You took the files?

11         MR. VAN METER:  Yes, sir.

12         COUNCILMAN MCCOY:  I want y'all to tell us

13    why it's not a terminatable offense, and I want

14    the City to tell us why it is.  And then we can

15    make a decision on this pretty quick.  I mean,

16    like you said, it's cut and dry.  Why isn't

17    it?  Why is it?  Let's hear it.

18         MR. HARRIS:  I think the City has got the

19    burden of proof here.

20         COUNCILMAN MCCOY:  Well, I mean, they said

21    it's theft of property.  Now, I want to know

22    why it's not.

23         MR. NIX:  Well, who do you want to go

24    first?

25         COUNCILMAN MCCOY:  Either one.

1    MR. HARRIS:  Go ahead.

2    MR. NIX:  All right.  It's city property.

3 It was being destroyed.  And Mr. Harris made

4 some good points.  If the City was not

5 following certain protocols, that doesn't mean

6 that Lieutenant Van Meter is not guilty of what

7 he did.  It's our property.  It's no different

8 than a walkie-talkie or a telephone or a set of

9 pencils.  If he thought it was being thrown

10 away, he's been a police officer for many

11 years.  He should have walked up to somebody

12 and said, hey, is this being thrown away or is

13 this something that I can take?

14    As far as we know, the investigation didn't

15 reveal that.  It was city property.  It was

16 taken.  It was distributed to people outside

17 the City.  I don't know how else to put it.

18    COUNCILMAN MCCOY:  Okay.  Let's hear it.

19    MR. HARRIS:  Well, basically the reason we

20 contend that he thought this was trash, this

21 stuff was being burned out in a 55 gallon

22 drum.  The fire people were loading it up on

23 the truck.  Dean came up, asked them what they

24 were doing.  You know, just stopped by

25 talking.  They told him it was personnel files

1    the City was throwing away, getting rid of.  He

2    took them right there in front of them.  There

3    was no deception here, absolutely no deception

4    whatsoever.  None of them had a problem at the

5    time with him taking them.  We asked

6    Ms. Gunnels when we had our hearing with the

7    judge if there was any specific instructions

8    given to anybody.  If these files were so

9    confidential and so important, then why didn't

10   they have a police guard standing there or one

11   of the fire people to make sure nothing happens

12   to none of this, make sure they're all

13   destroyed.

14        They sat in the hallway out here, per the

15   statements by the city, that they sat there for

16   like six days in the hallway.  Part of them

17   were in trash bags.  That's in Ms. Gunnel's

18   statement.  They were taken over to the house

19   after the fire people loaded them up.  They

20   scattered them all over the floor in an

21   abandoned house, left them, came back to the

22   fire department, had supper, waited for the

23   fire department chief to get through with the

24   council meeting.  And then they went and burned

25   it up.

1    Now, my contention is if the problem here

2    is the worry of confidential information

3    getting out, where is it more likely to get

4    out?  Scattered on the floor of an abandoned

5    house and left for hours at a time or in the

6    hands of a 20-year police veteran?  I mean,

7    that's common sense to me.  I just don't think

8    this is a theft.

9        COUNCILMAN MCCOY:  Let me ask you this.  At

10   what point in time and whose authority gave him

11   permission to take it?

12       MR. HARRIS:  Nobody gave him permission to

13   take it.  But you can't steal trash.  Per the

14   definition --

15       COUNCILMAN MCCOY:  I'm kind of confused on

16   the word "trash."  I put trash in my trash

17   can.  I put trash in my trash can, and I throw

18   it out and it becomes public property.  But, if

19   I'm sitting out there burning it, what is my

20   intent?  Is it just to throw it away?

21       MR. HARRIS:  From what we understand --

22       COUNCILMAN MCCOY:  No.  I mean, what's my

23   intent?  If I'm burning trash, what is my

24   intent?

25       MR. HARRIS:  To burn it up, to get rid of

1    it.

2         COUNCILMAN MCCOY:  To destroy it?

3         MR. HARRIS:  I would assume.

4         COUNCILMAN MCCOY:  Okay.  As opposed to

5    putting it out?

6         MR. HARRIS:  Right.  But when they were

7    loading it up, then they loaded it up -- they

8    quit burning it in the barrels because that was

9    time consuming, per the statements we've got

10   that the City has furnished to us.  And I can

11   understand that.  If you take a file and put it

12   in a barrel and you light it up --

13        COUNCILMAN MCCOY:  It ain't going to light.

14        MR. HARRIS:  That's right.

15        MR. HOLLEY:  Part of the problem there was,

16   these files were compacted.  They almost had to

17   put a sheet at a time.  The wind was blowing,

18   cinders were blowing around.

19        MR. HARRIS:  And I think the City had a

20   great idea.  Let's get rid of this stuff quick.

21   We're to burn down this house in a controlled

22   burn, let's put it in there.  Great idea.  Good

23   way to get rid of it.  Quick way to get rid of

24   it.  But my point is this.  It was taken.

25   First of all, it was left out here in the hall

1    for weeks or several days.  Not weeks.  Several

2    days.  Then it was taken the very night it was

3    going to be burned and scattered, scattered out

4    all over the floor of this abandoned house and

5    then left there.  Left there.  There was no

6    instructions by anyone to make sure that this

7    stuff was not tampered with, bothered with.  No

8    indication whatsoever that this was valuable,

9    confidential information that needed to be

10   safeguarded or protected.

11       Dean pulled up and talked to the fireman.

12   He thought it was just, you know, there.  Just

13   junk.  And, if he wanted to get it, he could

14   get it.  And the intent for it to be a theft of

15   property -- we have a copy of the definition

16   from Title 13 of theft of property, and that's

17   a decision y'all can make.  There's no

18   deception here.  There's no intent here

19   whatsoever.  May be poor judgment.  We concede

20   that.  We're not even going to argue that.  It

21   may be poor judgment, but it ain't a theft of

22   property.

23       COUNCILMAN MCCOY:  Now, Dean, tell me what

24   really happened.  I done heard everybody else

25   talk.  Tell me what really happened.

1    MR. VAN METER:  That's what happened.

2    COUNCILMAN MCCOY:  No, I want you to tell

3    me.

4    JUDGE MILFORD:  I need to swear him in.

5             (DEAN VAN METER SWORN)

6    COUNCILMAN MCCOY:  I just want you to tell

7    me what happened.  I done heard everybody else.

8    MR. VAN METER:  I come around the corner of

9    the building.  I saw a fireman out there with

10    two boxes.

11    COUNCILMAN YARBROUGH:  Excuse me.  Were you

12    on duty?

13    MR. VAN METER:  Yes, sir.  Two boxes, and

14    they was throwing them in a 55 gallon drum.  I

15    don't remember what firemen were there.  I

16    didn't pay a whole lot of attention.  I asked

17    them what they were doing.  They said they was

18    throwing old files away.

19    And I said, well, I wonder if mine is in

20    there from 1978.  Well, I went --

21    COUNCILMAN MCCOY:  So you left and came

22    back.  You went to the county.  That's right.

23    MR. VAN METER:  Yeah.  And I was looking

24    for the one where Pete McCoy swore me in

25    originally from 1978.  I got a copy.  I would

like to have the original.  So I was looking
for mine.  One of the fireman says, Dean, I
think we done throwed yours away.  And I'm
thinking, all right.  So I saw Ricky Price's.
And I said, well, I wonder if Ricky would like
to have his.  I saw Brian Poe's.  I saw Stan
Ross's.  I saw Greg Ray's, Peggy Hester's, and
I saw Joel's with his name from '77.  And I
said, that must have been when he come right
out of law school and done -- I think he was
city judge for awhile.

MR. HOLLEY:  Were those files there at the
55 gallon can?  Or were they in the box on the
truck?

MR. VAN METER:  They were taking them from
the box on the truck and putting them in the
can.

MR. HOLLEY:  So the files that you got were
in the boxes on the truck?

MR. VAN METER:  The ones that -- They were
taking them out and carrying them over there
and throwing them in the garbage can.

MR. HOLLEY:  Statements on file from the
witnesses, firemen, that you didn't remember
their names said that they told you they were

1   burning files.
2       MR. VAN METER:  They told me they was
3   throwing them away, yes, sir.
4       MR. HOLLEY:  Well, I'm going by the
5   statements.  Now, my question is, the files --
6       MR. INGRAM:  Judge, excuse me.  I think
7   Mr. McCoy has got the question here.
8       MR. HOLLEY:  Well, okay.  That's fine as
9   long as the City has a chance to respond.
10      COUNCILMAN MCCOY:  He can go ahead and
11  finish, because I do have a question for you.
12  You were -- you were burning them, and you went
13  through and you got them?  You got Ricky
14  Price's --
15      MR. VAN METER:  They were throwing them in
16  the garbage cans and I was --
17      COUNCILMAN MCCOY:  You got Brian's.  You
18  got --
19      MR. VAN METER:  Yes.  I got several of
20  them.
21      COUNCILMAN MCCOY:  And you got Judge's?
22      MR. HOLLEY:  But I think it's important --
23      COUNCILMAN MCCOY:  Now, hang on, Judge.
24      Let me ask you something.  According to
25  these statements, you contacted Ricky Price?

1    MR. VAN METER:  Yes.

2    COUNCILMAN MCCOY:  You contacted Peggy?

3    MR. VAN METER:  Um-hum.

4    COUNCILMAN MCCOY:  You contacted Brian?

5    MR. VAN METER:  No, I didn't contact Peggy.

6    COUNCILMAN MCCOY:  You tried to contact

7    Peggy?

8    MR. VAN METER:  I tried to contact her.

9    She had remarried and living somewhere in

10   Florida.

11   COUNCILMAN MCCOY:  All right.  Let me ask

12   you a question.  Why did you get them all

13   October the 4th --

14   MR. VAN METER:  They stayed in my pickup

15   truck for a couple of weeks.

16   COUNCILMAN MCCOY:  Hang on.  Hang on.  Let

17   me ask my question.

18   MR. VAN METER:  I mean, because if I would

19   have thought --

20   COUNCILMAN MCCOY:  Let me ask you a

21   question first before you tell me the answer.

22   Why on October the 4th did you get them, and

23   you contacted Ricky because we got a statement

24   from him and we got a statement from you, I

25   believe from Peggy's husband and all of those

1    people?

2        MR. VAN METER:  Yeah.

3        COUNCILMAN MCCOY:  For you to take 26 days

4    for you to contact the Judge who's right here

5    in the same building with you?

6        MR. VAN METER:  Well, I was thinking he was

7    going through budget hearings because y'all

8    hadn't approved a budget for the raise.  And I

9    said, well, I'll see him.  When I see him, I'll

10   give him his.  Because they rode in my pickup

11   truck for a week or so.  I mean, gentlemen, if

12   I was --

13       COUNCILMAN MCCOY:  I mean, because we went

14   through a lot of trouble to get Peggy because

15   you called her ex-husband.  You called some

16   jail down in Florida and stuff.

17       MR. VAN METER:  I was trying to get a hold

18   of her, and I was trying to --

19       COUNCILMAN MCCOY:  I'm just curious as to

20   why you didn't give Judge his?

21       MR. VAN METER:  Because I hadn't seen him.

22       COUNCILMAN MCCOY:  You work in the same

23   building.

24       MR. VAN METER:  I hadn't seen him.  I mean,

25   I see him every once in awhile.  But, if I did

1    see him, hey, I got something for you, because

2    they was out there in my truck.

3        COUNCILMAN MCCOY:  Okay.

4        MR. VAN METER:  And, if I was going to

5    steal something, I wouldn't do it in broad

6    daylight in front of a bunch of firemen.  I

7    mean, you know.

8        COUNCILMAN MCCOY:  I'm just curious as to

9    why it took so long.

10       MR. HARRIS:  I think your question goes

11   directly to the heart of what I said while ago

12   and what our whole argument is.  He thought

13   that this was nothing more than just junk.  I

14   mean, they were sitting in his truck, and he

15   hadn't seen the judge yet.  I mean, he did

16   not -- and at the point in time when he found

17   out that there was a problem here, he was never

18   even called in and asked his side of the

19   story.  The investigation was started.

20       MR. VAN METER:  See, I got a phone call.

21       MR. HARRIS:  And, when he found out, he

22   called up and said, hey, yeah, I got them.

23   I'll be glad to bring them back if there's a

24   problem.

25       MR. VAN METER:  I got a phone call from

1    Eddie Chandler on Sunday afternoon saying that

2    I was being investigated.

3         MR. NIX:  Did Eddie Chandler say how he

4    knew?

5         MR. VAN METER:  No, sir.

6         MR. NIX:  Did he indicate any council

7    member may have told him?

8         MR. VAN METER:  He didn't say.  He told me

9    that Teddy Morris was doing the investigation.

10        MR. NIX:  Well, that's in your statement,

11   and I thought that was extremely interesting

12   that a person outside the city would call the

13   subject of an investigation.

14        MR. VAN METER:  So when I asked him what it

15   was about, he told me about personnel files.

16   And he told me who was doing the investigation,

17   Detective Morris.  I picked up the phone, and I

18   called Chief Docimo.  He wouldn't make a

19   comment.  I called Teddy Morris.  He said that

20   he would need to talk to me later but he

21   couldn't talk to me right now about it.  And so

22   then I said, well, I'll call Joel.  So I called

23   Joel at home.

24        MR. NIX:  A month later?

25        MR. HOLLEY:  No.  He called me on October

1  the 30th.

2      MR. VAN METER:  That's when I found out

3  about it, when they're investigating me.

4      MR. NIX:  Right.  So you didn't call until

5  you knew you were being investigated?

6      MR. VAN METER:  Right.  Because I didn't

7  think it was a problem, not until then.  And

8  then I said, I told Joel, I said -- I told

9  Joel, I said I will be down there first thing

10 in the morning because they're laying in there

11 on my kitchen table now.  Because I took them

12 out of the truck.

13     MR. NIX:  I think the question Council

14 Member McCoy asked was very pertinent.  There's

15 a difference between throwing something away

16 and destroying it.  By your own admission they

17 were burning it.

18     MR. VAN METER:  No, I said they was

19 throwing them in the trash can.  Y'all say they

20 was burning them.  I don't know what they was

21 doing with them.

22     MR. NIX:  Okay.  Well, there are statements

23 in here saying that they were being burned.

24 And like Bill said, I mean, he's made some

25 points, valid points.  Our point is, Dean, you

1   should have asked somebody.  You should have

2   gone -- I mean, you've been a police officer

3   for a long time.  Why didn't you call Judge

4   Holley?  Why didn't you call the fire chief?

5        MR. VAN METER:  Well, see, I didn't think

6   there was a problem, because they was throwing

7   them away.

8        MR. NIX:  Well, do you know what?  It

9   turned out it was a problem because it's City

10  property and you took it without permission.

11       MR. INGRAM:  But as soon as -- see, the

12  property was supposedly taken on the 3rd.  The

13  investigation was started on October the 27th.

14  At the time that he found out that there was

15  some problem, there was an investigation going

16  on, he immediately, immediately called and

17  informed "I've got these files.  I didn't know

18  there was a problem.  I'll bring them back to

19  you."

20       MR. NIX:  Okay.  My response to that would

21  be a lot of people don't say they're guilty

22  until their hand gets caught in the cookie jar.

23       COUNCILMAN MALONE:  Well, I want to know

24  about this particular state law dealing with

25  destroying files, because that's the whole case

1   right there.  You know, if we had that in

2   place, could this have been avoided?  If we had

3   followed what the State had set forth?

4        MR. HOLLEY:  Mr. Malone, when we decided --

5   and whether or not we complied --

6        COUNCILMAN MALONE:  And, also, with this

7   new personnel officer that we have, what is her

8   responsibilities?  If these files are so

9   sensitive, should she be there to supervise

10  these files so nobody else would pick them up

11  and take them?  Or should she give instructions

12  to the fire department?  Because really and

13  truly, in her statement, I know this is not a

14  trial, but those files stayed in the hall for

15  nine to 10 days.  We don't know who went inside

16  of the boxes.  This is her statement.  They

17  left on the 4th.  It was on the 26th or 23rd

18  when she put the files in the hall, and that's

19  nine to 10 days.

20       MR. NIX:  You make a good point.  And, if

21  we find out about anybody who took them, then

22  they'll be disciplined as well.

23       MR. HOLLEY:  Two wrongs don't make a right,

24  Tony.

25       COUNCILMAN MALONE:  Amen.