1    MR. HOLLEY:  To answer your question, this

2    document that Mr. Harris gave me says, Revised

3    August 3rd, '05.  So it's pretty new, the

4    revision.  Now, yeah, I admit -- I mean, I take

5    the blame.  I'm your city manager, and I've

6    been on board about six months.  But we were

7    trying to protect the City's interest.  Okay?

8    The reasons those boxes are back there in the

9    hall, we didn't have anymore room.  The

10   personnel files were not left in the hall

11   always.  We were trying to make room.

12   Ms. Gunnels had control over those.  We're not

13   aware that any city employee went in those

14   files while they were in there.

15        Now, you know, they talked about

16   abandoned -- I mean, property thrown away and

17   destroyed.  The Supreme Court has ruled that

18   once you throw something in the trash can, then

19   you no longer have a right of privacy.  That's

20   why some news man that wants to can go to your

21   house.  And, if your trash can is out by the

22   road, he can go through your trash.  This was

23   not property thrown away.  It was entrusted to

24   city employees to put on the back of a city

25   vehicle to try to save the city money because

1    they were burning a house.  They actually

2    scattered the files all over the floor like

3    cinder so it would be properly burned.

4         Now, I think what is important here is that

5    if Mr. Van Meter thought that, oh, something is

6    amiss, they've made arguments that those files

7    were left there where anybody could get them.

8    If he had been a police officer in this City

9    for a total 27 years, why didn't he take

10    control?  Why didn't he go to his supervisor?

11    Why didn't he come to me and say, y'all need to

12    protect the property.

13         Second of all, like Mr. McCoy asked and I

14    asked him earlier, why didn't you tell

15    somebody?  Now, he took my file.  Quite

16    frankly, I didn't know I had a file from 1977.

17    He could have slipped it under my door.  As he

18    said, he knew where I lived.  He could have

19    brought it to my house.  He had my city cell

20    phone number.  And he didn't.

21         COUNCILMAN MALONE:  I understand that.  But

22    my question is we have got him not charged but

23    he has been disciplined for theft.

24         MR. HOLLEY:  Yes, sir.  Nobody gave him

25    permission to get on the back of a truck and

1    take property, sensitive property.  And, as you

2    know, right now, with the name and the social

3    security number, you can steal identity.  Now,

4    I asked Dean --

5         COUNCILMAN MALONE:  Okay.  They stayed in

6    the hall for nine to 10 days.  Anybody could

7    have went in there and got them.

8         MR. HOLLEY:  No, sir, not all personnel

9    files were in there.

10        COUNCILMAN MALONE:  We don't know that.

11   The statement doesn't say that.

12        MR. HOLLEY:  Well, none were taken back

13   there, Mr. Malone.

14        MR. NIX:  If anybody had taken them, that

15   would have been theft, too.

16        COUNCILMAN MALONE:  I understand that.

17        MR. HOLLEY:  If we find out somebody took

18   them, they should be disciplined or prosecuted,

19   also.

20        COUNCILMAN MALONE:  I understand that.  But

21   they was left unattended for nine to 10 days.

22        MR. HOLLEY:  But that doesn't make it right

23   for him to take them.

24        COUNCILMAN MALONE:  Well, I'm not saying he

25   wasn't wrong for taking them.  But the theft --

1    we got him for theft.

2        MR. HOLLEY:  Yes, sir.  I asked him --

3        COUNCILMAN MALONE:  What is the value?

4    What is the monetary value?

5        MR. HOLLEY:  The intrinsic value is not

6    important.  It's the fact that those files did

7    contain personal information.  I asked Mr. Van

8    Meter in front of this council, as long as

9    you've worked here, have you ever known of one

10   employee to be in possession of somebody else's

11   personnel file?  No.

12       Second of all, I asked him in the hearing,

13   Dean, did you read in those files?  He said,

14   No, I didn't read them.  But yet there's a

15   statement taken by one of your detectives from

16   a police officer, the police officer says he

17   ran into Dean's son, Preston.  And Preston,

18   according to the police officer, said, Hey, my

19   daddy is on administrative leave, paid

20   administrative leave because he took some

21   files.  And something to the effect, Now, Brian

22   Poe can sue the city again.  So that indicates

23   somebody had to read the file.

24       Now, there's a bigger issue here, too.

25   Okay?  Your police chief, the department head,

1    recommended termination.  After looking at the

2    facts, after a proper due process hearing,

3    after answering questions, my questions, after

4    having him listen and the lawyers present, I

5    upheld the department head's recommendation.

6    If you all don't, then you're going to create

7    more problems for the City.

8         What are you going to do when a street

9    department employee takes a couple of fittings

10   because he might run a business on the side?

11        COUNCILMAN MCCOY:  Judge Milford, don't you

12   think that this type of discussion is probably

13   going to be better for deliberation after we

14   have made a decision whether it's an actual

15   theft or not?

16        JUDGE MILFORD:  Well, the hearing is

17   supposed to be informal as possible.  And I've

18   been trying to do that.

19        COUNCILMAN MCCOY:  I do have one question

20   for the city inspector.  Is he here?

21        MR. NIX:  Who?

22        COUNCILMAN MCCOY:  Jerry.

23        MR. HOLLEY:  I don't know.

24        COUNCILMAN YARBROUGH:  He said he was going

25   home when he locked the city hall up over

1    there.

2        MR. HARRIS:  Could I make a response to

3    something that Judge Holley just said?

4        JUDGE MILFORD:  I don't see why not.

5        MR. HARRIS:  Judge Holley is sitting there

6    saying, you know, bottom line is he took the

7    files.  And, you know, the way I see this --

8    and maybe I'm wrong -- the same reason he asked

9    him, well, why didn't you ask somebody?  Why

10   didn't you do this?  The answer to that is real

11   simple.  It's the same reason that those files

12   were left in the hall for nine days.  And it's

13   the same reason that they were left scattered

14   in a house for several hours in an abandoned

15   house all over the floor, and it's the same

16   reason that the City of Lanett did not abide by

17   state law by not getting permission to destroy

18   these files, because nobody ever thought about

19   it.

20       Dean just didn't think there was anything

21   wrong with it.  And, if he didn't think

22   anything was wrong with it, it's not a theft

23   because there's no intent.  And you can call it

24   administrative.  You can call it a disciplinary

25   action.  You can call it a disciplinary

1    charge.  You can call it anything you want to

2    but call the man a thief.  Calling a man who

3    has been a police officer for 27 years a thief

4    and you're labeling him as that with these

5    charges because he made a mistake and the City

6    has made a mistake here.  And I think at the

7    end of the day, every one of y'all up there,

8    everybody here, I've known everybody here just

9    about, for a long time.  And there ain't a soul

10   here that's not a decent human being and not

11   conscientious about what they're doing right

12   here tonight.  And I think that the best way

13   that the City could be served here, the best

14   way is for everybody to take responsibility and

15   say we made some mistakes.  We don't have a

16   proper procedure.  We didn't look at the state

17   law.  We didn't follow it.  We made a mistake.

18       The chief of police, maybe he jumped the

19   gun a little bit on what he thought happened

20   here.  He didn't even get Dean's side of the

21   story before he started an investigation.  Got

22   Teddy Morris's summary in there of his

23   investigation.  The chief of police told him

24   who to interview and what to do.  He didn't

25   gather facts.  He started trying to go prove a

1  case that Dean Van Meter was a thief.

2      And what the City of Lanett would be best

3  served by, in my opinion -- and this is an

4  informal hearing, so I can give my opinion --

5  is for everybody to just sit back, take some

6  responsibility and say, hey, we've made some

7  mistakes here.  Let's address it so it doesn't

8  happen again.  Then everybody wins.  Everybody

9  wins.  You're not throwing a man who has given

10  27 years of his life away.  You folks have met

11  your responsibility.  Judge gets a procedure

12  that he can deal with from now on so it doesn't

13  happen again.  And the people of the City of

14  Lanett are best served.  That's what needs to

15  happen here.

16      MR. NIX:  Let me respond.  Bill made some

17  good points, and Mr. Malone made some good

18  points.  And, as the city attorney, I would

19  advise the council and -- excuse me -- the city

20  manager who is the chief employment officer of

21  the City, if other mistakes were made, other

22  discipline needs to be meted out.

23      COUNCILMAN MCCOY:  I agree.

24      MR. NIX:  If we find, as Mr. Harris very

25  astutely and eloquently stated, that we didn't

1  follow a policy, by golly, let's do something

2  about it.  Somebody else screwed up.  Call them

3  on the carpet.  Give them a discipline.  I

4  agree with him in part.

5  　　　MR. HARRIS:  Well, if you agree with me,

6  Mr. Nix, why wasn't there an investigation done

7  to talk about these files that were sitting

8  there in the hallway?  Was there an

9  investigation to determine if anything was

10  taken out of those files?

11  　　　COUNCILMAN MCCOY:  Would we have known if

12  we had any other problems had we not done an

13  investigation?  Would we have known that there

14  were other problems that you're pointing out,

15  because you asked the question, why did we do

16  an investigation --

17  　　　MR. HARRIS:  No.  I'm saying why wasn't one

18  done?  Nobody did an investigation to determine

19  if anything was taken out of those files.

20  　　　COUNCILMAN MCCOY:  No, you say -- you

21  asked --

22  　　　MR. HARRIS:  There may very well have been

23  something taken out of those files that sat out

24  in the hallway for nine days.  But you don't

25  know it because you didn't have somebody as

1   honest as Dean Van Meter to say, hey, I made a

2   mistake.  Yeah, I got ones that came off the

3   truck.  Here they are.  There may have been

4   files out of that box that are right now

5   somewhere else that you don't know about.

6        MR. NIX:  Well, you know, Mr. Harris,

7   Mr. Van Meter isn't the one that came up first

8   with this.  And you've read the investigation

9   file.  It came not from Mr. Van Meter.  And I

10   would tend to agree with you if Dean had come

11   up and gone, you know, boy, I thought about it

12   and I'm changing my mind.  But all of this came

13   up because somebody saw him.  My response to

14   you would you be -- and I think you're right --

15   hey, if we had seen somebody rooting around in

16   those files and somebody had come to Joel and

17   go, hey, there's some files sitting out there

18   in the hall --

19        MR. HARRIS:  But you don't know that

20   anybody didn't root in it, is my point, because

21   that wasn't investigated.

22        MR. HOLLEY:  Mr. Mayor, it doesn't matter.

23   It doesn't really matter.  If we need a written

24   policy to destroy records, we can develop

25   that.  If we had had a written policy, if we

1  didn't comply with every "I," dot every "T" in

2  that, this still doesn't change the fact that

3  an employee got in the back of a pickup

4  truck -- not by a barrel, but on the back of a

5  pickup truck and went through files.

6  MAYOR CRAWLEY:  And where was the truck

7  located?

8  MR. HOLLEY:  Back of the fire department.

9  MR. HARRIS:  Beside the barrel they were

10  burning.  Beside the barrel.

11  MAYOR CRAWLEY:  Were they burning?  Were

12  the files being burned in the barrel?

13  MR. VAN METER:  I don't know.  I didn't see

14  any smoke or anything coming out.

15  MR. HOLLEY:  If you read the statements,

16  there are three firemen that say that.  Yes,

17  sir.  They're present.

18  MAYOR CRAWLEY:  My question to you all is

19  what I want to know is was the files was city

20  property and were they on city property?  And

21  were they taken off of city property?  It

22  doesn't have to be files.  It could have been

23  anything.  It could have been that recorder.

24  MR. INGRAM:  Mr. Mayor, answer yes, yes,

25  and yes to each one of those questions.  The

1    fact of the matter is once the problem appeared

2    to Mr. Van meter, he immediately returned the

3    files.  Not only tried to, he did return the

4    files that he had in his possession.

5        Now, Mr. Nix likes to keep making the

6    statement, yeah, he returned them because he

7    got his hand caught in the cookie jar.  Well,

8    are we not here because the City got their hand

9    in the cookie jar, too, because they didn't --

10   something was done wrong and now their hand is

11   caught in the cookie jar?  And we're in the

12   same procedure because Mr. Van meter is the

13   problem here?  That's not the case.  You know,

14   he didn't do anything intentionally.  Y'all

15   didn't do anything intentionally.  He's wanting

16   his job back.  He loves this City.  He has

17   served this City, and that's what this is all

18   about.  He doesn't want to walk out of here and

19   be in disagreement with anyone here.  He made a

20   mistake.  He admitted his mistake.  The

21   investigation started.  Word came down to him.

22   He says, hey, I guess I've done something

23   wrong.  I'm going to bring it back.  His hand

24   wasn't caught in the cookie jar.  This is an

25   honest man.  If he thought he was doing

1   something wrong, maybe he would have contacted

2   somebody and said, hey, can I have these

3   files?

4       Y'all all have known this man. You've

5   known him for a long time. You know what kind

6   of person he is, what kind of individual he

7   is. Don't make a scapegoat out of him because

8   something else was not done right and something

9   happened in the City and some files got

10  missing. You know, this is not the right place

11  or the right time or the right person to do

12  this to.

13      COUNCILMAN MALONE: The statement right

14  here. I mean, I know I'm not doing this, but

15  this is written by Mr. Hal Shealey, and this

16  bothers me. I know that this -- he said here

17  that when they went to scatter the files

18  through this vacant house, he noticed some

19  furniture that was inside the house.

20      COUNCILMAN MCCOY: What?

21      COUNCILMAN MALONE: Some furniture,

22  contents. He went back. When they went back

23  to burn it, the furniture was gone. So that

24  means somebody had entered this house. And who

25  can say that when they entered it that they

1    didn't take any files?  The statement said they

2    scattered files.

3        MR. NIX:  And, if we find out who they are,

4    we'll either charge them with theft or

5    discipline them.

6        COUNCILMAN MALONE:  There were a lot of

7    errors made.  That's what I'm saying.

8        MR. HARRIS:  Mayor Crawley, I would like to

9    respond to what you're talking about, about the

10   recorder, the comment that you made that it was

11   no different than the recorder.

12       MAYOR CRAWLEY:  Yes.

13       MR. HARRIS:  In principle, I agree with

14   you.  But, in this situation, I can't agree

15   with you and the reason being is we're talking

16   about these files that Dean thought were of no

17   value and were being discarded and were trash,

18   whereas that recorder is something obviously of

19   value and obviously belongs to somebody.  And

20   he would know that that was somebody's

21   property.  I mean, I think we're talking apples

22   and oranges there.  And so I don't really think

23   that your analogy there is admirable.  I mean,

24   that's what, as I see it.  He thought this was

25   trash.  He thought it was discarded stuff that

1    was of no value to anybody, to the City or

2    anything else.  Dean or anybody else is not

3    going to come in here and take that tape

4    recorder.  They would know that was theft of

5    property.  They know that belongs to the City.

6    It's in this building.  It's sitting there.

7    It's not beside a burning barrel with five

8    other tape recorders sitting there burned up in

9    a barrel in a truckload that they're going back

10   and forth putting in the barrel.  So, now, I

11   don't think that analogy is really fair with

12   some other type of property.  I mean, we kind

13   of got a unique situation here, I guess is what

14   I'm saying, as far as the property itself.

15        COUNCILMAN MCCOY:  When we get those people

16   to sign that release whenever we burn houses,

17   are we taking responsibility of that property

18   until that is completed?  Are we assuming any

19   liability on those houses or anything?

20        MR. HOLLEY:  If we get a court order or a

21   release to burn a house, then the owner has had

22   plenty of time to remove anything they want.

23   Anything that's left in the house, when they

24   give notice of the burning, is assumed that

25   they don't want.  Now, I don't know anything

1    about any furniture.

2         But, see, the problem here is that for

3    whatever they say, Dean took those files.  The

4    only thing they can do is do deflect blame on

5    somebody else.  If they want to blame me,

6    that's fine.  If they want to blame

7    Ms. Gunnels, that's fine.

8         MR. INGRAM:  Judge, we're not blaming

9    anybody here tonight.

10        MR. HOLLEY:  But deflecting guilt.  Okay?

11        MR. INGRAM:  We're not deflecting guilt.

12        MR. HOLLEY:  Well, yes, you are.  You're

13   saying because we didn't do this or we didn't

14   do that, you shouldn't do this.  It doesn't

15   matter if other people took files.  If we know

16   about it, we'll do that, too.  But, you know,

17   all the mayor and council are trying to do

18   things right in the City.  And by golly I

19   certainly have tried to do that since I been

20   down here for the last six and a half months.

21   To do the best we can for the welfare of the

22   City.  And, in making my decision, I even put

23   in writing that my consideration had to not

24   only go to this employee but to the welfare of

25   the City as a whole.

1    For whatever reason, this is a 27-year law

2    enforcement man.  Any reasonable person would

3    have known those were personnel files and you

4    ask somebody before you take them.  If Dean

5    wanted to give me my file for sentimental

6    reasons, he had 26 or 27 days to do it.  For

7    whatever reason, he didn't return them until he

8    found out there was an investigation.  I'm

9    sorry.  He did it.  And whatever y'all decide

10   is going to set precedent.

11        Now, they can -- and rightfully so -- if we

12   made a clerical mistake about a policy, that

13   hasn't got nothing to do with somebody taking

14   City property.  And I disagree with Mr. Harris,

15   respectfully.  In my opinion, those personnel

16   files were probably just as or more important

17   than a tangible piece of property, because it

18   does have personal information.

19        Now, I certainly don't think Dean would

20   have given my social security number away.

21   But, if he did, somebody could steal my

22   identity.  I don't think he would, but my file

23   was taken.

24        MR. HARRIS:  So could somebody in that

25   abandoned house.

1    MR. HOLLEY:  Excuse me.  I didn't interrupt
2    you.  Don't interrupt me.  Okay?  It doesn't
3    matter.  You can say people took files over
4    there.  You can say 25 people.  But it don't
5    change the fact that your client did it, too.
6    That's the difference.
7        MR. HARRIS:  Judge, we conceded that right
8    from the start that he took the files.
9        MR. HOLLEY:  Well, I want you all to
10   understand that whatever you decide is going to
11   set some precedent, and we've been trying to do
12   things right.  If you want to be able to
13   continue to have effective department heads on
14   management teams, you're going to have to stand
15   behind them.  Because, if you don't, you're
16   going to have chaos down here.
17       COUNCILMAN MALONE:  Mr. City Manager?
18       MR. HOLLEY:  Yes, sir.
19       COUNCILMAN MALONE:  My concern again is due
20   process of this employee.
21       MR. HOLLEY:  Yes, sir.  Ours, too.  We've
22   gone over backwards to do that.
23       COUNCILMAN MALONE:  I understand.  I
24   understand.  How long was it before we took
25   Mr. Van Meter's statement before he knew he was

1    being investigated?

2        MR. HOLLEY:   That's a good question.

3    Mr. Harris talked about, Well, they didn't even

4    ask him.  When the police chief came to me and

5    said I have information that personnel files

6    belonging to the City were taken, at that point

7    we really didn't know who.  He had a good

8    idea.  Because Mr. Poe refused to tell him who

9    took them.  So I advised the police chief you

10   need to start an internal investigation,

11   because at that point we didn't know what all

12   was involved.

13       We didn't have a duty to go to him right

14   there.  So he took his investigators and says,

15   these are the people's names that we found out

16   or he found out maybe knew something about it.

17   We tried -- he tried to contact everybody that

18   had any knowledge.  And rightfully so, he

19   contacted Mr. Van Meter.  Dean came in with a

20   printed typed -- pre-typed statement, and he

21   gave another statement.  Even talked about the

22   Garrity Rule.  That's a special protection for

23   police officers to invoke that so that he can

24   talk or he can answer questions.  We don't have

25   any -- nobody has any inkling to charge him

1    criminally.  None whatsoever.

2        So we've bent over backwards for due

3    process.  Okay?  And, you know, they make some

4    good points, you know.  You bet your bottom

5    dollar if we destroy records again, whatever it

6    costs the City, we'll rent a commercial

7    shredder and spend, I don't know, a thousand or

8    two thousand dollars to shred files.  First

9    time we ever done it.  If you have to keep

10   personnel records six years after an employee

11   leaves -- my file was dated 1977.  So nothing

12   had been destroyed before then.  We had run out

13   of room.  And they can say you didn't do this

14   and somebody maybe should have guarded it with

15   a gun.  My Lord, if he's a policeman, why

16   didn't he can take possession of them?

17       COUNCILMAN MALONE:  Mr. City Manager, do

18   you believe that this would be just like a bad

19   judgment instead of a theft charge?

20       MR. HOLLEY:  No, sir, I don't.  Any

21   reasonable person knows that you don't take

22   personnel files.  Or if you see them, you go to

23   somebody and ask them about it.

24       COUNCILMAN MALONE:  Have we ever had a

25   meeting with employees and inform employees

1    what they should do when they come --

2        MR. HOLLEY:  Tony, you don't have to do

3    that.  You don't tell an employee not to steal.

4        COUNCILMAN MALONE:  When it comes to

5    personnel files and policy, have employees been

6    briefed?

7        MR. HOLLEY:  Sir, I've not been here six

8    months --

9        COUNCILMAN MALONE:  I know you haven't.

10   What I'm saying is we haven't.

11       MR. HOLLEY:  All I can say is this.  I'm

12   sorry this has happened to this employee.  But

13   I had to consider the overall good of the City

14   and what would happen down the road.  And I

15   want y'all to consider that, too.  I'm sorry

16   for Dean.  I've known him a long time.  And you

17   can say everything you want to say.  But how

18   many of you know -- you're a school teacher,

19   and you work for a corporation.  You work for a

20   corporation.  You work for an attorney

21   corporation.  How many of you know you don't go

22   take a file that has somebody's name on it and

23   keep it?

24       COUNCILMAN MALONE:  It wouldn't be theft.

25       MR. INGRAM:  I don't think he kept it.

1    Mr. Holley, I don't think he kept it.

2        MR. HOLLEY:  Yes, sir, he did keep it.

3        MR. INGRAM:  No, sir, he did not keep it.

4    He returned the files.

5        MR. HOLLEY:  No, sir, he didn't return

6    them.

7        MR. INGRAM:  Wait a minute.  Wait a

8    minute.  You stopped.  Now, don't interrupt me.

9        MR. HOLLEY:  I wasn't finished.  You

10   interrupted me, sir.

11       COUNCILMAN MCCOY:  Judge, I think we

12   probably need to go into --

13       MR. HOLLEY:  He didn't return them all.  He

14   gave them away to people.

15       MR. INGRAM:  The fact of the matter is --

16   the fact of the matter is that Mr. Don Phillips

17   contacted the City.

18       MR. HOLLEY:  No, sir, he did not contact

19   the City.

20       MR. INGRAM:  Somebody contacted the City on

21   behalf of Brian Poe.

22       MR. HOLLEY:  No, sir, they did not.  You're

23   wrong.  Just like you were wrong when you

24   thought he just had the files a day or two.

25   No, sir.  I contacted Don Phillips because we

1    had information -- the Chief of Police had

2    information that Mr. Van Meter had taken

3    files.  One of them was Mr. Poe's, and that

4    Mr. Poe took it to his lawyer.

5        MR. INGRAM:  So how did the Chief get that

6    information?

7        MR. HOLLEY:  I don't know.  Ask him.  He's

8    here.  Do you want to?

9        MR. INGRAM:  Well, I'm sure you've already

10   asked him.  Can't you answer my question?

11       MR. HOLLEY:  I think another employee told

12   him.

13       MR. INGRAM:  That's what this all involves,

14   though.  Because Brian Poe and Don Phillips

15   made some sort of threat or you heard somebody

16   say, Going to sue the City again.

17       MR. HOLLEY:  No, sir.  That allegedly came

18   from your client or somebody connected to him.

19       MR. INGRAM:  Well, my client never said

20   that.

21       MR. HOLLEY:  Well, I tell you.  I went to

22   -- Well, maybe Mr. Poe made the allegation.  I

23   don't know.  But, now, if you want to know the

24   truth, I don't know, but apparently Mr. Poe had

25   some sort of dealing with the City long ago.

1    It resulted in some sort of lawsuit.  From what
2    was told to me -- or this is like three times
3    hearsay -- he felt concerned because there was
4    certain information supposed to have been
5    removed from his file.  I don't know whether
6    that's true or not.  I did go to Mr. Phillips
7    and made him aware.  And Mr. Phillips says
8    there was no confidentiality agreement to my
9    knowledge in that; I will return your file.  So
10   Mr. Phillips brought the file to me, because he
11   recognized it was city property.  Did it within
12   an hour or an hour and a half.
13        JUDGE MILFORD:  Let me kind of interject in
14   here.  I think Councilman McCoy made a good
15   point.  We've moved into several statements
16   that have been of a general nature of closing
17   arguments, for lack of a better way to term
18   them, even though we're not in a formal court
19   setting.
20        Is there any other evidence that either
21   side feels need to be presented?
22        MR. HARRIS:  I would just like to address
23   one thing that Judge Holley just said about the
24   statement that I would like to clarify that
25   Mr. Van Meter made.  That he came in and had a

1   typed statement, that's correct.  And then he

2   gave another statement while he was there.

3   There was also another statement there, and the

4   statement that was given by him then at that

5   time was written by Detective Morris and handed

6   to Dean and told him to sign it.  And he told

7   him that, basically, in the statement -- wrote

8   the statement for him, you know, I admit

9   stealing these files.  And Dean wouldn't sign

10  that.  So there was another statement there,

11  too.  And that was from the City, and that was

12  basically -- The way this whole investigation

13  was conducted was not a fact-finding mission,

14  but more of a criminal-type investigation where

15  you're trying to prove a case versus a

16  fact-finding mission to find out what's going

17  on and let these people make a decision.  Judge

18  Holley and everybody else that's involved.  If

19  you'll look at every one of those statements,

20  three-quarters of them were written by

21  Mr. Morris.

22      Now, I was a police officer for a lot of

23  years myself, and I put a lot of people in jail

24  over the years.  And I've taken a lot of

25  interviews over the years.  And, as a rule of

thumb, a police officer does not write a
statement for somebody unless they specifically
ask him to because, number one, they don't have
the educational requirements to write one
that's legible or articulate enough to serve
the purpose.  And then you would write it for
them and read it to them and let them sign it.

Now, you know, all of these statements were
written by him.  They were all signed a certain
way.  You're going to have a hard time
convincing me Ms. Gunnels couldn't write her
own statement.  I met her the other day.  Very
articulate lady.  Very nice.  She can write her
own statement.  Dean could have wrote his own
statement.  Here's the statement, sign it.  I
don't like the one you've got.

JUDGE MILFORD:  Does the City have any
other evidence you want to present?

MR. NIX:  We had planned to call Lieutenant
Van Meter.  I mean, but he's been forthcoming
about his involvement.  He's answered the
questions we want to.  At the appropriate time
when Your Honor decides and when Mr. Harris and
Mr. Ingram are comfortable with it because we
want them to have the opportunity to present

1    whatever evidence they want to, then we just

2    have a couple of comments to close, as I'm sure

3    they do.

4        JUDGE MILFORD:  Does Mr. Van Meter have any

5    other evidence that he wants to present?  Not

6    in the nature of argument, but any other

7    evidence?

8        MR. HARRIS:  The only other thing, Judge,

9    that I've got that I would like to present, I'd

10   like to give a copy to every member here, and

11   that's a copy of the *Code of Alabama* that says

12   what the definition of theft of property is.

13   So that when you do deliberate, you can see

14   what the law says theft is.  Not what I say and

15   not what somebody else says, but you can see

16   what the law says.

17       COUNCILMAN MALONE:  I'm curious,

18   Mr. Harris.  It's kind of insignificant.  When

19   did I ever meet you?

20       MR. HARRIS:  You know, I'm not sure.

21       COUNCILMAN MALONE:  You said you've known

22   me a long time.

23       MR. HARRIS:  Well, I've known of you.  I've

24   known of Mr. Malone.  I have known of

25   Mr. Heard.  I've known of Mr. Crawley.  I grew

up several miles down the road from Judge

Milford.  I've known Mike Yarbrough for 13

years.  I know Kyle's family.  I've never met

Kyle to know Kyle.  I've known Judge for 30

years.  There's not a person here -- my point

was I think everybody here wants to do what is

the right thing for the City of Lanett.  I

mean, that's what this whole thing should be

about.

COUNCILMAN MALONE:  I understand.

JUDGE MILFORD:  Any other evidence that you

want to present?

MR. HARRIS:  I don't have to give that to

them right this minute.  But before they

deliberate, I would like for them to have that.

JUDGE MILFORD:  Does any member of the City

Council have any questions?  At this point,

what I'd like to do by winding up is let each

side have an opportunity to summarize their

position.  And then, Mr. Nix, I will ask you

since you're more familiar with the City's

policies than I am to indicate to the council

how they should proceed from here.

MR. NIX:  I will, Your Honor.  Thank you

very much.  And basically --

1    JUDGE MILFORD:  Does any member of the

2    counsel have anything they want to say?

3    COUNCILMAN MALONE:  I do.  I want to hear

4    from Ms. Gunnels.

5    COUNCILMAN MCCOY:  Could we take a

6    10-minute break?

7    JUDGE MILFORD:  Yes.

8    (RECESS)

9    JUDGE MILFORD:  Let the Record reflect the

10   mayor and council are all present.  Councilman

11   Malone has asked Ms. Gunnels to present some

12   evidence.  Ms. Gunnels, would you raise your

13   right hand?

14   (WITNESS SWORN)

15   COUNCILMAN MALONE:  Ms. Gunnels, in your

16   statement, you stated that you began to bring

17   the personnel files into the hall on 9/23 of

18   '05, to see what you had to burn.  You also

19   stated that you had a very heavy large-duty

20   trash bag or file that was given to Captain

21   Meecham for him and his shift to burn on that

22   day, and they did not burn them on that day.

23   MS. GUNNELS:  They did burn them on that

24   day.

25   COUNCILMAN MALONE:  Now, on the 26th, you

1  stated that you had placed nine boxes in the

2  hallway again to be burned.  I think they

3  burned the house on October the 4th.

4      MS. GUNNELS:  The 3rd.  It was the 3rd.

5      MR. HOLLEY:  Monday night.

6      MS. GUNNELS:  They burned it after the

7  council meeting.

8      COUNCILMAN MALONE:  So the file that you

9  gave him on the 23rd, they didn't burn all of

10  them at one time.  There was some left from

11  your statement?

12      MS. GUNNELS:  There were two boxes that

13  were put into the trash bag, and they were

14  taken out by Kelly Meecham on that Friday, the

15  23rd, and burned.  And then there were nine

16  more boxes that were going to have to be

17  burned.

18      COUNCILMAN MALONE:  Were all of the items

19  to be burned left in the hallway on that day?

20      MS. GUNNELS:  No.  No.  Well, now, I take

21  that back.  There were some files -- there was

22  a lot of boxes in the hallway.  Because when we

23  were moving, Focchan was moving into the old

24  personnel office.  And there were some

25  computers there that could not be moved.  So

1    Focchan and I had to swap offices.  So Focchan

2    had to move -- the room was in a huge mess.

3    There were boxes everywhere, files everywhere

4    in that room.  So the boxes in the cabinets,

5    the file cabinets had to be moved out in the

6    hallway for Focchan to move in. That was

7    sometime previous to September 23rd.

8         COUNCILMAN MALONE:  Did you give any

9    firefighters any special instructions to tell

10   them what to do or not to do or make sure that

11   nobody retrieved any files?

12        MS. GUNNELS:  I said, these are personnel

13   files.  These are to be burned.

14        COUNCILMAN MCCOY:  You told that to who?

15        MS. GUNNELS:  I told that to Kelly

16   Meecham.  I told that to Tim Jennings, and I

17   believe Hal Shealey, also.

18        COUNCILMAN MCCOY:  Okay.

19        JUDGE MILFORD:  Mr. Nix, do you have any

20   questions?

21        Mr. Harris, do you have any?

22        MR. HARRIS:  No.  I just got one thing, and

23   we touched on this before, Ms. Gunnels.  That

24   was the only instructions they got, correct?

25   That you gave them as far as files, just that

they're personnel files and need to be burned?

MS. GUNNELS:  Yes.  As far as I remember.
But there were other boxes of other information
such as payroll stuff and so forth that were to
be burned, too.  There was a whole hall full of
boxes.

MR. HARRIS:  I guess my question -- let me
try to rephrase it.  You didn't give any
special instructions that these are
confidential records; make sure nobody bothers
them?

MS. GUNNELS:  I said, These are personnel
files.  These are to be burned.

MR. HARRIS:  That was specifically what you
said and nothing more?  I just want to try to
be clear on what these people were told is
all.

MS. GUNNELS:  I mean, I guess I assumed
that anyone would know that personnel files
were confidential.

MR. HARRIS:  Thank you.

COUNCILMAN MCCOY:  It has been made a lot,
and I just want to kind of -- because you work
in this area -- about this hallway.  What is
the public access to this hallway?

1      MS. GUNNELS:  The doors -- okay.  This door

2    on this side coming out from the fire

3    department is open every day, but the public

4    would not really know that.  The fire

5    department comes in and out of that door.  The

6    backdoor is to be -- by my office is to be kept

7    locked at all times.

8       COUNCILMAN MCCOY:  Okay.  And then there's

9    a door going into where Genelle and all of

10   those are?

11      MS. GUNNELS:  Yeah, but that has a code.

12     COUNCILMAN MCCOY:  Okay.  But, I mean, so

13   the only one -- I'm just trying to determine,

14   you know, because we made a big -- these files

15   had been out in this hallway that anybody could

16   walk by and get them or whatever.  I'm just

17   trying to determine how much public access is

18   really in this hallway.

19     MS. GUNNELS:  Well, you might have somebody

20   coming by Jerry Thrower's office.  But I would

21   not say that there's a whole lot of traffic

22   from the public out there, because really they

23   wouldn't have that much business back there

24   unless they were going to see Jerry Thrower.

25     COUNCILMAN MCCOY:  Okay.  And who all's

offices and what is in this hallway?

MS. GUNNELS:  Okay.  My office is over there on the very end by the backdoor.

COUNCILMAN MCCOY:  Okay.

MS. GUNNELS:  Jerry Thrower's is back there.  The kitchen is back there.  But the backdoor, the employees have a key to come in and out the city hall.

COUNCILMAN MCCOY:  Okay.

MS. GUNNELS:  The access doors, all of those doors we've been told by the auditors are to be locked into the other offices which would be utilities and whatever.

COUNCILMAN MCCOY:  Okay.  So personnel, your office, the kitchen, the city building inspector and --

MS. GUNNELS:  And, when I leave my office over there, if I'm going to be gone any length at all, I lock the door.

COUNCILMAN MCCOY:  I'm just trying to determine if this is a heavily common traveled access or what?

MS. GUNNELS:  No, I wouldn't say that it is.

COUNCILMAN MCCOY:  Okay.

1    COUNCILMAN MALONE:  Other than employees?

2    MS. GUNNELS:  Other than city hall

3    employees.

4    COUNCILMAN MALONE:  City hall employees?

5    MS. GUNNELS:  Right.

6    COUNCILMAN MALONE:  Did you follow any type

7    of maybe process or policy when you thought

8    about destroying these files?  Was there

9    anything in place that you went by?

10   MS. GUNNELS:  We were not.  We were not

11   throwing them away.  We were to destroy them.

12   COUNCILMAN MALONE:  Did you follow any type

13   of --

14   MS. GUNNELS:  There is -- we don't have a

15   policy, no.  City of Lanett does not have a

16   policy about destroying files.  This was

17   something regarding the State that you can

18   destroy them and they can be destroyed by

19   shredding or by burning.

20   COUNCILMAN MALONE:  So you had to pull

21   something from the State?  A website or

22   something another?

23   MS. GUNNELS:  Debra had a book, and then I

24   pulled something off of the Internet.  And we

25   kept up with everything that was in the boxes

1   what was to be burned, how much you burned and

2   so forth.

3       COUNCILMAN MALONE:  Were you aware of

4   this -- what is that you all were handing out

5   while ago?

6       MR. HARRIS:  Local Government Records

7   Commission.

8       COUNCILMAN MALONE:  Are you aware of that?

9       MS. GUNNELS:  No.

10      COUNCILMAN MALONE:  That's all I have.

11      JUDGE MILFORD:  Any other person or

12  attorney have a question, council person?  Does

13  anyone have a question for Ms. Gunnels?

14      Do we need to receive any other evidence?

15      Mr. Dean, do y'all have anybody else that

16  you wanted to call?

17      MR. HARRIS:  No, sir.

18      JUDGE MILFORD:  Okay.  At this time I think

19  it would be appropriate for Mr. Nix and Mr. Van

20  Meter's counsel, whichever ones chooses to do

21  so to give you a brief summation of their

22  positions in this matter.  And then, Mr. Nix,

23  if you would follow that up --

24      MR. NIX:  I will explain the process.

25  Again, and I express gratitude to Mr. Harris

and Mr. Ingram and Mr. Van Meter.  They
followed, I think, what was appropriate
protocol in keeping this informal.  They
obviously are advocates for their client's
position, which they should be.

I don't think any of the facts are
disputed.  I mean, we all know Dean and Bill
and Jim have all conceded that we know Dean
took the file or their position seems to be
that it was "didn't realize that something was
being done wrong."

We, of course, respectfully disagree.  This
seems to us to be pretty clear-cut that this
was something that was obvious.  He got on the
back of a truck.  He took files.  They were
being destroyed.  He didn't seek anybody's
permission to do so.  Tellingly -- and I'm sure
Mr. Harris and Mr. Ingram would interpret this
differently than I would, since they
distributed the State definition of theft.  But
I direct your attention to the first one which
says, "A person commits the crime of theft if
he knowingly obtains or exerts unauthorized
control over the property of another with the
intent to deprive the owner of his or her

property." This was our property. He took
it. He gave it to other people. It seems
pretty clear-cut.

I want to remind you, though, that there
are two charges here. One is a Group II
offense of theft of property. The other is
conduct unbecoming of an officer. There are
two charges here that you need to consider.

Again, my hat is off to Bill and Jim.
They've done what they should do for their
client. This is more important than just this
one employee. I like Dean Van Meter. I've
known him all my life, doggone near it. And
I'm sorry he made this terrific mistake in
judgment and committed a disciplinary offense.
But, gentlemen, there's a change in the
attitude of this City that this council has
brought about in moving forward, in cleaning up
abuses which have existed and attempting to
move forward. I have a unique perspective in
that I've seen this for many, many years. And
finally you have department heads and city
managers who have made difficult decisions.

If you think this was easy for them to do,
you're wrong. It was not easy for them to do.

1  But the message this will send to the citizens

2  of the City of Lanett is extremely urgent.

3  This is a defining moment in this City's

4  history, and I don't mean to be mellow

5  dramatic, but I couldn't emphasize that any

6  more.

7      You hired the police chief.  You hired the

8  city manager.  It's time to stand behind them.

9  If you don't like the job they're doing, get

10  rid of them.  Get rid of Docimo.  Get rid of

11  Joel Holley.  If you don't think the job

12  they're doing is right, can them.  But, if you

13  do have faith in the people that you hire to

14  run this City, then you need to support them.

15  Because, if you don't, it's going to be more of

16  the same.  The same old same old that has gone

17  down in this City for years.  And finally this

18  council has had the brass to stand up and say

19  we've got to clean up the abuses that have

20  taken place for all of these years.  And one of

21  them is to blindside the people that you hire

22  to run this City.

23      I liken you as a board of directors of a

24  corporation.  You make policy.  You pick a

25  management team.  If your management team

doesn't run the City or run your corporation
the way you're supposed to, you fire them,
right?  But, if you hire the people that you
have faith in, then you listen to them and you
support them.  This means more than just this
one case, I'm telling you.  This is going to
send a message not only to the citizens of this
City, but to every other employee in this City.

MR. INGRAM:  Mayor and council, thank you
for the opportunity to have a hearing here
tonight with Mr. Van Meter.  And Mr. Nix
eloquently put it, as he said while ago, that a
mistake was made here.  I think there was a
mistake of judgment was the term that you
used.  And at no time in this process have we
denied that there was not a mistake made.

Our contentions were that once the
realization of the mistake was made, that there
were efforts to rectify that mistake.  At no
time did Dean try to take anybody's property
for his own use or for anyone else's use.
Those files that he took he thought were maybe
the property of the person whose name were on
the tab.  He called those people whose names
were on the tab of each one of those files and

says, Hey, I've got your old file, would you
like to have it?  Some of them said yes, and
some of them said, well, if I'm going to get in
middle of something because I've heard of an
investigation, no, I don't want it.  But at no
time do I think that Dean Van Meter truly
thought that he was actually depriving the City
of any of its property.  And, yes, that was
city property.  It was on city property when it
was taken.  Dean did not get in the back of a
pickup truck and go scavaging through files.
They were out there.

As he said, they were destroying files.  He
asked what they were doing.  They said they
told him what they were doing.  No one has
said, Dean, what are you doing going through
those files there?  Don't you know you can do
that?

Well, you know, that may or may not be the
responsibility of the firemen who were burning
the files.  We don't know.  But we're not
trying to lay blame on the City, the city
manager, Ms. Gunnels, or anyone else.  The
files were taken; the files were returned.  And
the confidential information that Joel keeps

talking about, his social security number, well
you know, Dean is a lieutenant in the police
department. He can pull up anybody sitting
here's social security number tonight with a
computer. So, you know, it's not like that
he's trying to steal somebody's confidential
information. He has told y'all he didn't go
through the files. They rode around in the
back of the truck until he could find some of
them. That's why I find it so hard for people
not to believe what Dean Van Meter has said. I
mean, every day, every day of the week, you
know, people like him that work for the City
are in court testifying. And we take their
word for it, because they swear under oath.
You know, this is the way it was. And we have
people in prison because of people like Dean
that say this is what we did. This is a
reason. You know, the boy was honest from day
one. He found out there was an investigation.
That's when he returned them. And, no, his
hands was not caught in the cookie jar and then
started bringing them back. He found out there
was a problem. He didn't know there was a
problem to start with.

1    Mr. Nix talks about, well, we need to do
2    something.  We're going to clean up the City.
3    We need to set a precedent.  It's going to tell
4    the people of Lanett we're doing our job in
5    here, or y'all are doing your job in here.
6    Well, gentlemen and ladies, what is this going
7    to say to the rest of your employees?  Because
8    I want to tell you, you know, I live here just
9    like the rest of you do.  And I hear the talk
10   on the street.  I will be frank with you.  Most
11   people think Dean is getting a raw deal out of
12   this.  Most people really don't understand why
13   he's being persecuted this way.  And it's a
14   fact that all you have got to do is listen,
15   because it's out there.
16       If Dean had of taken those files and he had
17   tried to done something for his own personal
18   gain, you know, I probably wouldn't be here
19   with him today.  But he didn't.  He made an
20   honest mistake, a bad judgment mistake.  And,
21   if he didn't care for this place, he wouldn't
22   be here today.  It's not about a job.  Dean is
23   already vested in his retirement.  He's not old
24   enough to draw it, but he's already to that
25   point.  He doesn't have to go through this, but

1  he loves the City.  He loves his job.  He's

2  been here for a length of time, and he was

3  trying to do a good job.

4      I've known Dean -- I've been in Lanett over

5  30 years, and I've known Dean ever since I've

6  been here.  And I have never found him anything

7  other than an honest, upstanding citizen and a

8  fine police officer.

9      So all we're asking for y'all is to

10  consider exactly what happened here.  He took

11  the files, yes.  No problem.  He brought the

12  files back when he found out there was a

13  problem.  There was no intent to deceive

14  anybody, no intent to deprive anybody.  The

15  mistake was made.  We're all human, and we've

16  all made mistakes.  But, to end a 27-year

17  career because maybe or maybe not he has a

18  disagreement or a cross personality with

19  someone else in the City, maybe his department

20  head, you know, the fact is that, you know,

21  Dean wanted to be chief.  He wasn't hired as

22  chief.  You know, how deep does this go with

23  the chief's office?  You know, I can't answer

24  that.  Dean can't answer it.  Nobody can.  But,

25  you know, there's a few political overtones

1  that are in this case tonight.  And you all

2  know what I'm talking about.

3     So, when you go back there, I want you to

4  consider the rest of the employees, what

5  they're going to look at.  Here's a man who

6  spent 27 years.  He made a mistake.  He said,

7  I'm sorry.  He brought the property back.  He

8  didn't try to deprive anybody of it, but he was

9  terminated afterwards.  So I appreciate your

10  time and your attention.  Thank you.

11     JUDGE MILFORD:  Mr. Nix, if you would bring

12  us up to speed on procedure at this point.

13     MR. NIX:  Under the procedure, Mr. Mayor --

14  and I've already cleared this with Mr. Van

15  Meter and his counsel -- you basically will

16  need to deliberate in the absence of all of

17  parties including Ms. Daniel, Judge Milford,

18  Mr. Ingram, Mr. Harris, and Mr. Van Meter and

19  Ms. Melanie and Judge Holley.  It will just be

20  the council.

21     Our personnel policy basically gives you

22  two alternatives, and I've written them out

23  here for you so y'all can look.  Because, when

24  you reconvene, you will need to vote in

25  public.  You understand that.  And I'm sure

1   Mr. Ingram and Mr. Harris -- and I will do the

2   same thing -- will ask you to vote

3   individually.  They'll ask you to poll the

4   council with your votes.  There are basically

5   two votes you can make.  I've already shown

6   this to Mr. Ingram and Mr. Harris.  One is a

7   motion to uphold the decision of the city

8   manager, and that motion would simply read, "I

9   move that we uphold the decision of the city

10  manager regarding Lieutenant Dean Van Meter."

11  If you decide not to uphold the decision of the

12  city manager, I've prepared a second motion

13  that says:  "I move that we do not uphold the

14  decision of the city manager regarding

15  Lieutenant Dean Van Meter and recommend the

16  following disciplinary action to be taken."  At

17  which point you need to tell us, if you do not

18  decide to uphold the decision of the city

19  manager, what you do desire the city manager to

20  do.  He needs some direction.

21      So, Mr. Mayor, when the deliberations of

22  the council -- Now, I'm going to absent the

23  council chambers.  As city attorney, you may

24  want to call me for some legal issue.  If

25  that's the case, I would like to have either

Mr. Ingram or Harris come back in here with me

so that they can see that there's no ex parte

communication. And I think that would be

appropriate under the executive session rules.

So, Mr. Mayor, at this time it's incumbent

upon all of us here to vacate the premises with

everybody except council.

COUNCILMAN YARBROUGH: Can I just say

thanks? Not to interrupt nobody. I would like

to say, the Honorable Mr. Ingram and Harris,

you've been gentlemen. Thank you.

MR. INGRAM: Thank you.

MR. NIX: I echo that sentiment. They

always have been. And Mr. Van Meter as well.

So, Mr. Mayor, at this point --

MR. HARRIS: I've just got one request. If

we could have the mayor and council could have

the material that I showed to you, Mr. Holley,

regarding the statute, State Record

Commission.

MR. NIX: Mr. Harris had presented to us

for your consideration.

JUDGE MILFORD: Let me ask one question.

Does your procedure require four votes?

MR. NIX: Yes. Excellent. Thank you. We

have in order -- and I checked this with the
Alabama League of Municipalities.  Four votes
to uphold the decision of the city manager
would be a quorum of this council.  A tie vote
would have the effect of granting their
appeal.  I checked that with the Alabama League
of Municipalities.  If there's a tie vote, then
your appeal succeeds.

JUDGE MILFORD:  Or if you have a three-two
vote it would not succeed.

MR. NIX:  It would not succeed.  You have
to have -- in this instance we have every
council member here.  In most instances if
somebody had gone, if Mr. Heard, for instance,
hadn't been able to be here, then a three to
two vote would have been sufficient.  But I do
tell the council -- and I checked this out
because I had a question about it -- that in
order to uphold the decision of the city
manager, it would take a four-to-two vote.  A
three-to-two or a tie vote would not uphold his
decision and would grant the success of Mr. Van
Meter's appeal.

COUNCILMAN MCCOY:  That being said,
Mr. Nix, according to this, it says within 10

working days of the hearing.

MR. NIX:  Good point.  Thank you,
Mr. McCoy.  While you do have to vote in open
session and you do have to reconvene this
session -- is it 10 days or five days?

COUNCILMAN MCCOY:  The policy that I was
looking for, it says within 10 working days of
the hearing, the Board will make the final
determination in the case.  The decision of the
Board is final.

MR. NIX:  Yeah.  I think that's the old one
that talks about the personnel review board.

COUNCILMAN MCCOY:  It may be.

COUNCILMAN MALONE:  It says 10 days if
they're going to take it -- but we have got
five days as the council.

MR. NIX:  Back on that Attorney General's
rule, it says we can have a personnel review
board.  I think that's correct.  So what that
means, gentlemen, is if you decide not to
render a decision tonight and you do not, you
have five working days to give Lieutenant Van
Meter your decision.  But, if you do not make
that decision tonight, you're going to have to
reconvene another meeting.  And that meeting

would be open, because the sole purpose of that meeting would be to vote.

So we're going to absent the council chambers at this time.

COUNCILMAN MCCOY:  I'm missing one thing, the conduct unbecoming an officer regulation. I can't find it.

MR. NIX:  That's in the police regulations.  I do not think, Mr. Mayor, with your consent -- Judge Milford has been most gracious to come and lend his time to the City.  At this point I do not anticipate unless Mr. Harris and Mr. Ingram has anymore need for him, Judge Milford thank you very much for overseeing these proceedings.

MR. HARRIS:  I appreciate it.

MR. NIX:  We'll be outside, and I'll be available to answer any legal questions.  But, if you call me in, then I will get them to come with me.

END OF PROCEEDINGS

```
 1              C E R T I F I C A T E

 2

 3     STATE OF ALABAMA

 4     COUNTY OF CHAMBERS

 5

 6         I hereby certify that the above and

 7     foregoing proceedings were taken down by me in

 8     stenotype and the proceedings were reduced to

 9     typewriting under my supervision; that the

10     foregoing represents a true and correct

11     transcript of the proceedings.

12

13         I further certify that I am neither of

14     counsel nor of kin to the parties to the

15     action, nor am I in anywise interested in the

16     result of said cause.

17

18         Dated this 21st day of January, 2007.

19

20

21         Melanie H. Garner, CSR, RPR

22         Court Reporter

23

24

25
```