# EXHIBIT
# H

# DEPOSITION OF WENDELL DEAN VAN METER

## December 8, 2006

## Pages 1 through 103

## CONDENSED TRANSCRIPT AND CONCORDANCE PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
566 South Perry Street
Post Office Box 62
Montgomery, AL  36104
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net



Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3         EASTERN DIVISION
4
5   WENDELL DEAN VAN METER,
    NEVA JANE VAN METER,
6
        Plaintiffs,
7
    Vs.                    CIVIL ACTION NO.
8                          3:06-CV-583-DRB
    THE CITY OF LANETT,
9   etc., et al.,
10       Defendants.
11
12       * * * * * * * * * * * * *
13
14       DEPOSITION OF WENDELL DEAN VAN METER,
15  taken pursuant to stipulation and agreement before
16  Lisa J. Nix, Registered Professional Reporter and
17  Commissioner for the State of Alabama at Large, in
18  the Law Offices of James Ingram and William Harris,
19  2005 South Broad Avenue, Lanett, Alabama on Friday,
20  December 8, 2006, commencing at approximately
21  8:50 a.m. CST.
22
23       * * * * * * * * * * * * *

Page 2

1         APPEARANCES
2
3   FOR THE PLAINTIFF:
4   Mr. James Ingram
    Mr. William Harris
5   Attorneys at Law
    2005 South Broad Avenue
6   Post Office Box 1175
    Lanett, AL 36863
7
8   FOR THE DEFENDANT:
9   Mr. T. Randall Lyons
    WEBSTER, HENRY, LYONS & WHITE
10  Attorneys at Law
    418 Scott Street
11  Montgomery, Alabama
12
13       * * * * * * * * * * * * *
14
15
16
17       EXAMINATION INDEX
18  WENDELL DEAN VAN METER
      BY MR. LYONS . . . . . . . . . .  5
19    BY MR. INGRAM . . . . . . . . . . 81
      BY MR. LYONS . . . . . . . . . . 92
20    BY MR. INGRAM . . . . . . . . . . 99
      BY MR. LYONS . . . . . . . . . . 101
21
22
23

Page 3

1         EXHIBIT INDEX
2              MAR
    DEFENDANT'S EXHIBIT
3
    1   12/7/05 notice of appeal to Joel Holley    36
4       from Wendell Dean Van Meter
5   2   12/7/05 Decision Upon Disciplinary/Due     37
        Process Hearing
6
    3   12/2/05 letter to Lt. Dean VanMeter from   43
7       Joel Holley re: Disciplinary
        Action/Police Chief R. Docimo's
8       Recommendation
9   4   Minutes of council meeting held           50
        12/19/05; Minutes of council meeting
10      held 12/14/05
11
12
13
14
15       * * * * * * * * * * * * *
16
17        STIPULATION
18       It is hereby stipulated and agreed by and
19  between counsel representing the parties that the
20  deposition of WENDELL DEAN VAN METER is taken
21  pursuant to the Federal Rules of Civil Procedure
22  and that said deposition may be taken before Lisa
23  J. Nix, Registered Professional Reporter and

Page 4

1   Commissioner for the State of Alabama at Large,
2   without the formality of a commission, that
3   objections to questions other than objections as to
4   the form of the question need not be made at this
5   time but may be reserved for a ruling at such time
6   as the said deposition may be offered in evidence
7   or used for any other purpose by either party
8   provided for by the Statute.
9        It is further stipulated and agreed by and
10  between counsel representing the parties in this
11  case that the filing of said deposition is hereby
12  waived and may be introduced at the trial of this
13  case or used in any other manner by either party
14  hereto provided for by the Statute regardless of
15  the waiving of the filing of the same.
16       It is further stipulated and agreed by and
17  between the parties hereto and the witness that the
18  signature of the witness to this deposition is
19  hereby waived.
20
21       * * * * * * * * * * * * *
22
23

Page 5

1            WENDELL DEAN VAN METER
2        The witness, after having first been duly
3    sworn to speak the truth, the whole truth and
4    nothing but the truth testified as follows:
5            EXAMINATION
6    BY MR. LYONS:
7    Q.   Could I get you to state your full name for
8         the record, please, sir.
9    A.   Wendell Dean Van Meter.
10   Q.   My name is Randy Lyons, and I represent the
11        City of Lanett in a lawsuit that you and
12        your wife have filed.
13            I'm here to take your deposition. I'm
14        going to ask you a series of questions.
15        And when I'm asking you these questions, if
16        I ask you anything you don't understand,
17        please stop me and tell me and I'll
18        rephrase it or re-ask it to where you and
19        I understand each other. Okay?
20   A.   Yes, sir.
21   Q.   And if you answer my question, I'm going to
22        assume you understood it.
23   A.   Yes, sir.

Page 6

1    Q.   Have you given a deposition before today?
2    A.   Yes, sir. Not on this case.
3    Q.   No. I mean, in other matters.
4    A.   Yes, sir.
5    Q.   How many different depositions do you think
6         you've given?
7    A.   Lord, I don't -- I can't remember. 27
8         years, I don't ...
9    Q.   All of them having to do with being a law
10        enforcement officer?
11   A.   Yes, sir.
12   Q.   Okay. Have you ever been sued in your
13        individual capacity or all as just a police
14        officer?
15   A.   As a police officer.
16   Q.   Okay. So you, yourself, personally have
17        never been sued by anyone?
18   A.   No, sir.
19   Q.   Have you ever sued anyone else other than
20        this lawsuit that we're here about?
21   A.   Yes, sir.
22   Q.   What other kind of lawsuit have you had?
23   A.   Over a wrecked vehicle.

Page 7

1    Q.   Were you injured in an automobile accident
2         or --
3    A.   No, sir, just the vehicle and damages.
4    Q.   Any other case you've ever been a plaintiff
5         in other than that one and this one?
6    A.   No, sir.
7    Q.   So you just sued over property damage?
8    A.   Yes, sir.
9    Q.   I'm going to ask you a series of questions
10        I ask everybody, and I don't mean to offend
11        you if I ask -- by these questions.
12            One of them is, have you ever been
13        arrested for anything?
14   A.   No, sir.
15   Q.   I didn't think so.
16   A.   Well, I've been arrested, but not
17        convicted.
18   Q.   Okay. What were you arrested for?
19   A.   Verbal harassment.
20   Q.   But you were not convicted of that?
21   A.   No, sir.
22   Q.   And you've never been convicted of any
23        crime?

Page 8

1    A.   No, sir. A speeding ticket.
2    Q.   Well, I meant other -- I should have
3         clarified it that way, but other than a
4         speeding ticket.
5    A.   No, sir.
6    Q.   Have you ever filed for disability?
7    A.   No, sir.
8    Q.   Have you ever filed bankruptcy?
9    A.   No, sir.
10   Q.   Ever been injured on the job?
11   A.   Yes, sir.
12   Q.   How were you injured on the job?
13   A.   Let's see. The first time I got my nose
14        broke in a fight with the City. Well, I
15        wasn't fighting with the City. I was
16        representing the City.
17   Q.   You were a police officer for the City?
18   A.   Right. Correct.
19   Q.   All right. Broken nose. What else? How
20        else have you been injured on the job?
21   A.   Cracked ribs.
22   Q.   Okay.
23   A.   Strained back.

Deposition of Wendell Dean Van Meter                                December 8, 2006

Page 9

1   Q.  All right.
2   A.  I think that's about it.
3          MR. HARRIS:  Did you get hurt when
4              you were in the wreck with the
5              cow?
6          THE WITNESS:  No, sir.
7   Q.  What's your present address, please, sir?
8   A.  1735 35th Avenue Southwest, Lanett, Alabama
9       36863.
10  Q.  How long have you lived at that address?
11  A.  32 years.
12  Q.  Who lives there with you, please, sir?
13  A.  My wife and my granddaughter.
14  Q.  And what's your wife's name?
15  A.  Neva Jane Van Meter.
16  Q.  And how long have y'all been married?
17  A.  32 years.
18  Q.  What's your date of birth?
19  A.  March 10th, 1956.
20  Q.  Your social security number?
21  A.  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.
22  Q.  Do you have an Alabama driver's license?
23  A.  Yes, sir.

Page 10

1   Q.  What's its number?
2   A.  I haven't a clue.
3   Q.  Do you have it with you?
4   A.  Yes, sir.
5   Q.  3944129, and --
6   A.  Commercial.
7   Q.  You have a commercial license?
8   A.  Yes, sir.
9   Q.  I see it at the top.  Okay.
10      What kind of commercial vehicles are
11      you licensed to drive?
12  A.  Everything but double and triple trailers
13      and HAZMAT.
14  Q.  How long have you had a CDL?
15  A.  Ten or 12 years.
16  Q.  And you have a restriction for corrective
17      lenses?
18  A.  Yes, sir.
19  Q.  Has your license ever been suspended or
20      revoked for anything?
21  A.  No, sir.
22  Q.  Have you ever driven over-the-road trucks?
23  A.  On drug details, yes, sir.  I mean, I

Page 11

1       borrow a truck for undercover details and
2       stuff like that.
3   Q.  Okay.  What's your educational background?
4   A.  High school.
5   Q.  What year did you graduate?
6   A.  '73.
7   Q.  Any military?
8   A.  No, sir.
9   Q.  No education after high school?
10  A.  Not other than schools the City sent me to.
11  Q.  Police school, police academy, things like
12      that?
13  A.  Police academy, some things like that.
14  Q.  And you told me earlier before we started
15      the deposition, but you worked for the City
16      of Lanett for 27 years?
17  A.  I started in 1978.  I left in '80.  Went to
18      work with the sheriff's department until
19      '82.  Come back to the City.
20          '85, I went to Diversified Products in
21      Opelika.  '88, I come back to the City.
22      Been there ever since.
23  Q.  Let me make sure I got it right.  1978, you

Page 12

1       started with the City of Lanett with the
2       police department?
3   A.  Yes, sir.
4   Q.  And were you just --
5   A.  Patrolman.
6   Q.  Patrolman.  Okay.  And then you were there
7       until 1980?
8   A.  Yes, sir.
9   Q.  And in '80 to '82, you left and went to the
10      sheriff's department to be a deputy?
11  A.  Chambers County.  (Nods head up and down.)
12  Q.  Okay.  And then you left there in 1982, and
13      you worked until '85 at Diversified
14      Products?
15  A.  No, sir.
16  Q.  Oh, I'm sorry.
17  A.  I come back to Lanett.
18  Q.  Came back to Lanett?
19  A.  Yes, sir.
20  Q.  I knew I would get that wrong.  All
21      right.  To be a patrolman again?
22  A.  Well, I handled a K-9 unit and I worked
23      investigation.

Deposition of Wendell Dean Van Meter                                December 8, 2006

Page 13

1  Q.  And you were there from '82 to '85, and
2      then you went to DP?
3  A.  Correct.
4  Q.  How long were you at Diversified Products?
5  A.  About three years, two and a half, three
6      years.  I come back to the City in '88.
7  Q.  And from 1988 until your termination, you
8      were with the City of Lanett?
9  A.  Correct.
10 Q.  And your position when you left the City
11     was lieutenant?
12 A.  Yes, sir.
13 Q.  Is that the highest rank you had ever
14     achieved with the City?
15 A.  Yes, sir.
16 Q.  While you were employed with the City of
17     Lanett, were you ever -- did you ever
18     receive any disciplinary action?
19 A.  Yes, sir.
20 Q.  Can you remember what those were for?
21 A.  Let's see.  Under Jones, when Jones was
22     chief, I let Mr. Lanier's daughter out of
23     jail.  She was 18 years old, charged with a

Page 14

1      DUI.  I let them bond her out instead of
2      making her stay the mandatory hours.
3  Q.  Okay.  And what was the discipline for
4      that?
5  A.  Eight days without pay.
6  Q.  Okay.  What else?
7  A.  Let's see.  Jimmy Smith was chief.  I
8      wrecked the patrol car.
9  Q.  What was the discipline for that?
10 A.  Two days without pay and walk a foot beat
11     for 30 days.
12 Q.  Okay.
13 A.  That's when I got a DUI on a foot beat.
14 Q.  You arrested somebody for DUI on a foot
15     beat?
16 A.  (Witness nods head up and down.)
17 Q.  All right.  What else?  What other
18     disciplinary action have you had?
19 A.  That's about all I can think of offhand.
20     I'm sure there's some more in there,
21     but ...
22 Q.  Okay.  Jimmy Smith, when was he chief?  Do
23     you remember?

Page 15

1  A.  Dorman retired in '80.  Jimmy Smith come in
2      in '84.
3  Q.  Okay.  And I remember Jimmy Jones, but I
4      just didn't ...
5  A.  Let's see.  I've been through seven chiefs
6      and eight mayors.
7  Q.  Well, what we are here about today is your
8      lawsuit about your termination from the
9      City of Lanett, and I understand that stems
10     from you having possession of some
11     personnel files; is that correct?
12 A.  Yes, sir.
13 Q.  Okay.  Tell me how it was that you came to
14     be in possession of these personnel files.
15 A.  I was on duty.  I rode through the parking
16     lot of the city hall complex.  Fire
17     department personnel were throwing files --
18     pulling files from -- I call it a Banker
19     Box and throwing them in 55-gallon drums.
20     They were looking at them, going
21     through them, and I asked them what they
22     was doing.  They told me they was throwing
23     away old files.  They was cleaning out an

Page 16

1      office for somebody that got promoted, city
2      hall.
3          So I said, well, I wonder if my old
4      file is in there.  They said they didn't
5      know.  I climbed up there and started
6      looking through them.  And then one of the
7      firemen come up -- fire personnel come up
8      and said, Dean, I think we done throwed
9      your old one away.
10         See, I was looking for my old one from
11     '78 where Pete McCoy swore me in, the
12     original -- where he swore me in
13     originally.
14         Well, then I saw some old friends'
15     files and I said, well, I wonder if they
16     would like to have some keepsake.  They're
17     throwing them away.  I'll get them.  So I
18     got several files, put them in my truck.
19     The firemen was looking at them.
20         The little Mitchum girl ...
21         MR. INGRAM:  Tessa
22 A.  Tessa.  There was an elderly gentleman that
23     had been missing for several years.  She

Deposition of Wendell Dean Van Meter                                    December 8, 2006

---

Page 17

1    saw his file, O. D. Gore.  I never knew
2    O. D. Gore worked for the City of Lanett.
3    She said he worked for the street
4    department.
5         Anyway, I got several of the old
6    friends' files and I put them in my truck.
7    Q.  Okay.  Were they burning the files while
8        you were out there?
9    A.  They was throwing them in a barrel.  That's
10       all I know.  And they made the comment they
11       was going to carry the rest of them what
12       they couldn't get in the barrels to an old
13       abandoned house that they was going to burn
14       that night, and they was going to scatter
15       them around on the floor.
16   Q.  You just saw them putting them in barrels?
17       You didn't see them burn anything?
18   A.  I didn't see a fire.
19   Q.  Okay.
20   A.  And according to the fire personnel, they
21       was just throwing them away.
22   Q.  Whose files did you get?
23   A.  Let's see.  Peggy Hester's.  Greg Ray's.

---

Page 18

1    Bryan Poe's.  Who else?  Ricky Price's.
2    Joel.  I got Joel's.
3    Q.  Joel Holley?
4    A.  Yes, sir.
5         I can't remember who all.  I know
6    those.
7    Q.  There were others, though, too?
8    A.  I think so, yes, sir.
9    Q.  What did you do -- Okay.  So you talked to
10       the fire personnel, and they said they were
11       throwing them away or that they were going
12       to put them in these barrels or take them
13       to this house to have a burn?
14   A.  Uh-huh.  (Positive response.)
15   Q.  You understood at least they were going to
16       burn the ones they were taking out to the
17       house?
18   A.  That's what they told me.
19   Q.  That's what they told you.  Okay.
20   A.  Whether they did or not, I don't know.
21   Q.  That's just what you understood they said?
22   A.  Correct.
23   Q.  Okay.  Did anybody with the fire department

---

Page 19

1    say anything to you about taking the files?
2    A.  No, sir.
3    Q.  But you did not find your own personal
4        file?
5    A.  No, sir.
6    Q.  What did you do with the files that you did
7        take?
8    A.  Well, a couple of days later, I ran into
9        Bryan Poe.  He works for the City of
10       Valley, the police department, and I give
11       him his.
12       And then about a week later -- Well, I
13       called Ricky Price.  He said that when he
14       was in the area -- he was up toward
15       Birmingham.  But he said when he was in the
16       area, he'd swing by and pick it up.  He
17       said he'd like to have his old file.  I
18       said all right.
19       I tried to get ahold of Greg Ray.  He's
20       in -- was up toward Huntsville the last
21       time I knew.
22       Peggy Hester, she had got a divorce,
23       moved to Florida and remarried, so I

---

Page 20

1    couldn't find her.
2        And Joel, it was October or November.
3    Anyway, they was going through budgets, and
4    I didn't see him.  So I said, well, when I
5    see him, I'll give him his old file.
6        Well, after I give Bryan his, about a
7    week or so later, Bryan calls me on the
8    phone.  And he says, they were supposed to
9    have taken some stuff out of my file.  I
10   says, I don't know what you're talking
11   about.  Don't have a clue.  I didn't open
12   them up.  I just saw the names on them.
13   Q.  You never looked through any of these
14       files?
15   A.  No, I never did go through any of them.
16   Q.  Okay.
17   A.  And he was fussing about there was supposed
18       to have been some stuff taken out and he
19       was going to contact his attorney and
20       nah-nah, nah-nah.  And next thing you know,
21       they're calling me and asking me about it.
22   Q.  During the time that you obtained -- other
23       than talking to the firemen or the fire

---

Deposition of Wendell Dean Van Meter                                    December 8, 2006

Page 21

1  personnel about what they were doing and
2  obtaining the file, you never talked with
3  anybody else with the City about taking any
4  of the files?
5  A. Huh-uh. (Negative response.) They rode in
6  my truck back and forth to work every day,
7  but I didn't say anything to anybody.
8  Q. And you didn't say anything to them about
9  anybody -- about getting them originally?
10  You didn't ask anybody if it was okay?
11  A. There wasn't nobody out there but the
12  firemen, and they said they was throwing
13  them away, so ...
14  Q. My question is, you didn't ask anybody if
15  you could take them?
16  A. No, I didn't go to city hall and ask
17  anybody. I mean, the firemen were out
18  there throwing them away.
19  That's like when they torn down the old
20  police department complex and all that, I
21  got some brick from it. I mean, I didn't
22  go and ask anybody. I got the brick, dated
23  them, put them in my barn.

Page 22

1  Q. Okay.
2  A. I mean, keepsakes.
3  Q. Well, but you'd agree that brick is a
4  little bit different than personnel files?
5  A. Well, it's according to how the City
6  would -- if they was throwing them away, I
7  was getting them.
8  Q. If it's got information in a file that you
9  wouldn't have been privy to otherwise, then
10  that's different than getting a piece of
11  brick that --
12  A. I don't know what was in them. I didn't
13  open them up.
14  Q. Okay. We'll just move on. So Bryan Poe
15  called you, and he was ticked off?
16  A. Yes, sir.
17  Q. And you didn't know what he was talking
18  about?
19  A. I didn't have a clue.
20  Q. And Mr. Poe had had litigation against the
21  City years ago?
22  A. Years ago, yes, sir.
23  Q. I had the pleasure of being involved in

Page 23

1  that one, too.
2  And so he called you and said they were
3  supposed to have taken stuff out of his
4  file that was still in there or whatever?
5  A. That's what he was telling me. I don't
6  know.
7  Q. So then the next thing you know, you're
8  called in to where?
9  A. Well, I wasn't called in.
10  Q. Okay.
11  A. I get a phone call at home that I'm being
12  investigated for taking personnel files.
13  Q. Who called you?
14  A. Eddie Chandler.
15  Q. And who is he?
16  MR. INGRAM: Former councilman.
17  A. Yeah, former councilman.
18  MR. HARRIS: He's a local TV
19  personality.
20  Q. Is he the one that runs that -- the TV show
21  that's always talking about everything
22  going on around --
23  A. (Witness nods head up and down.)

Page 24

1  Q. I can't think of the name of it right now.
2  A. Rumor Has It.
3  Q. Rumor Has It. That's it.
4  Mr. Chandler called you at home and
5  told you what, now?
6  A. I was being investigated for taking
7  personnel files.
8  Q. Did he tell you how he knew that?
9  A. No, sir. He told me who was investigating
10  it. Teddy Morris.
11  Q. He told you that Teddy Morris was
12  investigating it?
13  A. Correct.
14  Q. Anything else he told you?
15  A. No, sir.
16  Q. What's the next thing that you heard or --
17  A. The next thing I done when I hung up the
18  phone, I called Docimo -- Chief Docimo at
19  home. It was on a Sunday afternoon.
20  Q. And what occurred in that conversation?
21  A. I asked him about it.
22  Q. What did he say?
23  A. He couldn't talk about it.

Deposition of Wendell Dean Van Meter                                    December 8, 2006

Page 25

1    Q.  So you said, what's going on?  He just
2         said, I can't talk to you about it?
3    A.  Uh-huh.  (Positive response.)
4    Q.  Yes?
5    A.  That's what he said, yes, sir.
6    Q.  Uh-huhs and huh-uhs aren't clear.
7    A.  I'm sorry.
8    Q.  That's okay.  I've been taking depositions
9         all week of different folks.  And every
10        time if somebody says uh-huh or huh-uh, I
11        go, is that a yes or is that ano?  And
12        people think I'm picking on them, but it's
13        just to make the record clear.
14   A.  I understand.
15   Q.  What happened next after that?
16   A.  Let's see.  I called Teddy Morris at home.
17   Q.  What did Mr. Morris tell you?
18   A.  He said he needed to talk to me later, but
19        he couldn't talk to me right now about it.
20   Q.  All right.  What happened next?
21   A.  I called Joel, the city manager.
22   Q.  The same afternoon?
23   A.  Yes, sir, one right after the other.  I

Page 26

1         wanted to find out what was going on.
2    Q.  All right.  And what did Joel Holley tell
3         you?
4    A.  He told me I was being investigated for
5         taking personnel files.
6    Q.  Did he tell you anything else?
7    A.  And I told him, I said, well, I've got the
8         files.  I done took them out of the truck
9         and they're laying on the kitchen table,
10        because Ricky Price was supposed to come by
11        and get his.
12   Q.  Okay.  What else?
13   A.  And I said, they're laying right in here on
14        the kitchen table.  I said, I'll bring them
15        to you tomorrow if you want me to.  And he
16        told me he'd be in the office about nine
17        o'clock.  Well, I was sitting there,
18        waiting on him at 8:30 when he come in.  I
19        walked in and give them to him.
20   Q.  Okay.  Do you remember about when it was --
21        well, you said earlier it was October.  Is
22        that what --
23   A.  I'm not sure.  I know -- I know they burned

Page 27

1         a house.  It was -- They was having council
2         meeting that night.  And after council
3         meeting, that's when they burnt the house,
4         so it was that day.
5    Q.  Early October?
6    A.  I think so.
7    Q.  Okay.
8    A.  I'm not sure the exact date.  I mean --
9    Q.  I won't hold you to it, but just sometime
10        early --
11   A.  I mean, I didn't think nothing about it.
12        They were throwing them away.
13   Q.  Okay.  I know.  I'm just trying to get a
14        timeline of when you got the files.  It was
15        sometime early to mid October?
16   A.  I think so.
17   Q.  And when you turned them over to Joel
18        Holley, when was that?
19   A.  I'm not sure of the date.
20   Q.  Do you remember what month it was?
21   A.  I'm not sure.
22   Q.  Well, would it be --
23   A.  I mean, I haven't got my notes and

Page 28

1         statements in front of me, so I'm not sure.
2    Q.  Have you kept a journal or diary or
3         anything about what's happened?
4    A.  I've got notes wrote down somewhere, yes,
5         sir.
6    Q.  Is that something you did on your own or
7         did your lawyer ask you to do that?
8    A.  That's something I done on my own.
9              MR. LYONS:  Could I get a copy of
10             those?
11   A.  I've got statements --
12             MR. HARRIS:  We don't have a
13             copy.  We can get it.
14                 Are you talking about
15             statements that were taken as
16             part of the investigation?
17             THE WITNESS:  Uh-huh.  (Positive
18             response.)
19             MR. HARRIS:  I think that's what
20             he's talking about, like their
21             actual file.
22   A.  Where I had to write --
23   Q.  You have a copy of your statement that you

Deposition of Wendell Dean Van Meter                                    December 8, 2006

Page 29

1    gave? You're talking about the statement
2    you gave to --
3    A.  I've got them at the house. I don't have
4       them with me.
5    Q.  I'm not asking for it right now. But
6       you've got a copy of the statement you gave
7       to Teddy Morris?
8    A.  Yes, sir.
9    Q.  Have you got any other notes that you've
10       kept as to what happened and how it
11       occurred and all that?
12    A.  Yes, sir.
13    Q.  If you can make those available to your
14       lawyer so that we could get a copy of
15       those, that would be great.
16    A.  (Witness nods head up and down.)
17    Q.  I know that you were -- that the hearings
18       took place around the first part to the
19       middle part of December of 2005.
20    A.  Yes, sir.
21    Q.  So I guess my question is, is when you came
22       in to turn in the files, was it already
23       December or was it November or --

Page 30

1    A.  I'm thinking it was the latter part of
2       November.
3    Q.  That's what I figured.
4    A.  That's what I'm thinking. Because
5       immediately, they put me on administrative
6       leave.
7    Q.  Okay. Let's go back to you meeting Joel
8       Holley at his office at city hall. You
9       gave him the files, and then what happens?
10    A.  He said, you know this is City property? I
11       said, they was throwing them away. He
12       said, it's City property. I said, Joel,
13       they was throwing them away. How many
14       search warrants have I gotten from you over
15       the years by going through a trash can and
16       getting probable cause to get in a house?
17       You've given me search warrants on that
18       before.
19    Q.  Okay. And what else did --
20    A.  He said that the mayor and the council were
21       upset about it.
22    Q.  Okay.
23    A.  And then later, I'm told by several

Page 31

1    officers -- Tracy Bandy and Tifton Dobbs --
2    that the mayor wasn't going to help me
3    because I didn't help him in the election.
4    I didn't support him in the election.
5    Q.  Let's go back, though, to when you were
6       talking to Joel Holley. Is there anything
7       else that occurred in that meeting other
8       than what you've told me about?
9    A.  Not that I remember.
10    Q.  You told me that at some point, you were
11       put on administrative leave. When was that
12       in relation to your meeting with
13       Mr. Holley?
14    A.  Let's see. It was on a Monday. I'm not
15       sure when my next scheduled workday was.
16       We worked four on and four off. But when I
17       come back in --
18          It was November the 8th.
19    Q.  November the 8th?
20    A.  Yes, sir, that's what I was put on
21       administrative leave.
22          THE WITNESS: Have we got another
23          copy of that?

Page 32

1          MR. HARRIS: He's got a copy of
2          that.
3    Q.  When you were put on administrative leave,
4       was that before or after you had given the
5       files to Joel Holley, this letter?
6    A.  I had done give the files to Joel.
7    Q.  Okay. So it would have been -- so November
8       8th would have been after you met with Joel
9       Holley that Monday morning?
10    A.  Yes, sir.
11    Q.  Okay. I just want to make sure. All
12       right.
13          After you talked with Joel Holley and
14       then you were placed on administrative
15       leave, did you -- well, between talking to
16       Joel Holley and being placed on
17       administrative leave, do you remember
18       speaking to anyone else at the City about
19       this situation?
20    A.  I think it was about a week later when
21       Teddy called and wanted me to come in and
22       give a statement.
23    Q.  Okay. And you went and did that?

Page 33

1   A.  Yes, sir.
2   Q.  All right.  What's the next thing that you
3        did as far as ..
4   A.  Waited on Docimo to call me in and tell me
5        the outcome of the investigation.
6   Q.  Do you remember when that was?
7   A.  I'm not sure of the date.
8   Q.  Do you remember how long you were on
9        administrative leave before that?
10  A.  About two weeks, about two or so weeks,
11       something like that.
12  Q.  Tell me what happened in that meeting
13       between you and Chief Docimo.
14  A.  He called me in and told me that his
15       recommendation was termination and I could
16       file an appeal to the city manager.  I told
17       him I wanted to go ahead and file the
18       appeal.  I shook his hand and walked out.
19  Q.  Okay.  And so, then, you could appeal.  And
20       who did you appeal to first?  The city
21       manager?
22  A.  City manager, yes, sir.
23  Q.  And did you have -- Did you have a

Page 34

1        hearing -- a meeting with Joel Holley or a
2        hearing, or how did that occur?
3   A.  We had a hearing with Joel.
4   Q.  Okay.  And who was present at that hearing?
5   A.  Both my attorneys and Joel and Jennie
6        Gunnells.
7        (Brief interruption.)
8   Q.  And what occurred in that hearing?
9   A.  Told the facts of what I've done told you.
10       He said that he would make a decision -- he
11       had, what?  Three days to make it, but he
12       said he'd have me an answer that day.
13  Q.  And according to the document I have, it
14       shows that this meeting occurred -- or
15       hearing occurred on Wednesday, December 7th
16       of 2005.  Does that sound about right to
17       you?
18  A.  Sounds about right, yes, sir.
19  Q.  And Mr. Holley told you and your attorneys
20       that he would try to give you a decision
21       within a 24-hour period --
22  A.  Correct.
23  Q.  -- although he had three days, and then you

Page 35

1        had five working days to appeal, correct?
2   A.  Correct.
3   Q.  Prior to that hearing on December 7th, had
4        you spoken with any city council member
5        about this incident?
6   A.  I'm not sure if I had or not.
7   Q.  The only reason I asked is in this
8        document, it says that you told them that
9        you had spoken with Mike Yarbrough.
10  A.  I think I did mention it to him, and he --
11       he wouldn't comment on it.
12  Q.  Okay.  And you also stated that Lucille
13       McCullars had called you after your
14       December meeting and asked if you got fired
15       at the meeting.  That was something you
16       said in the hearing.
17          Is the December 2nd meeting the one you
18       had with Chief Docimo?
19  A.  I'm not sure.
20          MR. INGRAM:  Randy, what document
21          are you reading from?
22          MR. LYONS:  I am reading some
23          notes from the City of Lanett

Page 36

1        Dean Van Meter hearing,
2        Wednesday, December 7, 2005.
3        (Defendant's Exhibit 1 was marked
4        for identification.)
5   Q.  Let me show you what we've marked as
6        Defendant's Exhibit Number 1.
7          MR. HARRIS:  Okay.  We've got
8          that.
9   Q.  This is a document that's dated December
10       the 7th and signed by you, correct?
11  A.  Correct.
12  Q.  And this is a notice of appeal, and it's
13       addressed to Joel Holley, correct?
14  A.  Correct.
15  Q.  And is this a notice of appeal from his
16       decision or --
17  A.  It's a notice of appeal from his decision,
18       but I let him know so he could notify the
19       mayor and council that I wished to appeal
20       it to them.
21  Q.  All right.
22  A.  Which, I mean, his decision, he said I was
23       terminated effective immediately.

9 (Pages 33 to 36)

Page 37

1  Q.  Okay.  And that's what I was about to ask
2     you.  There's another document ...
3        (Defendant's Exhibit 2 was marked
4        for identification.)
5  Q.  These documents have highlighting on them
6     and some of them are underlined, but that
7     doesn't have any significance to anything.
8        I'll just show you Defendant's Exhibit
9     Number 2.  I'm sorry.  I'll just show it to
10    your lawyer.
11       MR. HARRIS:  I think that's what
12          you're looking at in front of
13          you, Dean.
14 Q.  It's the same thing.  It's just showing
15    Joel Holley's decision.
16 A.  Yes, sir.
17 Q.  And that was to uphold the chief's
18    recommendation to terminate you effective
19    immediately, correct, and that's dated
20    December 7th of '05?
21 A.  Right.
22 Q.  As far as this notice, there's a
23    certificate of service that you and your

Page 38

1     attorneys got that.  You would admit you
2     got this decision, correct?
3  A.  Correct.  Don't agree with it, but I got
4     it.
5  Q.  If you agree with it, we wouldn't be here,
6     would we?
7  A.  Well, I mean, he terminated me without my
8     due process with the mayor and council.
9  Q.  Well –
10 A.  Do you see what I'm saying?
11 Q.  I guess what you're saying – and you
12    correct me if I'm wrong.  You're saying
13    because he said you were terminated
14    effective immediately, that that was a
15    decision that, then, the mayor and council
16    couldn't overturn?
17 A.  They could overturn it, but he's supposed
18    to make recommendations.  And then I've got
19    an appeal process that – and if I don't
20    use my appeals, then that would come into
21    effect.  But until I use -- when I use my
22    appeal process, then he's done made the
23    decision and influenced the mayor and

Page 39

1     council.
2  Q.  Well, what's the difference in him saying
3     this is what it is or this is what my
4     recommendation is?  I mean, that's --
5  A.  Because that's not a recommendation.  That
6     says I was terminated, period.
7  Q.  Well, he as the city manager has said that
8     you're terminated, correct?
9  A.  Yes, sir.
10 Q.  And you're saying that what he should have
11    done is said my recommendation is that the
12    chief's recommendation should be accepted
13    by the council –
14 A.  Correct.  Recommendation, not --
15 Q.  -- and that he recommends you to be
16    terminated effective immediately?
17 A.  He didn't recommend.
18 Q.  No.  I'm saying, that's what you're
19    saying -- you're saying that's what he
20    should have done?
21 A.  That's what they've always done in the
22    past, made recommendations.
23 Q.  And that he should have made a

Page 40

1     recommendation --
2  A.  And then if the individual doesn't file an
3     appeal to the mayor and council, then the
4     city manager's recommendation would go into
5     effect as termination.
6  Q.  Okay.  And so --
7  A.  I was denied due process right there.
8  Q.  Well, you had a hearing with the mayor --
9  A.  I was already terminated.
10 Q.  Well, you agreed -- I mean, you agreed with
11    me a moment ago, though, that the mayor and
12    council could have overturned the city
13    manager's decision, correct?
14 A.  But I was already terminated.
15 Q.  Well, if it's an appeal, then that means
16    that you can appeal that decision, correct?
17 A.  But it should have been a recommendation,
18    not terminated effective immediately.
19 Q.  I understand what you're saying.
20 A.  I mean, I'm told I'm terminated.  Now,
21    you've got five days --
22 Q.  To appeal.
23 A.  -- to appeal.

Deposition of Wendell Dean Van Meter                                December 8, 2006

Page 41

1  Q.  Okay.
2  A.  All right. The mayor and council has done
3       seen all this.
4  Q.  Well, if he had recommended --
5  A.  And Joel stood up there in my last hearing
6       and says, you can either back me and the
7       department head or you don't need us.
8  Q.  Okay. The only difference that you see in
9       this is that you believe that Mr. Holley
10      should have put in his letter or in his
11      decision that he recommended termination,
12      not that he --
13 A.  Don't you think so?
14 Q.  I'm not going to comment on that. I'm
15      asking you what your opinion is. You don't
16      get to ask me questions.
17          Let me ask you this. If Mr. Holley had
18      put in his letter that he recommended
19      termination effective immediately, you
20      don't have a problem with that? I mean,
21      you don't agree with it, but you don't
22      think that would be improper?
23 A.  Well, how can he terminate me effective

Page 42

1       immediately if I'm not completed with my
2       due process?
3  Q.  Well, my question is -- go back to my
4       question now. Answer this question, and
5       then --
6          If he had said in this letter that I
7       recommend that Wendell Dean Van Meter be
8       terminated effective immediately --
9  A.  Let's leave off effective immediately.
10 Q.  Okay.
11 A.  And then advise you of your appeal process,
12      and if you don't file your appeal, then you
13      are terminated.
14 Q.  Okay.
15 A.  Do you see what I'm saying?
16 Q.  Let me ask it this way then. You're saying
17      that if he said I recommend that Wendell
18      Dean Van Meter be terminated and that that
19      was it, that that would have been
20      appropriate under the --
21 A.  Under the City policy.
22 Q.  -- the policies. Okay.
23          And that even though his letter that

Page 43

1       he -- that is Defendant's Exhibit Number 2,
2       it says: Wendell Dean Van Meter is hereby
3       notified his employment is terminated
4       immediately -- effective immediately with
5       the City of Lanett. But then down here on
6       the second page, it says: You may avail
7       yourself or appeal or grievance procedure
8       in that within ten working days of the city
9       manager's decision, the employee has a
10      right to elevate his grievance to the
11      Lanett City Council.
12          You did that, correct?
13 A.  Yes, sir.
14          (Brief interruption.)
15 Q.  So you were still given the right to appeal
16      to the city council, correct?
17 A.  Correct.
18          (Defendant's Exhibit 3 was marked
19            for identification.)
20 Q.  Show you what I'll mark -- I'm going to
21      show you what I'll mark as Defendant's
22      Composite Exhibit Number 3 to your
23      deposition. It's a letter dated December 2

Page 44

1       to you from Joel Holley, and attached to it
2       also is a certificate of service showing
3       that you got this. And it also includes
4       the incident reports about the files.
5          Did you receive this letter of December
6       2 from Joel Holley? And if those two
7       documents that are attached to it don't
8       have -- don't connect to that, we can
9       separate that.
10 A.  This here is where -- if I'm not mistaken,
11      it's where the city manager informed me of
12      what I'm being charged with and then
13      setting up the hearing at a later date --
14 Q.  Okay.
15 A.  -- if I'm not mistaken.
16 Q.  Is that telling you what -- Does that tell
17      you what the recommendation of the
18      department head, the chief, was?
19 A.  Yes, sir.
20 Q.  Okay. So that's showing you that the chief
21      said he recommended termination, and then
22      that you were going to have this hearing on
23      December 7th with Joel Holley?

Deposition of Wendell Dean Van Meter                    December 8, 2006

Page 45

1   A.  Correct.
2   Q.  Okay.  And then you had a hearing then
3       after December 7th, it appears, on December
4       the 14th with the city council -- a
5       special-called city council meeting; is
6       that correct?
7   A.  Correct.
8   Q.  And prior to December 14th and after
9       December 7th, did you have any other
10      meetings, contact or any involvement with
11      the City of Lanett or anybody with the City
12      of Lanett regarding this incident?
13  A.  No, sir.
14  Q.  Tell me what occurred in the city council
15      meeting for December the 14th of 2005.
16  A.  I think it was six o'clock in the evening
17      when we met.
18  Q.  5:30.  Okay.  Whatever.
19  A.  5:30?
20  Q.  Yes, sir.
21  A.  I'm sorry.
22  Q.  That's okay.
23  A.  Met in the council chamber.  I think Judge

Page 46

1       Calvin Milford was the mediator.
2   Q.  Okay.
3   A.  Just told them what happened, what I've
4       told you.
5   Q.  Didn't tell any different than what you've
6       told me today?
7   A.  No, sir.
8   Q.  And the whole council was present?
9   A.  Yes, sir.
10  Q.  Did they take a vote with you present?
11  A.  Not at that time, no, sir.
12  Q.  What else occurred other than you telling
13      your story as far as what happened?  Did
14      the City put on any testimony?
15  A.  My attorneys called Jennie Gunnells.
16  Q.  Okay.  Jennie Gunnells was called.
17  A.  Personnel.
18  Q.  Okay.  What was she asked to talk about?
19  A.  What policy the City had on destroying
20      personnel files.
21  Q.  Okay.
22  A.  She said they didn't have one.  William
23      Harris asked Ms. Gunnells if she had ever

Page 47

1       seen the State regulations on destroying
2       personnel files.  She said she hadn't.
3   Q.  Okay.
4   A.  Joel at one point made a comment to the
5       mayor and council to either back him and
6       the department head or they didn't need
7       them.
8           Without looking over it, I --
9           THE WITNESS:  We haven't got ours
10          typed up yet, have we?
11          MR. INGRAM:  Randy, I've got a
12          transcript of that.
13          MR. LYONS:  Do you?
14          MR. INGRAM:  I'll make it
15          available to you.
16  Q.  I don't have one either.  That's why I'm
17      asking what you remember.
18  A.  Well, I'm trying to remember everything.
19          MR. INGRAM:  We had a court
20          reporter present.
21  Q.  Okay.  How long did that hearing last?
22  A.  About two hours, an hour or two.
23  Q.  One to two hours?

Page 48

1   A.  Yes, sir.
2   Q.  And what was -- When you left that hearing
3       at 6:30, 7:30, whatever time it was, what
4       was -- did you have an outcome at that
5       point?
6   A.  No, sir.
7   Q.  Okay.
8           THE WITNESS:  Did we?
9           MR. INGRAM:  You had the vote.
10          THE WITNESS:  Well, I thought they
11          come back later --
12          MR. HARRIS:  I thought everybody
13          came back.
14          MR. INGRAM:  That's right.  A day
15          later.
16          MR. HARRIS:  They announced it, I
17          think, at the next regularly-
18          scheduled council meeting.
19          MR. LYONS:  Because of the
20          sunshine law?
21          MR. HARRIS:  Right.
22  Q.  And the next council meeting was, what?
23      The next day?

12 (Pages 45 to 48)

Deposition of Wendell Dean Van Meter                           December 8, 2006

---

Page 49

1  A.  I'm not sure.  Somewhere along in there,
2      yes, sir.  It couldn't have been the next
3      day because it was on Monday.  Normal
4      council meeting is on Mondays.  It was
5      close to a week.
6          MR. INGRAM:  Yeah, close to a
7          week.
8  Q.  Were you present at the regularly-scheduled
9      council meeting?
10 A.  Yes, sir.
11 Q.  What occurred at that meeting?
12 A.  They voted.
13 Q.  Anything else other than a vote occur?
14 A.  I don't know.  I got up and left.
15 Q.  No.  I mean, prior to your vote -- prior to
16     the vote, did anything else occur about the
17     incident with you?
18 A.  Not that I know of.
19         MR. HARRIS:  (Shakes head from
20         side to side.)
21 Q.  It appears that that was a council
22     meeting ...
23         MR. LYONS:  Let's mark this as

---

Page 50

1          Defendant's 4.
2          (Defendant's Exhibit 4 was marked
3          for identification.)
4  Q.  The council meeting was December the 19th.
5      Have you seen these minutes?  And it's
6      about -- The part about you is down here.
7  A.  No, sir, I haven't seen this.
8  Q.  It just says something to the -- that they
9      brought up the matter of what was discussed
10     at the December 14th special session that
11     was taken under advisement and that they --
12     about Lt. Dean Van Meter, that they were
13     going to take a vote.  And it appears that
14     the vote was -- there were two nays and the
15     rest yeas.
16 A.  Yeah, four to two.
17 Q.  Now that you've reviewed Defendant's
18     Exhibit Number 4 as far as --
19         MR. LYONS:  Have y'all seen it?
20         MR. HARRIS:  No.
21 Q.  -- about what occurred at the city council
22     meeting, is that what you remember
23     occurring?

---

Page 51

1  A.  Yes, sir.
2  Q.  Have you had any other contact with anyone
3      with the City of Lanett regarding this
4      matter?
5  A.  No, sir.
6  Q.  You mentioned earlier that two police
7      officers told you that the mayor said he
8      wasn't going to help you because you didn't
9      help him in the election.
10 A.  Correct.
11 Q.  And that was Tracy Bandy and who?
12 A.  Tifton Dobbs.
13 Q.  Has the mayor ever said anything to you
14     about --
15 A.  Directly?
16 Q.  Yeah.  Has he ever said anything to you
17     directly?
18 A.  No, sir.
19 Q.  Has he ever done anything -- Has he ever
20     inferred anything to you that would make
21     you think that he was trying to get you for
22     some political activity you took?
23 A.  No, sir, I don't ...

---

Page 52

1  Q.  He hasn't said anything --
2  A.  He hasn't said anything to me directly, no,
3      sir.
4  Q.  Have you overheard him say anything to
5      anyone else?
6  A.  No, sir.
7  Q.  Has any member of the city council told you
8      that the mayor was after you because you
9      didn't support him?
10 A.  No, sir.
11 Q.  How did the two officers that told you
12     that, where did they learn this
13     information, if you know?
14 A.  They go by his house, the mayor's house.
15 Q.  Just --
16 A.  They're friends with the mayor.
17 Q.  Just because they're friends with the
18     mayor?
19 A.  Yes, sir.
20 Q.  Correct me if I'm wrong, but from what I
21     understand you were telling me earlier,
22     your main complaint regarding your due
23     process --

---

Page 53

1   A.  I'm terminated.  That's my main complaint.
2   Q.  Okay.  I understand your main complaint is
3       that you're terminated.
4   A.  Sir, I've lost a 27-year career, and I'm
5       accused of being a thief.  And getting
6       another job is impossible at 50 years old.
7   Q.  Let me ask you one question about this and
8       then I'm going to go through your complaint
9       with you.
10  A.  Okay.
11  Q.  You've made a due process claim.  You're
12      saying that you were denied due process,
13      correct?
14  A.  Uh-huh.  (Positive response.)
15  Q.  Yes?
16  A.  Yes, sir.
17  Q.  Is the basis of the denial of your due
18      process what you've told me about
19      Defendant's Exhibit Number 2, that --
20      Mr. Holley putting in there that you were
21      terminated effective immediately, is that
22      what you're saying was the denial of your
23      due process?

Page 54

1   A.  Yes, sir.
2   Q.  Was there anything else that you're relying
3       on for your denial of due process?  And
4       you're looking at your lawyers, but --
5   A.  Well, that's what I hired them for.
6   Q.  But if you know of anything else, this is
7       my only time to --
8   A.  Well, I'm trying to think exactly ...
9   Q.  I mean, that's one of your claims, and
10      this is my only time to get to ask you.
11          (Attorney-client discussion.)
12          THE WITNESS:  Yeah, I forgot about
13          that.
14  A.  Oscar -- We asked Oscar Crawley to recuse
15      himself in the hearing, and he wouldn't do
16      it.
17  Q.  Okay.  And is that a part of what you're
18      claiming is a denial of your due process?
19  A.  Yes, sir.
20  Q.  Why did you ask Mayor Crawley to recuse
21      himself?
22  A.  Because of me being for another candidate
23      for mayor and him having ill feelings

Page 55

1       towards me according to the officers.
2   Q.  All right.  The vote that was taken
3       regarding your termination, did Mayor
4       Crawley vote in that?
5   A.  Yes, sir.  I mean, it's in this right here,
6       yes, sir.
7   Q.  It says there was a roll call vote.
8       Councilman Malone -- Tony Malone said nay.
9       Councilmember Duskin, yea.  Councilmember
10      Heard, nay.  Councilmember Yarbrough, yea.
11      Councilmember McCoy, yea.  And Mayor
12      Crawley, yea.
13  A.  Correct.
14  Q.  Well, it would have still been three to two
15      even if the mayor had withheld his vote,
16      correct?
17  A.  Possibly.
18  Q.  Well, he was the last one --
19  A.  Unless somebody else changed their vote
20      because of him.
21  Q.  Well, he was the last one called according
22      to the records.
23  A.  But if he had recused himself, then

Page 56

1       somebody else might have voted different,
2       correct?
3   Q.  I don't have any idea.
4   A.  I don't either.  We'll never know because
5       he wouldn't accuse himself.
6           MR. HARRIS:  Recuse.
7   Q.  Recuse himself.
8   A.  I'm sorry.
9   Q.  Well, but as it stands, Mayor Crawley
10      appears to be the last one that voted, and
11      he was a yea vote, but it would have still
12      been a three to two vote if you would have
13      just removed him from the situation?
14  A.  If you removed him from that right there,
15      yes, sir.  But in reality, I don't know.
16  Q.  Well, we can speculate as to what could
17      have occurred all day long.
18          Anything else you base your claim of
19      violation of due process other than this
20      statement in Defendant's Exhibit Number 2
21      and that Mayor Crawley wouldn't recuse
22      himself?
23  A.  No, sir.

Deposition of Wendell Dean Van Meter                                    December 8, 2006

---

Page 57

1    Q.   And other than you were of the opinion that
2         Mayor Crawley had ill feelings towards you
3         because you supported his opposition, was
4         there any other reason that you felt that
5         he should recuse himself?
6    A.   Years ago, I done an investigation, and he
7         was sitting on the board of the housing
8         authority, yes, sir.
9    Q.   Investigated the housing board, the housing
10        authority board?
11   A.   Members, and he was a member.
12   Q.   And he was investigated himself?
13   A.   Yes, sir.
14   Q.   Anything come of that?
15   A.   I was pulled out of the investigation.
16   Q.   You were pulled out?
17   A.   Yes, sir, put on patrol.  That's when Gene
18        Jones was chief.
19   Q.   As far as anything with Mayor Crawley at
20        that time, was he -- did any investigation
21        find anything against him?
22   A.   There was one individual that went to
23        prison.

---

Page 58

1    Q.   But it wasn't him?
2    A.   No, it wasn't him.
3    Q.   Okay.  But other than what these officers
4         have told you, you have no other evidence
5         that Mayor Crawley has any ill feelings
6         towards you, do you?
7    A.   Like I said, I done an investigation.  And
8         before it was complete -- completed, he
9         had -- using maintenance personnel at his
10        residence from the housing authority.
11   Q.   We're talking about two different things.
12   A.   I know it.  You're talking about --
13   Q.   How long ago was this investigation?
14   A.   That's when Gene Jones was chief.
15   Q.   So it's been quite some time?
16   A.   Correct.  And I don't know if he had any
17        animosity toward me from that or not.  I
18        don't know.
19   Q.   That would have been probably the early
20        nineties?
21   A.   Correct.
22   Q.   Well, I mean, as far as --
23   A.   I mean, I don't know.

---

Page 59

1    Q.   I understand.  Let me ask you this, then.
2         Other than what Officer Bandy and the other
3         officer told you, have you any other
4         evidence that Mayor Crawley has any ill
5         will or --
6    A.   No, sir.
7    Q.   -- feelings towards you?
8    A.   No, sir.
9    Q.   And you mentioned something, and I meant to
10        ask you earlier, but -- are you employed
11        anywhere at the present time?
12   A.   Marvin's.
13   Q.   Marvin's?
14   A.   Yes, sir.
15   Q.   And what do you do there?
16   A.   I work on the lumberyard.
17   Q.   And how long have you worked there?
18   A.   About four months, five months.
19   Q.   Have you worked anywhere else other than
20        Marvin's since the City of Lanett?
21   A.   Locksmithing.
22   Q.   Just working on your own?
23   A.   No, sir.  Roquemore's Key & Safe.

---

Page 60

1    Q.   And why did you leave Roquemore's to go to
2         Marvin's?
3    A.   Steadier.
4    Q.   What's your pay at Marvin's?
5    A.   8.50 an hour.
6    Q.   And how many hours a week?
7    A.   No more than 40.
8    Q.   And when you left the City, what was your
9         rate of pay at that time?
10   A.   17 something.  16, $17 an hour.
11   Q.   Were you on salary or were you still
12        hourly?
13   A.   Hourly.
14   Q.   How many hours did you normally work a
15        whole week?
16   A.   We work 36 hours one week, 48 the next
17        week.  Four on, four off.
18   Q.   Do you remember where you were as far as
19        the step for lieutenant?
20   A.   I'd topped out.  I'd been topped out
21        about -- since Terrell Whaley was mayor.  I
22        can remember the mayors, but as far as the
23        years ...

---

15 (Pages 57 to 60)

Deposition of Wendell Dean Van Meter                                    December 8, 2006

Page 61

1   Q.  I understand.
2   A.  Because I mentioned to Terrell one day
3       about adjusting the pay because everybody
4       else was catching me, even down in Biloxi.
5   Q.  I was going to say, I remember that, too.
6           So you were topped out for quite some
7       time.
8   A.  Correct.
9   Q.  The only rate increase that you would get
10      would be cost of living?
11  A.  Correct.
12          (Brief interruption.)
13  Q.  I want to go through some parts of your
14      complaint.  I know you didn't draft it.
15      Your lawyers did.  I'm just going to ask
16      you what you understand your claim to be.
17      If you know, fine.  If you don't, that's
18      fine.  I'm not asking for their opinion,
19      though.  If I can depose them, that would
20      be more fun, but I'm here to find out what
21      you know.
22          You have claimed intentional infliction
23      of emotional distress.  What evidence do

Page 62

1       you have that the City of Lanett or anybody
2       on behalf of the City of Lanett did this
3       intentionally to injure you in any manner?
4   A.  Well, them leaving the records out there.
5       If they were so important, shouldn't there
6       have been somebody out there to say, no,
7       you can't have them instead of the fire
8       personnel looking through them?  I mean,
9       they have an obligation, themselves, to
10      protect files if they want to keep them.
11      Don't you agree?
12  Q.  I told you earlier, you can't ask me
13      questions.
14  A.  I can, but you're not going to answer them.
15  Q.  You can ask me whatever you want, but I
16      don't have -- you've got to answer the
17      questions.  I don't.
18  A.  Okay.
19  Q.  You're saying that you think it was --
20      their intentional act was leaving the
21      records where you could get to them?
22  A.  They left them out so everybody could get
23      to them.  I mean, anybody -- if anybody had

Page 63

1       come by and the fire personnel been gone to
2       lunch, anything like that, look at the
3       identity theft.  No responsibility.
4   Q.  Have you been treated by any psychologist,
5       psychiatrist or counselor for any emotional
6       stress for this?
7   A.  I see Dr. Hemberg at the present.
8   Q.  Dr. Hemberg is a family doctor, isn't he?
9   A.  Correct.
10  Q.  He's your family doctor?
11  A.  Yes, sir.  Eric Hemberg.
12  Q.  And he's given you antidepressants?
13  A.  Lexapro, yes, sir.
14  Q.  Had you ever taken that before?
15  A.  No, sir.
16  Q.  How long have you been taking Lexapro?
17  A.  Good God.  I don't know.  A little while.
18      I'm not sure.
19  Q.  Seen any other doctor for anything as a
20      result of this incident?
21  A.  No, sir.
22  Q.  Had you ever been treated for depression
23      before this incident occurred?

Page 64

1   A.  Yes, sir.
2   Q.  When was that?
3   A.  Hemberg.
4   Q.  When was it?
5   A.  Oh, good God.  Gene Jones' administration.
6   Q.  Okay.
7   A.  That man didn't like anybody.
8           MR. LYONS:  Off the record.
9           (Off-the-record discussion.)
10  Q.  So you were treated by Dr. Hemberg back at
11      that time?
12  A.  Yes, sir.
13  Q.  Have you been treated by anyone else for
14      depression other than Dr. Hemberg?
15  A.  No, sir.
16  Q.  Never in your life?
17  A.  I mean, Marvin sent me to a doctor for a
18      physical.  I mean, you know --
19  Q.  No, I'm just saying for depression.
20  A.  No, sir.  No, sir.
21  Q.  I'm sorry.  My question may not have been
22      very good.
23          Now, you've also sued the City for

16 (Pages 61 to 64)

Deposition of Wendell Dean Van Meter                                  December 8, 2006

Page 65

1     defamation, and you mentioned this
2     earlier. You said you were being called a
3     thief. Who, if anybody, with the City of
4     Lanett has ever said you were a thief?
5 A.  Read it in the documents.
6 Q.  Well, I mean, who, specifically -- has
7     anyone told -- have you heard anyone tell
8     anyone out on the street that you were a
9     thief or --
10 A.  No, sir.
11 Q.  Have they published it to the public in any
12     way?
13 A.  No, sir.
14 Q.  In the city council hearing that was held
15     at the regular city council hearing that's
16     shown in Defendant's Exhibit Number 4, was
17     it discussed what the claims were that were
18     being made against you or was there any
19     discussion of you having stolen anything?
20 A.  It was -- The claims were, yes, sir.
21 Q.  Did they tell at that that you were being
22     charged with theft of property?
23 A.  Theft of City property and unbecoming a

Page 66

1     police officer, yes, sir.
2 Q.  That was discussed in the city -- the
3     regularly-scheduled city council meeting?
4 A.  I'm not sure.
5         MR. INGRAM: It was discussed in
6         the hearing.
7 Q.  It was in hearing, but I'm asking about
8     in the city council meeting where the city
9     council voted. Did they discuss --
10         MR. INGRAM: There was no
11         discussion at all.
12 Q.  So there was nothing out in front of the
13     public at that hearing that would have been
14     talked about, any theft of City property,
15     was there?
16 A.  Other than the other employees talking,
17     yes, sir.
18 Q.  Well, my question to you was, at the city
19     council hearing where the city council
20     voted in public hearing, there was no
21     discussion of your -- there was no claim
22     made or any discussion about you having
23     stolen any City property, was there?

Page 67

1 A.  Repeat the question again.
2 Q.  Talking about Defendant's Exhibit Number
3     4.
4 A.  Talking about at this hearing, at this
5     council meeting? No, they didn't mention
6     it. They just voted on --
7 Q.  They just voted?
8 A.  Voted, yes, sir.
9 Q.  Has anyone with the City or any other
10     employee with the City come and told you
11     that they heard you'd been charged with
12     theft of City property?
13 A.  Charged?
14 Q.  Yes, sir. In your complaint --
15 A.  Talking about a criminal charge?
16 Q.  Well, it says: Terminated employment on
17     unfounded charges of theft of City
18     property. That's why I'm using the term
19     charged.
20 A.  Okay.
21 Q.  You were not criminally charged with
22     anything?
23 A.  No, sir.

Page 68

1 Q.  There was never any -- Well, let me ask you
2     this. Was there ever any threat of
3     criminal charges to you by the City?
4 A.  No, sir.
5 Q.  Has anyone with the -- any employee of the
6     City or anyone come up to you and said
7     they've heard that you were accused of
8     theft of City property?
9 A.  Sure.
10 Q.  Who was that?
11 A.  All the police officers. They all knew
12     what was going on.
13 Q.  All the police officers?
14 A.  Just about all of them, yeah, they know.
15 Q.  Anyone else other than the police
16     officers?
17 A.  I run into people on the street, run into
18     them at Marvin's talking about it.
19 Q.  And is that -- did they find out -- Do you
20     know how these folks found out about it?
21 A.  It was in the news. I mean, Joel had been
22     on TV talking about it. I've talked about
23     it.

Deposition of Wendell Dean Van Meter                                          December 8, 2006

Page 69

1    Q.  So you've talked about it as well to the
2         press?
3    A.  Yes, sir. Joel has, too.
4    Q.  What press outlet did you talk to?
5    A.  It was CVP, local.
6    Q.  Have you been on Rumor Has It about this
7         issue?
8    A.  Yes, sir.
9         I don't know if you've got the document
10        or not. Do you mind if I look?
11   Q.  Go ahead.
12   A.  On December the 2nd, Joel sent me a
13        letter. I'm entitled to copies of the
14        report, statements, nah, nah, nah. Please
15        be aware that the open -- new open meeting
16        law may impact any hearing before the mayor
17        and council, open -- to be open to the
18        public.
19   Q.  And that's the reason why they had the
20        December 19th city council meeting to vote
21        as to the -- having it -- the open
22        hearing?
23   A.  (Nods head up and down.)

Page 70

1    Q.  Okay. You also in your complaint said that
2         it harmed your reputation, and you
3         mentioned earlier that you could not get --
4         it's affected your ability to get work.
5         Have you been turned down by anyplace
6         for -- you've requested employment because
7         they said you've been -- they heard you
8         stole City property?
9    A.  Sheriff Lockhart.
10   Q.  What did he tell you?
11   A.  Told me once we got all this behind us and
12        got it straightened out, he'd look at me.
13        But Valley ain't going to touch me either.
14   Q.  Did you apply at Valley?
15   A.  I talked to them about it, yes, sir.
16   Q.  Did you fill out an application or did you
17        just talk to them?
18   A.  I talked to them.
19   Q.  Did you talk to anyone else other than the
20        City of Valley?
21   A.  No, sir.
22   Q.  Or the sheriff's department?
23   A.  No, sir.

Page 71

1    Q.  And what did they say at Valley?
2    A.  They're hiring folks, but they never
3         would -- Huh-uh. (Negative response.)
4         Seems like your name just gets overpassed,
5         you know, just passed over.
6    Q.  Did you fill out an application with the
7         sheriff's department or did you just talk
8         to the sheriff?
9    A.  Talked to the sheriff, the same way I done
10        last time in 1980.
11   Q.  With Valley, who did you talk to?
12   A.  Frank Montroy and John --
13        MR. INGRAM: McConnell.
14   A.  McConnell.
15   Q.  And with the sheriff's department, you
16        talked with the sheriff himself?
17   A.  Yes.
18   Q.  All right. Anywhere else that you've
19        attempted to obtain employment and not been
20        able to get it because of this situation?
21   A.  No.
22        You've got to understand, I had 27
23        years in law enforcement. That was my

Page 72

1    livelihood. I started at the age of 22.
2    I'm 50 years old. How many people is going
3    to hire a 50-year-old to patrol the street?
4    Q.  All I can ask you is if you've applied
5         anywhere.
6    A.  I mean, you know, what is your profession
7         worth to you?
8    Q.  Again, I'm not here to answer the
9         questions.
10        MR. HARRIS: Just answer his
11        questions.
12        MR. INGRAM: He's just here to ask
13        you questions.
14        THE WITNESS: I know it, but ...
15        MR. INGRAM: I know it's personal
16        with you. It's not personal
17        with Randy.
18        THE WITNESS: Well, I'm not
19        personal with him.
20   Q.  You're not mad at me --
21   A.  No, no, no.
22   Q.  And I'm just here to ask you questions.
23        I'm just doing my job.

Deposition of Wendell Dean Van Meter                                      December 8, 2006

Page 73

1   A.   I understand.
2   Q.   And you're not going to hurt my feelings
3        asking questions. I'm not going to answer
4        them.
5             Anyway, the other thing you talked
6        about is loss of consortium, and that's
7        mainly your wife's claim, but let me ask
8        you. How has this affected your
9        relationship with your wife?
10  A.   Different rooms all the time, never
11       together. I had to draw all of my
12       retirement out to pay off bills.
13  Q.   Have y'all had to seek marriage counseling?
14  A.   No, sir.
15  Q.   What you're telling me is y'all don't sleep
16       in the same room?
17  A.   No, sir.
18  Q.   And that's been something that's occurred
19       just since this all took place?
20  A.   Pretty much so.
21  Q.   Well, before this happened, did y'all stay
22       in the same room?
23  A.   Yes, sir.

Page 74

1   Q.   Is the reason for that that she is just so
2        upset? Is she mad at you?
3   A.   I get ill quick, a short fuse.
4   Q.   Do you have children?
5   A.   Yes, sir.
6   Q.   How many children have you got?
7   A.   I have two sons.
8   Q.   And what are their ages?
9   A.   24 and 31, and I'm raising a granddaughter.
10  Q.   How old is your granddaughter?
11  A.   Eight years old.
12  Q.   Is your wife employed anywhere?
13  A.   Yes, sir.
14  Q.   Where is she --
15  A.   Huguley Water Authority.
16  Q.   What does she do there?
17  A.   She's a clerk.
18  Q.   In your complaint, you also allege
19       negligence on the part of the City. It
20       says: Negligence for failure to establish
21       a written policy that would ensure due
22       process of law to you and that the
23       defendants, the mayor, the council

Page 75

1        members --
2             And you -- you've only sued the three
3        other -- the council members that voted
4        yea, correct?
5   A.   Correct.
6   Q.   You said they were negligent in their
7        failure to prevent Joel Holley from the
8        unauthorized termination prior to your due
9        process hearing.
10  A.   Yes, sir, your Exhibit 2.
11  Q.   What is your opinion or what is your
12       statement as to what's wrong with the
13       written policy and what needs to be changed
14       in the written policy to correct due
15       process of law?
16  A.   They need to go by their policy that they
17       already --
18  Q.   So it's not that they didn't establish a
19       written policy. They just -- Your position
20       is, they didn't follow it?
21  A.   They didn't follow the policy, the written
22       policy they got on termination. And they
23       don't have a policy on destroying personnel

Page 76

1        records --
2   Q.   Okay.
3   A.   -- to prevent stuff like this from
4        happening to anybody else. John Doe
5        employee can get ahold of it, throw them in
6        the trash or do what they want to with
7        them.
8   Q.   You said you were with the police
9        department for 27 years. When was your
10       plan to retire?
11  A.   30 years.
12  Q.   At 30 years?
13  A.   Yes, sir.
14  Q.   So you were going to go three more years?
15  A.   I would have liked to have, yes, sir.
16  Q.   When you took out your retirement money to
17       pay bills, did that cause you any type
18       of -- did you have to pay any kind of
19       penalty for --
20  A.   Taxes.
21  Q.   Just taxes?
22  A.   Federal taxes.
23  Q.   You didn't have, like, a ten percent

19 (Pages 73 to 76)

Deposition of Wendell Dean Van Meter                                    December 8, 2006

Page 77

1    penalty for taking it out early?
2    A.   I think so, yes, sir.
3    Q.   Okay. So you had to pay taxes and you may
4        have had to pay some penalty?
5    A.   Penalty for early withdrawal.
6    Q.   Are you sure that you did?
7    A.   I believe so, yes, sir.
8    Q.   Do you remember how much you took out of
9        your retirement account?
10   A.   I think it was 40 some odd thousand, and
11       then after taxes and penalties, it ended up
12       30 some odd thousand.
13   Q.   When this occurred, basically a year ago
14       from where we're sitting now, at that point
15       you had been with the department for 27
16       years?
17   A.   Well, I had been back since '88, yes, sir.
18   Q.   How does that run as far as your thought
19       for being there -- for 30 years?  Was it
20       going to be 30 years total or was it going
21       to be 30 years from 1988?
22   A.   It would be 30 years total.
23   Q.   Total?

Page 78

1    A.   Yes, sir.
2    Q.   So three years from last year?
3    A.   Uh-huh. (Positive response.)
4    Q.   Yes?
5    A.   Yes, sir.
6    Q.   What you were planning to do?  Were you
7        going to work somewhere else after you
8        retired?
9    A.   Yes, piddle around.
10       MR. LYONS:  Let's take a break for
11          a minute and let me see if
12          there's anything.  I may be
13          about through.
14       (Brief recess was taken.)
15   Q.   There's one thing I didn't ask you about.
16       When you were on administrative leave, was
17       that paid administrative leave?
18   A.   Yes, sir.
19   Q.   I thought it was.  I just wanted to confirm
20       that it was.
21       Also, you told me that you had been on
22       Rumor Has It.  How many times have you been
23       on Rumor Has It about this situation?

Page 79

1    A.   One time.
2    Q.   One time.
3    A.   And I was discussing it with my attorneys
4        just a few minutes ago at the break.  The
5        City had it put in the Valley Times
6        newspaper that I was dismissed and what
7        for.  I forgot about that.
8    Q.   Was that before or after you were on Rumor
9        Has It or that you spoke --
10   A.   That was before.
11   Q.   Was it before you spoke to any other media?
12   A.   Yes, sir.
13   Q.   Is there anything that we've not covered
14       about the incident with the City and your
15       termination and the hearing and all that
16       that we need to cover that you ...
17   A.   The only thing is Joel terminated me
18       effective immediately.  He doesn't have
19       that authority.
20   Q.   And we've talked about that prior.
21   A.   Yes, sir.
22   Q.   Is that the main thing?
23   A.   That's ...

Page 80

1    Q.   All right.
2        MR. LYONS:  If you can get your
3           lawyers your notes and the
4           statements that you gave, if
5           you'll get those to them, and
6           then if y'all will get me a
7           copy of the transcript when
8           you get that, I'm through.
9           Thank you, sir.
10       MR. HARRIS:  I think the
11          statements that he's referring
12          to you've already got.  Those
13          are all statements you were
14          furnished that were taken --
15       THE WITNESS:  Right.
16       MR. INGRAM:  The city --
17       MR. LYONS:  The investigation?
18       MR. HARRIS:  Right.
19       MR. LYONS:  I've got that.  He
20          said he had some private notes
21          that he had taken himself as
22          well.
23       THE WITNESS:  I'll look.

Deposition of Wendell Dean Van Meter                                    December 8, 2006

Page 81

1       MR. LYONS:  And if he's got that,
2       I'd like that as well.
3       Thank you, sir.
4       THE WITNESS:  I appreciate it.
5       (Off-the-record discussion.)
6       EXAMINATION
7    BY MR. INGRAM:
8    Q.  Dean, through the series of questions that
9       Mr. Lyons has asked you, there's a few
10      things that I'd like for you to maybe
11      clarify or elaborate a little further on.
12   A.  Yes, sir.
13   Q.  What did you believe the reason for your
14      termination was?
15   A.  It was because Oscar didn't like me.
16      Docimo don't like me.
17   Q.  Let me rephrase that.  What reason were you
18      given by the city manager and Chief Docimo?
19   A.  I'm a troublemaker.
20   Q.  And that stemmed from what?
21   A.  I don't have a clue.
22   Q.  As far as the theft of City property
23      goes --

Page 82

1    A.  Yes, sir.
2    Q.  -- was that what -- the basis of the
3       termination that Docimo told you, or did
4       Docimo tell you you were a troublemaker?
5    A.  Well, Joel is the one that told me I was a
6       troublemaker.
7    Q.  What did Docimo tell you the reason for
8       your termination, that he recommended --
9    A.  Theft of City property and unbecoming a
10      police officer.
11   Q.  Defendant's Exhibit -- I think it's
12      probably Number 1, the letter of
13      termination from the city manager, Joel
14      Holley.
15   A.  That would be Exhibit Number 2, yes, sir.
16   Q.  The last paragraph, probably about -- no,
17      on the front page.
18   A.  Oh, okay.
19   Q.  The last paragraph on the front page about
20      three lines up, I think -- I don't have a
21      copy of it here.  What is the -- If you
22      would, start with that and read that.
23   A.  Employee Wendell Dean Van Meter is hereby

Page 83

1       notified that his employment is terminated
2       effective immediately with the City of
3       Lanett.
4    Q.  Continue.
5    A.  I concur that City property consisting of
6       personnel files was stolen which is a
7       violation of a Class II offense of the City
8       personnel policy.
9    Q.  Now, the term stolen is used in that
10      letter?
11   A.  Yes, sir.  Yes, sir.
12   Q.  And that letter was somehow disseminated
13      amongst the public --
14   A.  Yes, sir.
15   Q.  -- as far as you know, because you saw a
16      copy of it --
17      MR. LYONS:  Object to the form.
18   Q.  -- from individuals?
19   A.  Yes, sir.
20      And it also talks further in the letter
21      about the new open meeting law could impact
22      the hearing as discussed with you, with
23      your counsel.  They keep threatening open

Page 84

1       meeting laws.
2    Q.  So how long after that letter was delivered
3       to you did you hear on the street the
4       reason for your termination?
5    A.  Let's see.  I come by your office and
6       picked it up.  You got it the day prior.
7       And I can't remember who I talked to on the
8       phone that night that told me that you had
9       the letter.  I'm trying to remember who
10      told me.
11   Q.  Well, my question is to you, what was the
12      length of time from the time that letter
13      was delivered to you and to I did you hear
14      it from people on the street the reason for
15      termination?
16   A.  The next morning before I picked it up from
17      you.
18   Q.  And what reason were -- did those people
19      hear that you were terminated?
20   A.  For theft.
21   Q.  Now, as far as your involvement -- the
22      media attention to this matter, did you ask
23      or were you asked to come on --

21 (Pages 81 to 84)

Deposition of Wendell Dean Van Meter                                        December 8, 2006

Page 85

1   A.  I was asked.
2   Q.  -- the local show?
3   A.  I was asked.
4   Q.  And was there any discussion when you were
5       asked to come on the show about what y'all
6       would talk about on the show?
7   A.  We talked about this incident, yes, sir.
8   Q.  Now, how long have you been with the City?
9   A.  I've been back since '88. I first started
10      in '78.
11  Q.  And you worked under how many mayors?
12  A.  Eight mayors.
13  Q.  How many police chiefs?
14  A.  Seven.
15  Q.  So you've seen a lot of employees come and
16      go --
17  A.  A lot of politics.
18  Q.  -- over the years?
19  A.  A lot of politics.
20  Q.  Can you recall in those number of years
21      working under that many mayors and that
22      many chiefs of police of a termination of
23      an officer in this manner?

Page 86

1   A.  No, sir.
2   Q.  Do you feel like you were singled out?
3   A.  Yes, sir.
4   Q.  And who do you feel like singled you out?
5   A.  The mayor and Joel.
6   Q.  Now, once you were terminated, where did
7       you -- what was your lifestyle after you
8       were terminated?
9   A.  Well, my salary was cut in half.
10  Q.  How about your personal lifestyle?
11  A.  My personal lifestyle went to hell in a
12      handbasket.
13  Q.  What did you -- on the day you were
14      terminated, what did you do?
15  A.  Tried to find another job.
16  Q.  And how long did you go without?
17  A.  About two months.
18  Q.  About two months?
19      Was that the same time that you had to
20      seek medical advice?
21  A.  Yes, sir.
22  Q.  How were you spending your days?
23  A.  Drinking.

Page 87

1   Q.  And during those days that you were looking
2       for another job and drinking and after you
3       sought medical advice for what you said was
4       depression, what was your attitude of your
5       wife, Neva Jane, toward you?
6   A.  Short, just short about everything.
7   Q.  Where did you spend most of your time?
8   A.  On the back porch.
9   Q.  Where did she spend most of her time?
10  A.  In the living room.
11  Q.  So y'all really didn't have much social
12      intercourse?
13  A.  Huh-uh. (Negative response.)
14  Q.  Have things improved?
15  A.  No, sir.
16  Q.  You went several months without employment,
17      and then you went to work for Roquemore's
18      Lock & Safe?
19  A.  Yes, sir.
20  Q.  And what were your duties there?
21  A.  Unlocking houses, vehicles, drilling safety
22      deposit boxes, going in safes, banks.
23  Q.  Do you recall working at a bank with

Page 88

1       Roquemore's?
2   A.  Yes, sir.
3   Q.  Do you recall any kind of conversation with
4       bank employees concerning you?
5   A.  We was at the corporate office, yes, sir.
6       One young corporate didn't know me that
7       well or didn't know me and he heard that I
8       was dismissed for stealing, and Mr. Johnson
9       had to correct him, because he's known me
10      all his life -- well, all my life.
11  Q.  When you say Mr. Johnson, you're speaking
12      of Bubba Johnson?
13  A.  Yes, sir.
14  Q.  With Charter Bank?
15  A.  Yes, sir.
16  Q.  So there was an employee at the bank that
17      felt uncomfortable with you in the bank
18      because of --
19  A.  This incident.
20  Q.  -- this incident?
21  A.  Yes, sir.
22  Q.  Since you left Roquemore's, you've been
23      employed at Marvin's Building Materials; is

Page 89

1     that correct?
2   A.  Yes, sir.
3   Q.  And your job is what?
4   A.  I work on the woodyard.
5   Q.  And what does that job entail?
6   A.  Stacking lumber, getting up orders, helping
7     customers.
8   Q.  Does that job entail handling money?
9   A.  No, sir. Occasionally COD's. I mean, if
10    we make a delivery, they might write a
11    check, COD. It goes back to the company,
12    yes, sir. Other than that, no.
13   Q.  Did you apply for advancement within the
14    company?
15   A.  Yes, sir.
16   Q.  And what position?
17   A.  Assistant manager.
18   Q.  And what happened to that?
19   A.  Got shot down.
20   Q.  Did you go through the employment process
21    with the company?
22   A.  Yes, sir.
23   Q.  Did you take the necessary required --

Page 90

1   A.  Test, yes, sir.
2   Q.  And what was the outcome of your test?
3   A.  They were good, but they wanted me to get a
4    little more experience under my belt.
5   Q.  Do you feel like that this accusation
6    against you for theft has been an effect on
7    your job as assistant manager with
8    Marvin's?
9   A.  It could have, yes, sir. They haven't
10    said, but ...
11   Q.  But you were passed over?
12   A.  Yes, sir.
13   Q.  Were you passed over for someone within the
14    company?
15   A.  No, sir, someone outside the company.
16   Q.  Are you still on medication for depression?
17   A.  Yes, sir, when I can afford it, yes, sir.
18   Q.  So you lost your health insurance with the
19    job?
20   A.  Yes, sir.
21   Q.  So you have no health insurance now?
22   A.  Where my medical bills were $20 a month,
23    they're 130, $140 a month.

Page 91

1   Q.  So you're not insured? You and your family
2    are not insured?
3   A.  My wife has got me on her emergency plan,
4    but as far as prescription, no.
5   Q.  So you don't have a regular health
6    insurance policy on you?
7   A.  No, sir.
8   Q.  So that's cost you some extra out-of-pocket
9    money?
10   A.  Yes, sir.
11   Q.  Do you feel like people look at you
12    different now than they did when you were a
13    police officer?
14   A.  Occasionally, yes, sir.
15   Q.  Is it because of the theft charge?
16   A.  Yes.
17   Q.  Did you discuss any alternative with the
18    City as far as your employment prior to the
19    termination or prior to the city council
20    vote?
21   A.  You always talk to them about negotiating
22    retirement.
23   Q.  Did you offer anyone at the City or make

Page 92

1    the suggestion to anyone with the City that
2    you work in another department or anything?
3   A.  Yes, sir. I tried to talk to them about
4    that, being moved to city hall or
5    outside -- well, outside the police
6    department. They wouldn't do it.
7   Q.  They weren't interested in listening to
8    that?
9   A.  Pardon me?
10   Q.  They weren't interested in that?
11   A.  No, sir.
12         MR. INGRAM: Bill, do you have
13     anything?
14         MR. HARRIS: (Shakes head from
15     side to side.)
16         MR. LYONS: I've got a couple of
17     things based on what -- your
18     lawyer has asked some
19     questions that raised a couple
20     of questions in my mind.
21         EXAMINATION
22  BY MR. LYONS:
23   Q.  You said that you are now on your wife's

Deposition of Wendell Dean Van Meter                                    December 8, 2006

Page 93

1       emergency health --
2    A.  Well, she's got family coverage, insurance,
3        got me on hers, which costs more.  But,
4        now, as far as prescription cards, dental,
5        vision and all I had with the City, I
6        haven't got that.
7    Q.  Don't have that?
8    A.  No, sir.
9    Q.  Other than this situation at Charter Bank,
10       have you had anyone else to say anything to
11       you that they felt uncomfortable about you
12       being somewhere or about you or looked -- I
13       mean, treated you differently because of
14       this -- because of this claim of theft?
15   A.  I don't know how people's normal feelings
16       are or what they're thinking.  I don't have
17       a clue.
18   Q.  I'm just saying did they say anything to
19       you?
20   A.  No, not directly.
21   Q.  And your lawyer said that you -- Did you at
22       some point try to negotiate retirement
23       because of this?

Page 94

1    A.  Yes.
2    Q.  I was not aware of that.
3            And then when did you ask to be moved
4        to another department?  After you were
5        terminated or --
6    A.  No, prior.
7    Q.  Who did you talk to about moving to another
8        department?
9    A.  Let's see.  I talked to Mike Yarbrough
10       about being moved to city hall for ... what
11       is it?  Ordinance inspector.
12   Q.  Anybody else you talked to about being
13       moved to another department?
14   A.  I'm trying to think.  Offhand -- I talked
15       to several people about it.  Because they
16       was supposed to open up a slot over there,
17       and I was trying to transfer over there.
18   Q.  Did you ever talk to Joel Holley about it?
19   A.  I may have mentioned it to him.  I'm not
20       sure.
21   Q.  Not sure?
22           Did you ever talk to the mayor about
23       it?

Page 95

1    A.  Indirectly, yes, sir.
2    Q.  You didn't talk to him about it?
3    A.  No, sir, I didn't.
4    Q.  What other position were you looking to try
5        to change to other than ordinance
6        inspector?
7    A.  That's about the only thing I know of
8        offhand.
9    Q.  Okay.  And this letter, Defendant's Exhibit
10       Number 2, you were asked -- you said that
11       people on the street -- other people had
12       either seen it or shown it to you or
13       something to that effect; is that correct?
14   A.  Well, they told me about it, yes, sir.  I
15       was told about it before I got to Jim's
16       office to get the copy of it the next day.
17       See, I actually received it on the 8th.
18   Q.  But do you know if people have actually
19       gotten copies of the letter or they've just
20       heard that you were terminated?
21   A.  I don't know if they got copies of the
22       letter or not.
23   Q.  Okay.

Page 96

1    A.  It was in the Valley Times, so ...
2    Q.  Do you know when it was in the Valley
3        Times?
4    A.  I'm not sure of the date, no, sir.  I think
5        it -- If the council meeting was on Monday
6        night, I think it was on that Tuesday when
7        they ...
8    Q.  When they voted?
9    A.  Correct.
10   Q.  On the 19th?
11   A.  Correct, if I'm not mistaken, yes.
12   Q.  And we're looking at Defendant's 4, which
13       is the council record --
14   A.  Right.
15   Q.  -- for the December 19th meeting.
16           What I'm asking you is, from what I
17       understood you were saying earlier is the
18       morning that you -- before you even came
19       over to your lawyer's office on December
20       the 8th to get a copy of this letter, you
21       had already had people tell you they had
22       heard you had been terminated by the City?
23   A.  Yes.

Deposition of Wendell Dean Van Meter                                    December 8, 2006

Page 97

1    Q.  Do you remember who said that to you?
2    A.  Well, Eddie Chandler is one, but offhand --
3        several police officers.
4    Q.  Okay.  So police officers and then
5        Mr. Chandler?
6    A.  Uh-huh.  (Positive response.)
7    Q.  Anybody else you can think of?
8    A.  Then after it come out in the newspaper,
9        the phone was ringing off the hook.  I
10       mean, you know --
11   Q.  What your lawyer seemed to be implying is
12       that somehow, the City got this letter out
13       to other folks.  Do you have any knowledge
14       that anybody other than you got a copy of
15       this letter?
16   A.  Not offhand.
17   Q.  Have you ever had any what you believe to
18       be personal problems or any other kind of
19       problems with Joel Holley where he would
20       single you out like this?
21   A.  He was judge for 25 years.  I mean, every
22       time I raised my right hand and swore to
23       him, he always believed me.  Why he

Page 98

1        wouldn't believe me now, I don't know.
2    Q.  But, I mean, you don't have any reason that
3        you can think of that he would single you
4        out?
5    A.  Other than calling -- said I was a
6        troublemaker, so ...
7    Q.  And then the mayor, you've already talked
8        about this investigation of the housing
9        authority board and then that you were --
10   A.  He was on the board.
11   Q.  Right, and then you supported his
12       opposition when he ran for mayor.
13   A.  Correct.
14   Q.  And nobody at Marvin's told you the reason
15       you didn't get the assistant manager's
16       position was to have anything to do with
17       this?  It was just they told you they
18       wanted you to get more experience working
19       there beforehand?
20   A.  That's what they said, yes.
21   Q.  Okay.
22   A.  We want you to get more experience under
23       your belt at Marvin's, but then they turn

Page 99

1        around and they go outside and hire
2        somebody with no experience at Marvin's.
3    Q.  Well, did the person that they hired work
4        at another company similar to Marvin's?
5    A.  I don't know.
6    Q.  Do you know?
7    A.  I don't know.
8    Q.  He may have been working at Lowe's or Home
9        Depot, but you don't know?
10   A.  I don't think so.
11   Q.  You don't think so, but you don't know.
12           With your job at Marvin's, it doesn't
13       have any kind of benefits like health
14       insurance or anything like that?
15   A.  You have to pay for it, and it's expensive.
16           MR. LYONS:  I think that's all I
17       have.  Thank you.
18           EXAMINATION
19   BY MR. INGRAM:
20   Q.  Dean, who's Shirley Greenwood?
21   A.  Oscar's girlfriend and secretary at the
22       police department, clerk.
23   Q.  And how long has Ms. Greenwood been at the

Page 100

1        police department?
2    A.  She come in after this administration come
3        in.
4    Q.  And what does Ms. Greenwood do?
5    A.  She's a clerk and answers the phone at the
6        police department.
7    Q.  And how well do you know Ms. Greenwood?
8    A.  Know her pretty well.
9    Q.  Do you know what Ms. Greenwood is paid by
10       the City?
11   A.  Her and several more people that are good
12       friends with the mayor started off at top
13       pay making more than what an officer was
14       that had been there three years.
15   Q.  What's the top pay?
16   A.  I think it's around 11 or $12 an hour, 12
17       something an hour.
18   Q.  Now, you've had a lot to say about
19       Ms. Greenwood, haven't you?
20   A.  Yes, sir.
21   Q.  Now, who do you think that offended?
22   A.  Oscar.
23   Q.  Who all did you have something to say about

25 (Pages 97 to 100)

**Page 101**

1    Ms. Greenwood to?
2    A. Docimo, Joel, Oscar. I mean, it's not fair
3        for someone to walk in, never been in a
4        police department, never worked around a
5        police department to start off making more
6        than what an officer that's been out on the
7        street three years. That's the
8        troublemaker, I reckon.
9    Q. Do you think that your comments to these
10       individuals may have had an effect upon the
11       mayor?
12   A. Yes, sir.
13   Q. Did anyone ever tell you to shut up about
14       it or leave it alone?
15   A. Yes, sir.
16   Q. Ms. Greenwood still with the City?
17   A. As I know of, yes, sir.
18       MR. INGRAM: Okay.
19       EXAMINATION
20   BY MR. LYONS:
21   Q. Who told you to shut up about it or leave
22       it alone?
23   A. Chief Docimo.

**Page 102**

1        MR. LYONS: All right. Thank you,
2        sir.
3
4    * * * * * * * * * * * *
5    FURTHER DEPONENT SAITH NOT
6    * * * * * * * * * * * *
7
8        REPORTER'S CERTIFICATE
9    STATE OF ALABAMA:
10   MONTGOMERY COUNTY:
11       I, Lisa J. Nix, Registered Professional
12   Reporter and Commissioner for the State of Alabama
13   at Large, do hereby certify that I reported the
14   deposition of:
15       WENDELL DEAN VAN METER
16   who was first duly sworn by me to speak the truth,
17   the whole truth and nothing but the truth, in the
18   matter of:
19       WENDELL DEAN VAN METER, NEVA JANE VAN
20       METER,
21       Plaintiffs,
22       Vs.
23       THE CITY OF LANETT, etc., et al.,

**Page 103**

1        Defendants.
2        In The U.S. District Court
3        For the Middle District of Alabama
4        Northern Division
5        Case Number 3:06-CV-583-DRB
6    on Friday, December 8, 2006.
7        The foregoing 102 computer printed pages
8    contain a true and correct transcript of the
9    examination of said witness by counsel for the
10   parties set out herein. The reading and signing of
11   same is hereby waived.
12       I further certify that I am neither of kin
13   nor of counsel to the parties to said cause nor in
14   any manner interested in the results thereof.
15       This 19th day of December 2006.
16
17
18                    _____
19                    Lisa J. Nix, Registered
                     Professional Reporter and
                     Commissioner for the State
20                    of Alabama at Large
21
22
23

26 (Pages 101 to 103)

Deposition of Wendell Dean Van Meter

December 8, 2006

Page 1

---

**A**

abandoned 17:13
ability 70:4
able 71:20
about 6:20 9:2 13:5
14:19 15:7,8 19:1,12
20:6,11,17,21 21:1,3
21:8,9 22:18 23:21
24:21,23 25:2,19
26:16,20 27:11 28:3
28:14,20 29:1 30:21
31:8 32:18,20 33:10
33:10 34:16,18 35:5
37:1 44:4 46:18
47:22 49:16 50:6,6
50:12,21 51:14 53:7
53:18 54:12 58:11,12
59:18 60:21 61:3
66:7,14,22 67:2,4,15
68:14,18,20,22,22
69:1,6 70:15 73:6
78:13,15,23 79:7,14
79:20 82:16,19 83:21
85:5,6,7 86:10,17,18
87:6 91:21 92:3
93:11,12 94:7,10,12
94:15,18,22 95:2,7
95:14,15 98:8 100:18
100:23 101:13,21
academy 11:11,13
accepted 39:12
accident 7:1
according 17:20 22:5
34:13 55:1,21
account 77:9
accusation 90:5
accuse 56:5
accused 53:5 68:7
achieved 13:14
act 62:20
action 1:7 13:18 14:18
Action/Police 3:7
activity 51:22
actual 28:21
actually 95:17,18
address 9:7,10
addressed 36:13
adjusting 61:3
administration 64:5
100:2
administrative 30:5
31:11,21 32:3,14,17
33:9 78:16,17
admit 38:1
advancement 89:13
advice 86:20 87:3
advise 42:11
advisement 50:11
affected 70:4 73:8
afford 90:17

after 5:2 11:9 20:6
25:15,23 27:2 32:4,8
32:13 35:13 45:3,8
52:8 77:11 78:7 79:8
84:2 86:7 87:2 94:4
97:8 100:2
afternoon 24:19 25:22
again 12:21 67:1 72:8
against 22:20 57:21
65:18 90:6
age 72:1
ages 74:8
ago 22:21,22 40:11
57:6 58:13 77:13
79:4
agree 22:3 38:3,5 41:21
62:11
agreed 3:18 4:9,16
40:10,10
agreement 1:15
ahead 33:17 69:11
ahold 19:19 76:5
ain't 70:13
al 1:9 2:6 102:23
Alabama 1:2,17,19
2:11 4:1 9:8,22 102:9
102:12 103:3,20
allege 74:18
alone 101:14,22
along 49:1
already 29:22 40:9,14
75:17 80:12 96:21
98:7
alternative 91:17
although 34:23
always 23:21 39:21
91:21 97:23
amongst 83:13
animosity 58:17
announced 48:16
another 31:22 37:2
53:6 54:22 86:15
87:2 92:2 94:4,7,13
99:4
answer 5:21 34:12 42:4
62:14,16 72:8,10
73:3
answers 100:5
antidepressants 63:12
anybody 18:23 21:3,7,9
21:10,14,17,22 45:11
62:1,23,23 64:7 65:3
76:4 94:12 97:7,14
anyone 6:17,19 32:18
51:2 52:5 64:13 65:7
65:7,8 67:9 68:5,6,15
70:19 91:23 92:1
93:10 101:13
anyplace 70:5
anything 5:16 7:13

10:20 17:17 19:1
21:7,8 24:14 26:6
28:3 31:6 37:7 49:13
49:16 51:13,16,19,20
52:1,2,4 54:2,6 56:18
57:14,19,21 63:2,19
65:19 67:22 78:12
79:13 92:2,13 93:10
93:18 98:16 99:14
Anyway 17:5 20:3 73:5
anywhere 59:11,19
71:18 72:5 74:12
appeal 3:3 33:16,18,19
33:20 35:1 36:12,15
36:17,19 38:19,22
40:3,15,16,22,23
42:11,12 43:7,15
appeals 38:20
APPEARANCES 2:1
appears 45:3 49:21
50:13 56:10
application 70:16 71:6
applied 72:4
apply 70:14 89:13
appreciate 81:4
appropriate 42:20
approximately 1:20
area 19:14,16
around 17:15 23:22
29:18 78:9 99:1
100:16 101:4
arrested 7:13,16,18
14:14
asked 15:21 24:21 35:7
35:14 46:18,23 54:14
81:9 84:23 85:1,3,5
92:18 95:10
asking 5:15 20:21 29:5
41:15 47:17 61:18
66:7 73:3 96:16
assistant 89:17 90:7
98:15
assume 5:22
attached 44:1,7
attempted 71:19
attention 84:22
attitude 87:4
attorney 20:19
attorneys 2:5,10 34:5
34:19 38:1 46:15
79:3
Attorney-client 54:11
authority 57:8,10
58:10 74:15 79:19
98:9
automobile 7:1
avail 43:6
available 29:13 47:15
Avenue 1:19 2:5 9:8
aware 69:15 94:2

away 15:23 16:9,17
17:21 18:11 21:13,18
22:6 27:12 30:11,13
a.m 1:21

---

**B**

back 8:23 11:19,21
12:17,18 13:6 21:6
30:7 31:5,17 41:6
42:3 47:5 48:11,13
64:10 77:17 85:9
87:8 89:11
background 11:3
Bandy 31:1 51:11 59:2
bank 87:23 88:4,14,16
88:17 93:9
Banker 15:18
bankruptcy 8:8
banks 87:22
barn 21:23
barrel 17:9
barrels 17:12,16 18:12
base 56:18
based 92:17
basically 77:13
basis 53:17 82:2
beat 14:10,13,15
before 1:15 3:22 6:1
11:14 30:18 32:4
33:9 58:8 63:14,23
69:16 73:21 79:8,10
79:11 84:16 95:15
96:18
beforehand 98:19
behalf 62:2
behind 70:11
being 6:9 22:23 23:11
24:6 26:4 32:16
44:12 53:5 54:22
65:2,18,21 77:19
92:4 93:12 94:10,12
believe 41:9 77:7 81:13
97:17 98:1
believed 97:23
belt 90:4 98:23
benefits 99:13
between 3:19 4:10,17
32:15 33:13
Bill 92:12
bills 73:12 76:17 90:22
Biloxi 61:4
Birmingham 19:15
birth 9:18
bit 22:4
board 57:7,9,10 98:9
98:10
bond 14:1
borrow 11:1
Both 34:5
Box 2:6 15:19

boxes 87:22
break 78:10 79:4
brick 21:21,22 22:3,11
Brief 34:7 43:14 61:12
78:14
bring 26:14
Broad 1:19 2:5
broke 8:14
Broken 8:19
brought 50:9
Bryan 18:1 19:9 20:6,7
22:14
Bubba 88:12
budgets 20:3
Building 88:23
burn 17:13,17 18:13,16
burned 26:23
burning 17:7
burnt 27:3

---

**C**

call 15:18 23:11 33:4
55:7
called 19:13 22:15 23:2
23:8,9,13 24:4,18
25:16,21 32:21 33:14
35:13 46:15,16 55:21
65:2
calling 20:21 98:5
calls 20:7
Calvin 46:1
came 12:18 15:13
29:21 48:13 96:18
candidate 54:22
capacity 6:13
car 14:8
cards 93:4
career 53:4
carry 17:11
case 4:11,13 6:2 7:4
103:5
catching 61:4
cause 30:16 76:17
103:13
CDL 10:14
certificate 37:23 44:2
102:8
certify 102:13 103:12
chamber 45:23
Chambers 12:11
Chandler 23:14 24:4
97:2,5
change 95:5
changed 55:19 75:13
charge 67:17 91:15
charged 13:23 44:12
65:22 67:11,13,19,21
charges 67:17 68:3
Charter 88:14 93:9
check 89:11

Deposition of Wendell Dean Van Meter

December 8, 2006

Page 2

**chief** 3:7 13:22 14:7,22
  24:18 33:13 35:18
  44:18,20 57:18 58:14
  81:18 101:23
**chiefs** 15:5 85:13,22
**chief's** 37:17 39:12
**children** 74:4,6
**city** 1:8 5:11 8:14,15,16
  8:17 11:10,15,19,21
  12:1 13:6,8,10,14,16
  15:9,16 16:1 17:2
  19:9 21:3,16 22:5,21
  25:21 30:8,10,12
  32:18 33:16,20,22
  35:4,23 39:7 40:4,12
  42:21 43:5,8,11,16
  44:11 45:4,5,11,11
  45:14 46:14,19 50:21
  51:3 52:7 59:20 60:8
  62:1,2 64:23 65:3,14
  65:15,23 66:2,3,8,8
  66:14,18,19,23 67:9
  67:10,12,17 68:3,6,8
  69:20 70:8,20 74:19
  79:5,14 80:16 81:18
  81:22 82:9,13 83:2,5
  83:7 85:8 91:18,19
  91:23 92:1,4 93:5
  94:10 96:22 97:12
  100:10 101:16
  102:23
**Civil** 1:7 3:21
**claim** 53:11 56:18
  61:16 66:21 73:7
  93:14
**claimed** 61:22
**claiming** 54:18
**claims** 54:9 65:17,20
**clarified** 8:3
**clarify** 81:11
**Class** 83:7
**cleaning** 15:23
**clear** 25:6,13
**clerk** 74:17 99:22
  100:5
**climbed** 16:5
**close** 49:5,6
**clue** 10:2 20:11 22:19
  81:21 93:17
**COD** 89:11
**COD's** 89:9
**come** 11:19,21 12:17
  13:6 15:1 16:7,7
  26:10,18 31:17 32:21
  38:20 48:11 57:14
  63:1 67:10 68:6 84:5
  84:23 85:5,15 97:8
  100:2,2
**commencing** 1:20
**comment** 17:10 35:11

41:14 47:4
**comments** 101:9
**commercial** 10:6,7,10
**commission** 4:2
**Commissioner** 1:17 4:1
  102:12 103:19
**company** 89:11,14,21
  90:14,15 99:4
**complaint** 52:22 53:1,2
  53:8 61:14 67:14
  70:1 74:18
**complete** 58:8
**completed** 42:1 58:8
**complex** 15:16 21:20
**Composite** 43:22
**computer** 103:7
**concerning** 88:4
**concur** 83:5
**confirm** 78:19
**connect** 44:8
**consisting** 83:5
**consortium** 73:6
**contact** 20:19 45:10
  51:2
**contain** 103:8
**Continue** 83:4
**conversation** 24:20
  88:3
**convicted** 7:17,20,22
**copies** 69:13 95:19,21
**copy** 28:9,13,23 29:6
  29:14 31:23 32:1
  80:7 82:21 83:16
  95:16 96:20 97:14
**corporate** 88:5,6
**correct** 8:18 13:3,9
  15:11 18:22 24:13
  34:22 35:1,2 36:10
  36:11,13,14 37:19
  38:2,3,12 39:8,14
  40:13,16 43:12,16,17
  45:1,6,7 51:10 52:20
  53:13 55:13,16 56:2
  58:16,21 61:8,11
  63:9 75:4,5,14 88:9
  89:1 95:13 96:9,11
  98:13 103:8
**corrective** 10:16
**cost** 61:10 91:8
**costs** 93:3
**council** 3:9,9 27:1,2
  30:20 35:4 36:19
  38:8,15 39:1,13 40:3
  40:12 41:2 43:11,16
  45:4,5,14,23 46:8
  47:5 48:18,22 49:4,9
  49:21 50:4,21 52:7
  65:14,15 66:3,8,9,19
  66:19 67:5 69:17,20
  74:23 75:3 91:19

96:5,13
**councilman** 23:16,17
  55:8
**Councilmember** 55:9,9
  55:10,11
**counsel** 3:19 4:10
  83:23 103:9,13
**counseling** 73:13
**counselor** 63:5
**County** 12:11 102:10
**couple** 19:8 92:16,19
**court** 1:1 47:19 103:2
**cover** 79:16
**coverage** 93:2
**covered** 79:13
**cow** 9:5
**Cracked** 8:21
**Crawley** 54:14,20 55:4
  55:12 56:9,21 57:2
  57:19 58:5 59:4
**crime** 7:23
**criminal** 67:15 68:3
**criminally** 67:21
**CST** 1:21
**customers** 89:7
**cut** 86:9
**CVP** 69:5

**D**

**D** 17:1,2
**damage** 7:7
**damages** 7:3
**date** 9:18 27:8,19 33:7
  44:13 96:4
**dated** 21:22 36:9 37:19
  43:23
**daughter** 13:22
**day** 21:6 27:4 34:12
  48:14,23 49:3 56:17
  61:2 84:6 86:13
  95:16 103:15
**days** 14:5,10,11 19:8
  34:11,23 35:1 40:21
  43:8 86:22 87:1
**Dean** 1:5,14 2:18 3:4,6
  3:20 5:1,9 16:8 36:1
  37:13 42:7,18 43:2
  50:12 81:8 82:23
  99:20 102:15,19
**December** 1:20 29:19
  29:23 34:15 35:3,14
  35:17 36:2,9 37:20
  43:23 44:5,23 45:3,3
  45:8,9,15 50:4,10
  69:12,20 96:15,19
  103:6,15
**decision** 5:3 34:10,20
  36:16,17,22 37:15
  38:2,15,23 40:13,16
  41:11 43:9

**defamation** 65:1
**DEFENDANT** 2:8
**defendants** 1:10 74:23
  103:1
**Defendant's** 3:2 36:3,6
  37:3,8 43:1,18,21
  50:1,2,17 53:19
  56:20 65:16 67:2
  82:11 95:9 96:12
**delivered** 84:2,13
**delivery** 89:10
**denial** 53:17,22 54:3,18
**denied** 40:7 53:12
**dental** 93:4
**department** 11:18 12:2
  12:10 15:17 17:4
  18:23 19:10 21:20
  41:7 44:18 47:6
  70:22 71:7,15 76:9
  77:15 92:2,6 94:4,8
  94:13 99:22 100:1,6
  101:4,5
**DEPONENT** 102:5
**depose** 61:19
**deposit** 87:22
**deposition** 1:14 3:20,22
  4:6,11,18 5:13 6:1
  11:15 43:23 102:14
**depositions** 6:5 25:8
**Depot** 99:9
**depression** 63:22 64:14
  64:19 87:4 90:16
**deputy** 12:10
**destroying** 46:19 47:1
  75:23
**details** 10:23 11:1
**diary** 28:2
**difference** 39:2 41:8
**different** 6:5 22:4,10
  25:9 46:5 56:1 58:11
  73:10 91:12
**differently** 93:13
**directly** 51:15,17 52:2
  93:20
**disability** 8:6
**disciplinary** 3:7 13:18
  14:18
**Disciplinary/Due** 3:5
**discipline** 14:3,9
**discuss** 66:9 91:17
**discussed** 50:9 65:17
  66:2,5 83:22
**discussing** 79:3
**discussion** 54:11 64:9
  65:19 66:11,21,22
  81:5 85:4
**dismissed** 79:6 88:8
**disseminated** 83:12
**distress** 61:23
**District** 1:1,2 103:2,3

**Diversified** 11:20 12:13
  13:4
**Division** 1:3 103:4
**divorce** 19:22
**Dobbs** 31:1 51:12
**Docimo** 24:18,18 33:4
  33:13 35:18 81:16,18
  82:3,4,7 101:2,23
**Docimo's** 3:7
**doctor** 63:8,10,19
  64:17
**document** 34:13 35:8
  35:20 36:9 37:2 69:9
  65:5
**documents** 37:5 44:7
  65:5
**Doe** 76:4
**doing** 15:22 21:1 72:23
**done** 16:23 24:17 26:8
  28:8 32:6 34:9 38:22
  39:11,20,21 41:2
  51:19 57:6 58:7 71:9
**Dorman** 15:1
**double** 10:12
**down** 12:11 14:16
  21:19 23:23 28:4
  29:16 43:5 50:6 61:4
  69:23 70:5 89:19
**DP** 13:2
**Dr** 63:7,8 64:10,14
**draft** 61:14
**draw** 73:11
**drilling** 87:21
**drinking** 86:23 87:2
**drive** 10:11
**driven** 10:22
**driver's** 9:22
**drug** 10:23
**drums** 15:19
**due** 38:8 40:7 42:2
  52:22 53:11,12,17,23
  54:3,18 56:19 74:21
  75:8,14
**DUI** 14:1,13,14
**duly** 5:2 102:16
**during** 20:22 87:1
**Duskin** 55:9
**duties** 87:20
**duty** 15:15

**E**

**each** 5:19
**earlier** 11:14 26:21
  51:6 52:21 59:10
  62:12 65:2 70:3
  96:17
**early** 27:5,10,15 58:19
  77:1,5
**EASTERN** 1:3
**Eddie** 23:14 97:2
**education** 11:9

Deposition of Wendell Dean Van Meter

educational 11:3
effect 38:21 40:5 90:6
  95:13 101:10
effective 36:23 37:18
  38:14 39:16 40:18
  41:19,23 42:8,9 43:4
  53:21 79:18 83:2
eight 14:5 15:6 74:11
  85:12
either 4:7,13 41:6 47:5
  47:16 56:4 70:13
  95:12
elaborate 81:11
elderly 16:22
election 31:3,4 51:9
elevate 43:10
emergency 91:3 93:1
emotional 61:23 63:5
employed 13:16 59:10
  74:12 88:23
employee 43:9 67:10
  68:5 76:5 82:23
  88:16
employees 66:16 85:15
  88:4
employment 43:3
  67:16 70:6 71:19
  83:1 87:16 89:20
  91:18
ended 77:11
enforcement 6:10
  71:23
ensure 74:21
entail 89:5,8
entitled 69:13
Eric 63:11
establish 74:20 75:18
et 1:9 102:23
etc 1:9 102:23
even 42:23 55:15 61:4
  96:18
evening 45:16
ever 6:12,19 7:4,12 8:6
  8:8,10 10:19,22
  11:22 13:13,17,17
  46:23 51:13,16,19,19
  63:14,22 65:4 68:2
  94:18,22 97:17
  101:13
every 21:6 25:9 97:21
everybody 7:10 48:12
  61:3 62:22
everything 10:12 23:21
  47:18 87:6
evidence 4:6 58:4 59:4
  61:23
exact 27:8
exactly 54:8
examination 2:16 5:5
  81:6 92:21 99:18

101:19 103:9
Exhibit 3:1,2 36:3,6
  37:3,8 43:1,18,22
  50:2,18 53:19 56:20
  65:16 67:2 75:10
  82:11,15 95:9
expensive 99:15
experience 90:4 98:18
  98:22 99:2
extra 91:8

F
facts 34:9
failure 74:20 75:7
fair 101:2
family 63:8,10 91:1
  93:2
far 33:3 37:22 46:13
  50:18 57:19 58:22
  60:18,22 77:18 81:22
  83:15 84:21 91:4,18
  93:4
Federal 3:21 76:22
feel 86:2,4 90:5 91:11
feelings 54:23 57:2
  58:5 59:7 73:2 93:15
felt 57:4 88:17 93:11
few 79:4 81:9
fight 8:14
fighting 8:15
figured 30:3
file 16:4 17:1 19:4,17
  20:5,9 21:2 22:8 23:4
  28:21 33:16,17 40:2
  42:12
filed 5:12 8:6,8
files 15:11,14,17,18,23
  16:15,18 17:6,7,22
  19:1,6 20:14 21:4
  22:4 23:12 24:7 26:5
  26:8 27:14 29:22
  30:9 32:5,6 44:4
  46:20 47:2 62:10
  83:6
filing 4:11,15
fill 70:16 71:6
find 19:3 20:1 26:1
  57:21 61:20 68:19
  86:15
fine 61:17,18
fire 15:16 16:7 17:18
  17:20 18:10,23 20:23
  62:7 63:1
fired 35:14
firemen 16:7,19 20:23
  21:12,17
first 5:2 8:13 29:18
  33:20 85:9 102:16
five 35:1 40:21 59:18
floor 17:15

Florida 19:23
folks 25:9 68:20 71:2
  97:13
follow 75:20,21
follows 5:4
foot 14:10,13,14
foregoing 103:7
forgot 54:12 79:7
form 4:4 83:17
formality 4:2
former 23:16,17
forth 21:6
found 68:20
four 31:16,16 50:16
  59:18 60:17,17
Frank 71:12
Friday 1:19 103:6
friends 16:14 17:6
  52:16,17 100:12
from 3:4,6 13:1,7 15:8
  15:10,18 16:10 21:21
  30:14 35:21,23 36:15
  36:17 44:1,6 49:19
  52:20 56:13,14 58:10
  58:17 75:7 76:3
  77:14,21 78:2 81:20
  82:13 83:18 84:12,14
  84:16 92:14 96:16
front 28:1 37:12 66:12
  82:17,19
full 5:7
fun 61:20
furnished 80:14
further 4:9,16 81:11
  83:20 102:5 103:12
fuse 74:3
fussing 20:17

G
gave 29:1,2,6 30:9 80:4
Gene 57:17 58:14 64:5
gentleman 16:22
gets 71:4
getting 21:9 22:7,10
  30:16 53:5 89:6
girl 16:20
girlfriend 99:21
give 19:10 20:5,6 26:19
  32:6,22 34:20
given 6:1,6 30:17 32:4
  43:15 63:12 81:18
go 20:15 21:16,22
  25:11 30:7 31:5
  33:17 40:4 42:3
  52:14 53:8 60:1
  61:13 69:11 75:16
  76:14 85:16 86:16
  89:20 99:1
God 63:17 64:5
goes 81:23 89:11

going 5:14,21 7:9 15:20
  17:11,13,14 18:11,15
  20:3,19 23:22 25:1
  26:1 30:15 31:2
  41:14 43:20 44:22
  50:13 51:8 53:8 61:5
  61:15 62:14 68:12
  70:13 72:2 73:2,3
  76:14 77:20,20 78:7
  87:22
gone 63:1
good 63:17 64:5,22
  90:3 100:11
Gore 17:1,2
gotten 30:14 95:19
graduate 11:5
granddaughter 9:13
  74:9,10
great 29:15
Greenwood 99:20,23
  100:4,7,9,19 101:1
  101:16
Greg 17:23 19:19
grievance 43:7,10
guess 29:21 38:11
Gunnells 34:6 46:15,16
  46:23

H
half 13:5 86:9
hall 15:16 16:2 21:16
  30:8 92:4 94:10
hand 33:18 97:22
handbasket 86:12
handled 12:22
handling 89:8
happened 25:15,20
  28:3 29:10 33:12
  46:3,13 73:21 89:18
happening 76:4
happens 30:9
harassment 7:19
harmed 70:2
Harris 1:18 2:4 9:3
  23:18 28:12,19 32:1
  36:7 37:11 46:23
  48:12,16,21 49:19
  50:20 56:6 72:10
  80:10,18 92:14
having 5:2 6:9 15:10
  27:1 54:23 65:19
  66:22 69:21
HAZMAT 10:13
head 12:11 14:16 13:23
  29:16 41:7 44:18
  47:6 49:19 69:23
  92:14
health 90:18,21 91:5
  93:1 99:13
hear 84:3,13,19

heard 24:16 55:10 65:7
  67:11 68:7 70:7 88:7
  95:20 96:22
hearing 3:5 34:1,2,3,4
  34:8,15 35:3,16 36:1
  40:8 41:5 44:13,22
  45:2 47:21 48:2
  54:15 65:14,15 66:6
  66:7,13,19,20 67:4
  69:16,22 75:9 79:15
  83:22
hearings 29:17
held 3:9,10 65:14
hell 86:11
help 31:2,3 51:8,9
helping 89:6
Hemberg 63:7,8,11
  64:3,10,14
HENRY 2:9
her 14:1,2 20:1 87:9
  91:3 100:8,11
hereto 4:14,17
Hester 19:22
Hester's 17:23
high 11:4,9
highest 13:13
highlighting 37:5
him 19:11 20:4,5,5
  24:21 26:7,18,19
  30:9 31:3,4 33:17
  35:10 36:18 39:2
  47:5 51:9 52:4,9
  54:23 55:20 56:13,14
  57:21 58:1,2 72:19
  88:9 94:19 95:2
  97:23
himself 54:15,21 55:23
  56:5,7,22 57:5,12
  71:16 80:21
hire 72:3 99:1
hired 54:5 99:3
hiring 71:2
hold 27:9
Holley 3:3,7 18:3 26:2
  27:18 30:8 31:6,13
  32:5,9,13,16 34:1,19
  36:13 41:9,17 44:1,6
  44:23 53:20 75:7
  82:14 94:18 97:19
Holley's 37:15
home 23:11 24:4,19
  25:16 99:8
hook 97:9
hour 47:22 60:5,10
  100:16,17
hourly 60:12,13
hours 14:2 47:22,23
  60:6,14,16
house 17:13 18:13,17
  27:1,3 29:3 30:16

52:14,14
houses 87:21
housing 57:7,9,9 58:10
98:8
Huguley 74:15
huh-uh 21:5 25:10 71:3
87:13
huh-uhs 25:6
hung 24:17
Huntsville 19:20
hurt 9:3 73:2

**I**
idea 56:3
identification 36:4 37:4
43:19 50:3
identity 63:3
II 83:7
ill 54:23 57:2 58:5 59:4
74:3
immediately 30:5
36:23 37:19 38:14
39:16 40:18 41:19
42:1,8,9 43:4,4 53:21
79:18 83:2
impact 69:16 83:21
implying 97:11
important 62:5
impossible 53:6
improper 41:22
improved 87:14
incident 35:5 44:4
45:12 49:17 63:20,23
79:14 85:7 88:19,20
includes 44:3
increase 61:9
INDEX 2:16 3:1
Indirectly 95:1
individual 6:13 40:2
57:22
individuals 83:18
101:10
inferred 51:20
infliction 61:22
influenced 38:23
information 22:8 52:13
informed 44:11
Ingram 1:18 2:4,19,20
16:21 23:16 35:20
47:11,14,19 48:9,14
49:6 66:5,10 71:13
72:12,15 80:16 81:7
92:12 99:19 101:18
injure 62:3
injured 7:1 8:10,12,20
inspector 94:11 95:6
instead 14:1 62:7
insurance 90:18,21
91:6 93:2 99:14
insured 91:1,2

intentional 61:22 62:20
intentionally 62:3
intercourse 87:12
interested 92:7,10
103:14
interruption 34:7
43:14 61:12
introduced 4:12
investigated 23:12 24:6
26:4 57:9,12
investigating 24:9,12
investigation 12:23
28:16 33:5 57:6,15
57:20 58:7,13 80:17
98:8
involved 22:23
involvement 45:10
84:21
issue 69:7

**J**
J 1:16 3:23 102:11
103:18
jail 13:23
James 1:18 2:4
Jane 1:5 9:15 87:5
102:19
Jennie 34:5 46:15,16
Jimmy 14:7,22 15:1,3
Jim's 95:15
job 8:10,12,20 53:6
72:23 86:15 87:2
89:3,5,8 90:7,19
99:12
Joel 3:3,7 18:2,3 20:2
25:21 26:2 27:17
30:7,12 31:6 32:5,6,8
32:13,16 34:1,3,5
36:13 37:15 41:5
44:1,6,23 47:4 68:21
69:3,12 75:7 79:17
82:5,13 86:5 94:18
97:19 101:2
Joel's 18:2
John 71:12 76:4
Johnson 88:8,11,12
Jones 13:21,21 15:3
57:18 58:14 64:5
journal 28:2
judge 45:23 97:21
just 6:13 7:3,7 12:4
15:4 17:16,21 18:21
20:12 22:14 25:1,13
27:9,13 32:11 37:8,9
37:14 46:3 50:8
52:15,17 56:13 59:22
61:15 64:19 67:6,7
68:14 70:17 71:4,5,7
72:10,12,22,23 73:19
74:1 75:19 76:21

78:19 79:4 87:6
93:18 95:19 98:17

**K**
keep 62:10 83:23
keepsake 16:16
keepsakes 22:2
kept 28:2 29:10
Key 59:23
kin 103:12
kind 6:22 10:10 76:18
88:3 97:18 99:13
kitchen 26:9,14
knew 12:20 17:1 19:21
24:8 68:11
know 16:5 17:10 18:5
18:20 20:10,20 22:12
22:17 23:6,7 26:23
26:23 27:13 29:17
30:10 36:18 49:14,18
52:13 54:6 56:4,15
58:12,16,18,23 61:14
61:17,21 63:17 64:18
68:14,20 69:9 71:5
72:6,14,15 83:15
88:6,7 93:15 95:7,18
95:21 96:2 97:10
98:1 99:5,6,7,9,11
100:7,8,9 101:17
knowledge 97:13
known 88:9
K-9 12:22

**L**
Lanett 1:8,19 2:6 5:11
9:8 11:16 12:1,17,18
13:8,17 15:9 17:2
35:23 43:5,11 45:11
45:12 51:3 59:20
62:1,2 65:4 83:3
102:23
Lanier's 13:22
Large 1:17 4:1 102:13
103:20
last 19:20 41:5 47:21
55:18,21 56:10 71:10
78:2 82:16,19
later 19:8,12 20:7
25:18 30:23 32:20
44:13 48:11,15
latter 30:1
law 1:1 4:5,10 6:9
48:20 69:16 71:23
74:22 75:15 83:21
laws 84:1
lawsuit 5:11 6:20,22
15:8
lawyer 28:7 29:14
37:10 92:18 93:21
97:11

lawyers 54:4 61:15
80:3
lawyer's 96:19
laying 26:9,13
learn 52:12
least 18:15
leave 30:6 31:11,21
32:3,15,17 33:9 42:9
60:1 78:16,17 101:14
101:21
leaving 62:4,20
left 11:17 12:9,12
13:10 48:2 49:14
60:8 62:22 88:22
length 84:12
lenses 10:17
let 11:23 13:22 14:1
36:5,18 41:17 42:16
53:7 59:1 68:1 73:7
78:11 81:17
letter 3:6 32:5 41:10,18
42:6,23 43:23 44:5
69:13 82:12 83:10,12
83:20 84:2,9,12 95:9
95:19,22 96:20 97:12
97:15
Let's 8:13 13:21 14:7
15:5 17:23 25:16
30:7 31:5,14 42:9
49:23 78:10 84:5
94:9
Lexapro 63:13,16
license 9:22 10:7,19
licensed 10:11
lieutenant 13:11 60:19
life 64:16 88:10,10
lifestyle 86:7,10,11
like 11:2,11,13 16:16
19:17 21:19 28:20
33:11 58:7 63:2 64:7
71:4 76:3,23 81:2,10
81:15,16 86:2,4 90:5
91:11 97:20 99:13,14
liked 76:15
lines 82:20
Lisa 1:16 3:22 102:11
103:18
listening 92:7
litigation 22:20
little 16:20 22:4 63:17
81:11 90:4
lived 9:10
livelihood 72:1
lives 9:12
living 61:10 87:10
local 23:18 69:5 85:2
Lock 87:18
Lockhart 70:9
Locksmithing 59:21
long 9:10,16 10:14 13:4

33:8 47:21 56:17
58:13 59:17 63:16
84:2 85:8 86:16
99:23
look 63:2 69:10 70:12
80:23 91:11
looked 20:13 93:12
looking 15:20 16:6,10
16:19 37:12 47:8
54:4 62:8 87:1 95:4
96:12
Lord 6:7
loss 73:6
lost 53:4 90:18
lot 15:16 85:15,17,19
100:18
Lowe's 99:8
Lt 3:6 50:12
Lucille 35:12
lumber 89:6
lumberyard 59:16
lunch 63:2
Lyons 2:9,9,18,19,20
5:6,10 28:9 35:22
47:13 48:19 49:23
50:19 64:8 78:10
80:2,17,19 81:1,9
83:17 92:16,22 99:16
101:20 102:1

**M**
mad 72:20 74:2
made 4:4 17:10 38:22
39:22,23 47:4 53:11
65:18 66:22
main 52:22 53:1,2
79:22
mainly 73:7
maintenance 58:9
make 11:23 25:13
29:13 32:11 34:10,11
38:18 47:14 51:20
89:10 91:23
making 14:2 100:13
101:5
Malone 55:8,8
man 64:7
manager 25:21 33:16
33:21,22 39:7 44:11
81:18 82:13 89:17
90:7
manager's 40:4,13
43:9 98:15
mandatory 14:2
manner 4:13 62:3
85:23 103:14
many 6:5 30:13 60:6,14
72:2 74:6 78:22
85:11,13,21,22
MAR 3:2

**March** 9:19
**mark** 43:20,21 49:23
**marked** 36:3,5 37:3
43:18 50:2
**marriage** 73:13
**married** 9:16
**Marvin** 64:17
**Marvin's** 59:12,13,20
60:2,4 68:18 88:23
90:8 98:14,23 99:2,4
99:12
**Materials** 88:23
**matter** 50:9 51:4 84:22
102:18
**matters** 6:3
**may** 3:22 4:5,6,12 43:6
64:21 69:16 77:3
78:12 94:19 99:8
101:10
**maybe** 81:10
**mayor** 30:20 31:2
36:19 38:8,15,23
40:3,8,11 41:2 47:5
51:7,13 52:8,16,18
54:20,23 55:3,11,15
56:9,21 57:2,19 58:5
59:4 60:21 69:16
74:23 86:5 94:22
98:7,12 100:12
101:11
**mayors** 15:6 60:22
85:11,12,21
**mayor's** 52:14
**McConnell** 71:13,14
**McCoy** 16:11 55:11
**McCullars** 35:13
**mean** 6:3 7:10 10:23
21:17,21 22:2 27:8
27:11,23 36:22 38:7
39:4 40:10,20 41:20
49:15 54:9 55:5
58:22,23 62:8,23
64:17,18 65:6 68:21
72:6 89:9 93:13
97:10,21 98:2 101:2
**means** 40:15
**meant** 8:2 59:9
**media** 79:11 84:22
**mediator** 46:1
**medical** 86:20 87:3
90:22
**medication** 90:16
**meeting** 3:9,9 27:2,3
30:7 31:7,12 33:12
34:1,14 35:14,15,17
45:5,15 48:18,22
49:4,9,11,22 50:4,22
66:3,8 67:5 69:15,20
83:21 84:1 96:5,15
**meetings** 45:10

**member** 35:4 52:7
57:11
**members** 57:11 75:1,3
**mention** 35:10 67:5
**mentioned** 51:6 59:9
61:2 65:1 70:3 94:19
**met** 32:8 45:17,23
**Meter** 1:5,5,14 2:18 3:4
3:20 5:1,9 9:15 36:1
42:7,18 43:2 50:12
82:23 102:15,19,20
**mid** 27:15
**middle** 1:2 29:19 103:3
**might** 56:1 89:10
**Mike** 35:9 94:9
**Milford** 46:1
**military** 11:7
**mind** 69:10 92:20
**minute** 78:11
**minutes** 3:9,9 50:5 79:4
**missing** 16:23
**mistaken** 44:10,15
96:11
**Mitchum** 16:20
**moment** 40:11
**Monday** 31:14 32:9
49:3 96:5
**Mondays** 49:4
**money** 76:16 89:8 91:9
**Montgomery** 2:11
102:10
**month** 27:20 90:22,23
**months** 59:18,18 86:17
86:18 87:16
**Montroy** 71:12
**more** 14:20 60:7 61:20
76:14 90:4 93:3
98:18,22 100:11,13
101:5
**morning** 32:9 84:16
96:18
**Morris** 24:10,11 25:16
25:17 29:7
**most** 87:7,9
**move** 22:14
**moved** 19:23 92:4 94:3
94:10,13
**moving** 94:7
**much** 73:20 77:8 87:11

**— N —**

**nah** 69:14,14,14
**nah-nah** 20:20,20
**name** 5:7,10 9:14 24:1
71:4
**names** 20:12
**nay** 55:8,10
**nays** 50:14
**necessary** 89:23
**need** 4:4 41:7 47:6

75:16 79:16
**needed** 25:18
**needs** 75:13
**Negative** 21:5 71:3
87:13
**negligence** 74:19,20
**negligent** 75:6
**negotiate** 93:22
**negotiating** 91:21
**neither** 103:12
**Neva** 1:5 9:15 87:5
102:19
**never** 6:17 7:22 17:1
20:13,15 21:2 56:4
64:16 68:1 71:2
73:10 101:3,4
**new** 69:15 83:21
**news** 68:21
**newspaper** 79:6 97:8
**next** 20:20 23:7 24:16
24:17 25:15,20 31:15
33:2 48:17,22,23
49:2 60:16 84:16
95:16
**night** 17:14 27:2 84:8
96:6
**nine** 26:16
**nineties** 58:20
**Nix** 1:16 3:23 102:11
103:18
**nobody** 21:11 98:14
**nods** 12:11 14:16 23:23
29:16 69:23
**normal** 49:3 93:15
**normally** 60:14
**Northern** 103:4
**nose** 8:13,19
**notes** 27:23 28:4 29:9
35:23 80:3,20
**nothing** 5:4 27:11
66:12 102:17
**notice** 3:3 36:12,15,17
37:22
**notified** 43:3 83:1
**notify** 36:18
**November** 20:2 29:23
30:2 31:18,19 32:7
**number** 9:20 10:1 36:6
37:9 43:1,22 50:18
53:19 56:20 65:16
67:2 82:12,15 85:20
95:10 103:5

**— O —**

**O** 17:1,2
**Object** 83:17
**objections** 4:3,3
**obligation** 62:9
**obtain** 71:19
**obtained** 20:22

**obtaining** 21:2
**Occasionally** 89:9
91:14
**occur** 34:2 49:13,16
**occurred** 24:20 29:11
31:7 34:8,14,15
45:14 46:12 49:11
50:21 56:17 63:23
73:18 77:13
**occurring** 50:23
**October** 20:2 26:21
27:5,15
**odd** 77:10,12
**off** 22:15 31:16 42:9
60:17 64:8 73:12
97:9 100:12 101:5
**offend** 7:10
**offended** 100:21
**offense** 83:7
**offer** 91:23
**offered** 4:6
**offhand** 14:19 94:14
95:8 97:2,16
**office** 2:6 16:1 26:16
30:8 84:5 88:5 95:16
96:19
**officer** 6:10,14,15 8:17
59:2,3 66:1 82:10
85:23 91:13 100:13
101:6
**officers** 31:1 51:7
52:11 55:1 58:3
68:11,13,16 97:3,4
**Offices** 1:18
**Off-the-record** 64:9
81:5
**Oh** 12:16 64:5 82:18
**okay** 5:19 6:12,16 7:18
8:22 10:9 11:3 12:6
12:12 14:3,6,12,22
15:3,13 17:7,19 18:9
18:19,23 20:16 21:10
22:1,14 23:10 25:8
26:12,20 27:7,13
30:7,19,22 32:7,11
32:23 33:19 34:4
35:12 36:7 37:1 40:6
41:1,8 42:10,14,22
44:14,20 45:2,18,22
46:2,16,18,21 47:3
47:21 48:7 53:2,10
54:17 58:3 62:18
64:6 67:20 70:1 76:2
77:3 82:18 95:9,23
97:4 98:21 101:18
**old** 13:23 15:23 16:3,9
16:10,14 17:5,12
19:17 20:5 21:19
53:6 72:2 74:10,11
**once** 70:11 86:6

**one** 7:5,5,12 16:6,9,10
23:1,20 25:23 35:17
46:22 47:4,16,23
53:7 54:9 55:18,21
56:10 57:22 60:16
61:2 78:15 79:1,2
82:5 88:6 97:2
**ones** 18:16
**only** 35:7 41:8 54:7,10
61:9 75:2 79:17 95:7
**Opelika** 11:21
**open** 20:11 22:13 69:15
69:15,17,17,21 83:21
83:23 94:16
**opinion** 41:15 57:1
61:18 75:11
**opposition** 57:3 98:12
**orders** 89:6
**ordinance** 94:11 95:5
**original** 16:12
**originally** 16:13 21:9
**Oscar** 54:14,14 81:15
100:22 101:2
**Oscar's** 99:21
**other** 4:3,7,13 5:19 6:3
6:19,22 7:4,5 8:2,3
11:10 14:17 20:22
25:23 29:9 31:7 45:9
46:12 49:13 51:2
56:19 57:1,4 58:3,4
59:2,2,3,19 63:19
64:14 66:16,16 67:9
68:15 70:19 73:5
75:3 79:11 89:12
93:9 95:4,5,11 97:13
97:14,18 98:5
**others** 18:7
**otherwise** 22:9
**out** 13:22 14:1 15:23
17:8 18:16 20:9,18
21:11,17 23:3 26:1,8
33:18 57:15,16 60:20
60:20 61:6,20 62:4,6
62:22 65:8 66:12
68:19,20 70:12,16
71:6 73:12 76:16
77:1,8 86:2,4 97:8,12
97:20 98:4 101:6
103:10
**outcome** 33:5 48:4 90:2
**outlet** 69:4
**outside** 90:15 92:5,5
99:1
**out-of-pocket** 91:8
**over** 6:23 7:7 27:17
30:14 47:8 71:5
85:18 90:11,13 94:16
94:17 96:19
**overheard** 52:4
**overpassed** 71:4

December 8, 2006

Deposition of Wendell Dean Van Meter

Page 6

overturn 38:16,17
overturned 40:12
over-the-road 10:22
own 19:3 28:6,8 59:22
o'clock 26:17 45:16

**P**
page 43:6 82:17,19
pages 103:7
paid 78:17 100:9
paragraph 82:16,19
Pardon 92:9
parking 15:15
part 28:16 29:18,19
  30:1 50:6 54:17
  74:19
parties 3:19 4:10,17
  103:10,13
parts 61:13
party 4:7,13
passed 71:5 90:11,13
past 39:22
patrol 14:8 57:17 72:3
patrolman 12:5,6,21
pay 14:5,10 60:4,9 61:3
  73:12 76:17,18 77:3
  77:4 99:15 100:13,15
Peggy 17:23 19:22
penalties 77:11
penalty 76:19 77:1,4,5
people 25:12 68:17
  72:2 84:14,18 91:11
  94:15 95:11,11,18
  96:21 100:11
people's 93:15
percent 76:23
period 34:21 39:6
person 99:3
personal 19:3 72:15,16
  72:19 86:10,11 97:18
personality 23:19
personally 6:16
personnel 15:11,14,17
  16:7 17:20 18:10
  21:1 22:4 23:12 24:7
  26:5 46:17,20 47:2
  58:9 62:8 63:1 75:23
  83:6,8
Pete 16:11
phone 20:8 23:11 24:18
  84:8 97:9 100:5
physical 64:18
pick 19:16
picked 84:6,16
picking 25:12
piddle 78:9
piece 22:10
place 29:18 73:19
placed 32:14,16
plaintiff 2:3 7:4

Plaintiffs 1:6 102:21
plan 76:10 91:3
planning 78:6
please 5:8,17 9:7,12
  69:14
pleasure 22:23
Poe 19:9 22:14,20
Poe's 18:1
point 31:10 47:4 48:5
  77:14 93:22
police 6:13,15 8:17
  11:11,11,13 12:2
  19:10 21:20 51:6
  66:1 68:11,13,15
  76:8 82:10 85:13,22
  91:13 92:5 97:3,4
  99:22 100:1,6 101:4
  101:5
policies 42:22
policy 42:21 46:19
  74:21 75:13,14,16,19
  75:21,22,23 83:8
  91:6
political 51:22
politics 85:17,19
porch 87:8
position 13:10 75:19
  89:16 95:4 98:16
Positive 18:14 25:3
  28:17 53:14 78:3
  97:6
possession 15:10,14
Possibly 55:17
Post 2:6
prescription 91:4 93:4
present 9:7 34:4 46:8
  46:10 47:20 49:8
  59:11 63:7
press 69:2,4
pretty 73:20 100:8
prevent 75:7 76:3
Price 19:13 26:10
Price's 18:1
printed 103:7
prior 35:3 45:8 49:15
  49:15 75:8 79:20
  84:6 91:18,19 94:6
prison 57:23
private 80:20
privy 22:9
probable 30:16
probably 58:19 82:12
  82:16
problem 41:20
problems 97:18,19
procedure 3:21 43:7
process 3:5 38:8,19,22
  40:7 42:2,11 52:23
  53:11,12,18,23 54:3
  54:18 56:19 74:22

75:9,15 89:20
Products 11:20 12:14
  13:4
profession 72:6
Professional 1:16 3:21
  102:11 103:19
promoted 16:1
property 7:7 30:10,12
  65:22,23 66:14,23
  67:12,18 68:8 70:8
  81:22 82:9 83:5
protect 62:10
provided 4:8,14
psychiatrist 63:5
psychologist 63:4
public 65:11 66:13,20
  69:18 83:13
published 65:11
pulled 57:15,16
pulling 15:18
purpose 4:7
pursuant 1:15 3:21
put 16:18 17:6 18:12
  21:23 30:5 31:11,20
  32:3 41:10,18 46:14
  57:17 79:5
putting 17:16 53:20

**Q**
question 4:4 5:21 21:14
  29:21 42:3,4,4 53:7
  64:21 66:18 67:1
  84:11
questions 4:3 5:14,15
  7:9,11 41:16 62:13
  62:17 72:9,11,13,22
  73:3 81:8 92:19,20
quick 74:3
quite 58:15 61:6

**R**
R 3:7
raised 92:19 97:22
raising 74:9
ran 19:8 98:12
Randall 2:9
Randy 5:10 35:20
  47:11 72:17
rank 13:13
rate 60:9 61:9
Ray 19:19
Ray's 17:23
re 3:7
read 65:5 82:22
reading 35:21,22
  103:10
reality 56:15
really 87:11
reason 35:7 57:4 69:19
  74:1 81:13,17 82:7

84:4,14,18 98:2,14
recall 85:20 87:23 88:3
receive 13:18 44:5
received 95:17
recess 78:14
reckon 101:8
recommend 39:17 42:7
  42:17
recommendation 3:8
  33:15 37:18 39:4,5
  39:11,12,14 40:1,4
  40:17 44:17
recommendations
  38:18 39:22
recommended 41:4,11
  41:18 44:21 82:8
recommends 39:15
record 5:8 25:13 64:8
  96:13
records 55:22 62:4,21
  76:1
recuse 54:14,20 56:6,7
  56:21 57:5
recused 55:23
referring 80:11
regarding 45:12 51:3
  52:22 55:3
regardless 4:14
Registered 1:16 3:23
  102:11 103:18
regular 65:15 91:5
regularly 48:17
regularly-scheduled
  49:8 66:3
regulations 47:1
relation 31:12
relationship 73:9
relying 54:2
remarried 19:23
remember 6:7 13:20
  14:23 15:3 18:5
  26:20 27:20 31:9
  32:17 33:6,8 47:17
  47:18 50:22 60:18,22
  61:5 77:8 84:7,9 97:1
removed 56:13,14
Repeat 67:1
rephrase 5:18 81:17
report 69:14
reported 102:13
reporter 1:16 3:23
  47:20 102:12 103:19
REPORTER'S 102:8
reports 44:4
represent 5:10
representing 3:19 4:10
  8:16
reputation 70:2
requested 70:6
required 89:23

reserved 4:5
residence 58:10
response 18:14 21:5
  25:3 28:18 53:14
  71:3 78:3 87:13 97:6
responsibility 63:3
rest 17:11 50:15
restriction 10:16
result 63:20
results 103:14
retire 76:10
retired 15:1 78:8
retirement 73:12 76:16
  77:9 91:22 93:22
reviewed 50:17
revoked 10:20
re-ask 5:18
ribs 8:21
Ricky 18:1 19:13 26:10
right 8:18,19 9:1 11:23
  12:21 14:17 19:18
  24:1 25:19,20,23
  26:2,13 29:5 32:12
  33:2 34:16,18 36:21
  37:21 40:7 41:2
  43:10,15 48:14,21
  55:2,5 56:14 71:18
  80:1,15,18 96:14
  97:22 98:11 102:1
ringing 97:9
rode 15:15 21:5
roll 55:7
room 73:16,22 87:10
rooms 73:16
Roquemore's 59:23
  60:1 87:17 88:1,22
Rules 3:21
ruling 4:5
Rumor 24:2,3 69:6
  78:22,23 79:8
run 68:17,17 77:18
runs 23:20

**S**
Safe 59:23 87:18
safes 87:22
safety 87:21
SAITH 102:5
salary 60:11 86:9
same 4:15 25:22 37:14
  71:9 73:16,22 86:19
  103:11
saw 16:14 17:1,16
  20:12 83:15
saying 38:10,11,12
  39:2,10,18,19,19
  40:19 42:15,16 53:12
  53:22 62:19 64:19
  93:18 96:17
says 20:8,10 25:10 35:8

39:6 41:6 43:2,6 50:8
  55:7 67:16 74:20
**scatter** 17:14
**scheduled** 31:15 48:18
**school** 11:4,9,11
**schools** 11:10
**Scott** 2:10
**search** 30:14,17
**second** 43:6
**secretary** 99:21
**security** 9:20
**see** 8:13 10:9 13:21
  14:7 15:5 16:10
  17:17,18,23 20:4,5
  25:16 31:14 38:10
  41:8 42:15 63:7
  78:11 84:5 94:9
  95:17
**seek** 73:13 86:20
**seemed** 97:11
**Seems** 71:4
**seen** 41:3 47:1 50:5,7
  50:19 63:19 85:15
  95:12
**sent** 11:10 64:17 69:12
**separate** 44:9
**series** 5:14 7:9 81:8
**service** 37:23 44:2
**session** 50:10
**set** 103:10
**setting** 44:13
**seven** 15:5 85:14
**several** 16:18,23 17:5
  30:23 87:16 94:15
  97:3 100:11
**Shakes** 49:19 92:14
**sheriff** 70:9 71:8,9,16
**sheriff's** 11:18 12:10
  70:22 71:7,15
**Shirley** 99:20
**shook** 33:18
**short** 74:3 87:6,6
**shot** 89:19
**show** 23:20 36:5 37:8,9
  43:20,21 85:2,5,6
**showing** 37:14 44:2,20
**shown** 65:16 95:12
**shows** 34:14
**shut** 101:13,21
**side** 49:20,20 92:15,15
**signature** 4:18
**signed** 36:10
**significance** 37:7
**signing** 103:10
**similar** 99:4
**since** 11:22 59:20 60:21
  73:19 77:17 85:9
  88:22
**single** 97:20 98:3
**singled** 86:2,4

**sir** 5:8,20,23 6:2,4,11
  6:18,21 7:3,6,8,14,21
  8:1,5,7,9,11 9:6,7,12
  9:23 10:4,8,18,21,23
  11:8 12:3,8,15,19
  13:12,15,19 15:12
  18:4,8 19:2,5 22:16
  22:22 24:9,15 25:5
  25:23 28:5 29:8,12
  29:20 31:20 32:10
  33:1,22 34:18 37:16
  39:9 43:13 44:19
  45:13,20 46:7,9,11
  48:1,6 49:2,10 50:7
  51:1,5,18,23 52:3,6
  52:10,19 53:4,16
  54:1,19 55:5,6 56:15
  56:23 57:8,13,17
  59:6,8,14,23 63:11
  63:13,15,21 64:1,12
  64:15,20,20 65:10,13
  65:20 66:1,17 67:8
  67:14,23 68:4 69:3,8
  70:15,21,23 73:14,17
  73:23 74:5,13 75:10
  76:13,15 77:2,7,17
  78:1,5,18 79:12,21
  80:9 81:3,12 82:1,15
  83:11,11,14,19 85:7
  86:1,3,21 87:15,19
  88:2,5,13,15,21 89:2
  89:9,12,15,22 90:1,9
  90:12,15,17,17,20
  91:7,10,14 92:3,11
  93:8 95:1,3,14 96:4
  100:20 101:12,15,17
  102:2
**sitting** 26:17 57:7
  77:14
**situation** 32:19 56:13
  71:20 78:23 93:9
**six** 45:16
**sleep** 73:15
**slot** 94:16
**Smith** 14:7,22 15:1
**social** 9:20 87:11
**some** 11:13 14:20
  15:10 16:14,16 20:9
  20:18 21:21 31:10
  35:22 37:6 51:22
  58:15 61:6,13 77:4
  77:10,12 80:20 91:8
  92:18 93:22
**somebody** 14:14 16:1
  25:10 55:19 56:1
  62:6 99:2
**somehow** 83:12 97:12
**someone** 90:13,15
  101:3
**something** 28:6,8 33:11

35:15 50:8 59:9
  60:10 73:18 95:13
  100:17,23
**sometime** 27:9,15
**somewhere** 28:4 49:1
  78:7 93:12
**sons** 74:7
**sorry** 12:16 25:7 37:9
  45:21 56:8 64:21
**sought** 87:3
**sound** 34:16
**Sounds** 34:18
**South** 1:19 2:5
**Southwest** 9:8
**speak** 5:3 102:16
**speaking** 32:18 88:11
**special** 50:10
**special-called** 45:5
**specifically** 65:6
**speculate** 56:16
**speeding** 8:1,4
**spend** 87:7,9
**spending** 86:22
**spoke** 79:9,11
**spoken** 35:4,9
**Stacking** 89:6
**stands** 56:9
**start** 82:22 101:5
**started** 11:14,17 12:1
  16:5 72:1 85:9
  100:12
**state** 1:17 4:1 5:7 47:1
  102:9,12 103:19
**stated** 35:12
**statement** 28:23 29:1,6
  32:22 56:20 75:12
**statements** 28:1,11,15
  69:14 80:4,11,13
**STATES** 1:1
**Statute** 4:8,14
**stay** 14:2 73:21
**Steadier** 60:3
**stealing** 88:8
**stemmed** 81:20
**stems** 15:9
**step** 60:19
**still** 23:4 43:15 55:14
  56:11 60:11 90:16
  101:16
**stipulated** 3:18 4:9,16
**stipulation** 1:15 3:17
**stole** 70:8
**stolen** 65:19 66:23 83:6
  83:9
**stood** 41:5
**stop** 5:17
**story** 46:13
**straightened** 70:12
**Strained** 8:23
**street** 2:10 17:3 65:8

68:17 72:3 84:3,14
  95:11 101:7
**stress** 63:6
**stuff** 11:2 20:9,18 23:3
  76:3
**sued** 6:12,17,19 7:7
  64:23 75:2
**suggestion** 92:1
**Sunday** 24:19
**sunshine** 48:20
**support** 31:4 52:9
**supported** 57:3 98:11
**supposed** 20:8,17 23:3
  26:10 38:17 94:16
**sure** 11:23 14:20 26:23
  27:8,19,21 28:1
  31:15 32:11 33:7
  35:6,19 49:1 63:18
  66:4 68:9 77:6 94:20
  94:21 96:4
**suspended** 10:19
**swing** 19:16
**swore** 16:11,12 97:22
**sworn** 5:3 102:16

---

**T**

T 2:9
**table** 26:9,14
**take** 5:13 18:12 19:7
  21:15 46:10 50:13
  78:10 89:23
**taken** 1:15 3:20,22 20:9
  20:18 23:3 28:15
  50:11 55:2 63:14
  78:14 80:14,21
**taking** 18:16 19:1 21:3
  23:12 24:6 25:8 26:5
  63:16 77:1
**talk** 24:23 25:2,18,19
  46:18 69:4 70:17,19
  71:7,11 85:6 91:21
  92:3 94:7,18,22 95:2
**talked** 18:9 21:2 32:13
  66:14 68:22 69:1
  70:15,18 71:9,16
  73:5 79:20 84:7 85:7
  94:9,12,14 98:7
**talking** 20:10,23 22:17
  23:21 28:14,20 29:1
  31:6 32:15 58:11,12
  66:16 67:2,4,15
  68:18,22
**talks** 83:20
**taxes** 76:20,21,22 77:3
  77:11
**Teddy** 24:10,11 25:16
  29:7 32:21
**tell** 5:17 15:13 24:8
  25:17 26:2,6 33:4,12
  44:16 45:14 46:5

65:7,21 70:10 82:4,7
  96:21 101:13
**telling** 23:5 44:16
  46:12 52:21 73:15
  ten 10:15 43:8 76:23
**term** 67:18 83:9
**terminate** 37:18 41:23
**terminated** 36:23 38:7
  38:13 39:6,8,16 40:9
  40:14,18,20 42:8,13
  42:18 43:3 53:1,3,21
  67:16 79:17 83:1
  84:19 86:6,8,14 94:5
  95:20 96:22
**termination** 13:7 15:8
  33:15 40:5 41:11,19
  44:21 55:3 75:8,22
  79:15 81:14 82:3,8
  82:13 84:4,15 85:22
  91:19
**Terrell** 60:21 61:2
**Tessa** 16:21,22
**test** 90:1,2
**testified** 5:4
**testimony** 46:14
**Thank** 80:9 81:3 99:17
  102:1
**theft** 63:3 65:22,23
  66:14 67:12,17 68:8
  81:22 82:9 84:20
  90:6 91:15 93:14
**their** 28:20 55:19 61:18
  62:20 74:8 75:6,16
**themselves** 62:9
**thereof** 103:14
**thief** 53:5 65:3,4,9
**thing** 20:20 23:7 24:16
  24:17 33:2 37:14
  73:5 78:15 79:17,22
  95:7
**things** 11:11,13 58:11
  81:10 87:14 92:17
**think** 6:5 7:15 9:2
  14:19 16:8 18:8 24:1
  25:12 27:6,11,16
  28:19 32:20 35:10
  37:11 41:13,22 45:16
  45:23 48:17 51:21
  54:8 62:19 77:2,10
  80:10 82:11,20 94:14
  96:4,6 97:7 98:3
  99:10,11,16 100:16
  100:21 101:9
**thinking** 30:1,4 93:16
**though** 18:7 31:5 40:11
  42:23 61:19
**thought** 48:10,12 77:18
  78:19
**thousand** 77:10,12
**threat** 68:2

Deposition of Wendell Dean Van Meter

threatening 83:23
three 13:5,5 34:11,23
  55:14 56:12 75:2
  76:14 78:2 82:20
  100:14 101:7
through 15:5,15,21
  16:6 20:3,13,15
  30:15 53:8 61:13
  62:8 78:13 80:8 81:8
  89:20
throw 76:5
throwed 16:8
throwing 15:17,19,22
  16:17 17:9,21 18:11
  21:12,18 22:6 27:12
  30:11,13
ticked 22:15
ticket 8:1,4
Tifton 31:1 51:12
time 4:5,5 8:13 19:21
  20:22 25:10 46:11
  48:3 54:7,10 57:20
  58:15 59:11 60:9
  61:7 64:11 71:10
  73:10 79:1,2 84:12
  84:12 86:19 87:7,9
  97:22
timeline 27:14
times 78:22 79:5 96:1,3
today 6:1 15:7 46:6
together 73:11
told 11:14 15:22 18:18
  18:19 24:5,9,11,14
  26:4,7,16 30:23 31:8
  31:10 33:14,16 34:9
  34:9,19 35:8 40:20
  46:3,4,6 51:7 52:7,11
  53:18 58:4 59:3
  62:12 65:7 67:10
  70:11 78:21 82:3,5
  84:8,10 95:14,15
  98:14,17 101:21
tomorrow 26:15
Tony 55:8
top 10:9 100:12,15
topped 60:20,20 61:6
torn 21:19
total 77:20,22,23
touch 70:13
toward 19:14,20 58:17
  87:5
towards 55:1 57:2 58:6
  59:7
Tracy 31:1 51:11
trailers 10:12
transcript 47:12 80:7
  103:8
transfer 94:17
trash 30:15 76:6
treated 63:4,22 64:10

64:13 93:13
trial 4:12
tried 19:19 86:15 92:3
triple 10:12
troublemaker 81:19
  82:4,6 98:6 101:8
truck 11:1 16:18 17:6
  21:6 26:8
trucks 10:22
true 103:8
truth 5:3,3,4 102:16,17
  102:17
try 34:20 93:22 95:4
trying 27:13 47:18
  51:21 54:8 84:9
  94:14,17
Tuesday 96:6
turn 29:22 98:23
turned 27:17 70:5
TV 23:18,20 68:22
two 13:5 14:10 33:10
  33:10 44:6 47:22,22
  47:23 50:14,16 51:6
  52:11 55:14 56:12
  58:11 74:7 86:17,18
type 76:17
typed 47:10

U

uh-huh 18:14 25:3,10
  28:17 53:14 78:3
  97:6
Uh-huhs 25:6
unauthorized 75:8
unbecoming 65:23
  82:9
uncomfortable 88:17
  93:11
under 13:21 42:20,21
  50:11 85:11,21 90:4
  98:22
undercover 11:1
underlined 37:6
understand 5:16,19
  15:9 25:14 40:19
  52:21 53:2 59:1 61:1
  61:16 71:22 73:1
understood 5:22 18:15
  18:21 96:17
unfounded 67:17
unit 12:22
UNITED 1:1
Unless 55:19
Unlocking 87:21
until 11:18 12:7,13
  13:7 38:21
uphold 37:17
upset 30:21 74:2
use 38:20,21,21
used 4:7,13 83:9

using 58:9 67:18
U.S 103:2

V

Valley 19:10 70:13,14
  70:20 71:1,11 79:5
  96:1,2
Van 1:5,5,14 2:18 3:4
  3:20 5:1,9 9:15 36:1
  42:7,18 43:2 50:12
  82:23 102:15,19,19
VanMeter 3:6
vehicle 6:23 7:3
vehicles 10:10 87:21
Verbal 7:19
very 64:22
violation 56:19 83:7
vision 93:5
vote 46:10 48:9 49:13
  49:15,16 50:13,14
  55:2,4,7,15,19 56:11
  56:12 69:20 91:20
voted 49:12 56:1,10
  66:9,20 67:6,7,8 75:3
  96:8
Vs 1:7 102:22

W

Waited 33:4
waiting 26:18
waived 4:12,19 103:11
waiving 4:15
walk 14:10 101:3
walked 26:19 33:18
want 26:15 32:11 61:13
  62:10,15 76:6 98:22
wanted 26:1 32:21
  33:17 78:19 90:3
  98:18
warrants 30:14,17
wasn't 8:15 21:11 23:9
  31:2 51:8 58:1,2
Water 74:15
way 8:3 42:16 65:12
  71:9
WEBSTER 2:9
Wednesday 34:15 36:2
week 19:12 20:7 25:9
  32:20 49:5,7 60:6,15
  60:16,17
weeks 33:10,10
well 7:16 8:2,14 12:22
  15:7 16:3,14,15 19:8
  19:12 20:4,6 22:3,5
  23:9 26:7,17,21
  27:22 32:15 38:7,9
  39:2,7 40:8,10,15
  41:4,23 42:3 47:18
  48:10 54:5,8 55:14
  55:18,21 56:9,16

58:22 62:4 65:6
  66:18 67:16 68:1
  69:1 72:18 73:21
  77:17 80:22 81:2
  82:5 84:11 86:9 88:7
  88:10 92:5 93:2
  95:14 97:2 99:3
  100:7,8
Wendell 1:5,14 2:18
  3:4,20 5:1,9 42:7,17
  43:2 82:23 102:15,19
went 11:17,20 12:9
  13:2 32:23 57:22
  86:11 87:16,17
were 7:1,18,20 8:12,17
  9:4 12:4,6 13:1,4,8
  13:16,17,20 15:17,20
  17:7,8 18:7,10,11,15
  18:16 20:8 21:1,17
  23:2 27:12 28:15
  29:17 30:20 31:5,10
  32:3,14 33:8 38:13
  43:15 44:22 49:8
  50:12,14 52:21 53:12
  53:20 57:1,16 60:11
  60:11,18 61:6 62:5
  64:10 65:2,4,8,17,17
  65:20,21 67:21 68:7
  75:6 76:8,14 78:6,6
  78:16 79:8 80:13,14
  81:17 82:4 84:18,19
  84:23 85:4 86:2,6,8
  86:13,22 87:1,20
  90:3,11,13,22 91:12
  94:4 95:4,10,20
  96:17 98:9
weren't 92:7,10
We'll 22:14 56:4
we're 6:20 58:11 77:14
  96:12
we've 36:5,7 79:13,20
Whaley 60:21
while 13:16 17:7 63:17
WHITE 2:9
whole 5:3 46:8 60:15
  102:17
wife 5:12 9:13 73:9
  74:12 87:5 91:3
wife's 9:14 73:7 92:23
William 1:18 2:4 46:22
wished 36:19
withdrawal 77:5
withheld 55:15
witness 4:17,18 5:2 9:6
  14:16 23:23 28:17
  29:16 31:22 47:9
  48:8,10 54:12 72:14
  72:18 80:15,23 81:4
  103:9
wonder 16:3,15

woodyard 89:4
work 11:18 21:6 59:16
  60:14,16 70:4 78:7
  87:17 89:4 92:2 99:3
workday 31:15
worked 11:15 12:13,22
  17:2,3 31:16 59:17
  59:19 85:11 101:4
working 35:1 43:8
  59:22 85:21 87:23
  98:18 99:8
works 19:9
worth 72:7
wouldn't 22:9 35:11
  38:5 54:15 56:5,21
  92:6 98:1
wreck 9:4
wrecked 6:23 14:8
write 28:22 89:10
written 74:21 75:13,14
  75:19,21
wrong 12:20 38:12
  52:20 75:12
wrote 28:4

Y

Yarbrough 35:9 55:10
  94:9
yea 55:9,10,11,12
  56:11 75:4
yeah 23:17 49:6 50:16
  51:16 54:12 68:14
year 11:5 77:13 78:2
years 6:8 9:11,17 10:15
  11:16 13:5,6,23
  16:23 22:21,22 30:15
  53:6 57:6 60:23
  71:23 72:2 74:11
  76:9,11,12,14 77:16
  77:19,20,21,22 78:2
  85:18,20 97:21
  100:14 101:7
yeas 50:15
young 88:6
y'all 9:16 50:19 73:13
  73:15,21 80:6 85:5
  87:11

$

$12 100:16
$140 90:23
$17 60:10
$20 90:22

0

05 37:20

1

1 3:3 36:3,6 82:12
10th 9:19

Deposition of Wendell Dean Van Meter

December 8, 2006

Page 9

**101** 2:20
**102** 103:7
**11** 100:16
**1175** 2:6
**12** 10:15 100:16
**12/14/05** 3:10
**12/19/05** 3:9
**12/2/05** 3:6
**12/7/05** 3:3,5
**130** 90:23
**14th** 45:4,8,15 50:10
**16** 60:10
**17** 60:10
**1735** 9:8
**18** 13:23
**19th** 50:4 69:20 96:10
  96:15 103:15
**1956** 9:19
**1978** 11:17,23
**1980** 12:7 71:10
**1982** 12:12
**1988** 13:7 77:21

——————— **2** ———————

**2** 3:5 37:3,9 43:1,23
  44:6 53:19 56:20
  75:10 82:15 95:10
**2nd** 35:17 69:12
**2005** 1:19 2:5 29:19
  34:16 36:2 45:15
**2006** 1:20 103:6,15
**22** 72:1
**24** 74:9
**24-hour** 34:21
**25** 97:21
**27** 6:7 11:16 71:22 76:9
  77:15
**27-year** 53:4

——————— **3** ———————

**3** 3:6 43:18,22
**3:06-CV-583-DRB** 1:8
  103:5
**30** 14:11 76:11,12
  77:12,19,20,21,22
**31** 74:9
**32** 9:11,17
**35th** 9:8
**36** 3:3 60:16
**36863** 2:6 9:9
**37** 3:5
**3944129** 10:5

——————— **4** ———————

**4** 3:9 50:1,2,18 65:16
  67:3 96:12
**40** 60:7 77:10
**418** 2:10
**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** 9:21
**43** 3:6

**48** 60:16

——————— **5** ———————

**5** 2:18
**5:30** 45:18,19
**50** 3:9 53:6 72:2
**50-year-old** 72:3
**55-gallon** 15:19

——————— **6** ———————

**6:30** 48:3

——————— **7** ———————

**7** 36:2
**7th** 34:15 35:3 36:10
  37:20 44:23 45:3,9
**7:30** 48:3
**73** 11:6
**78** 16:11 85:10

——————— **8** ———————

**8** 1:20 103:6
**8th** 31:18,19 32:8
  95:17 96:20
**8.50** 60:5
**8:30** 26:18
**8:50** 1:21
**80** 11:17 12:9 15:1
**81** 2:19
**82** 11:19 12:9 13:1
**84** 15:2
**85** 11:20 12:13 13:1
**88** 11:21 13:6 77:17
  85:9

——————— **9** ———————

**92** 2:19
**99** 2:20